**Michael Charles SATCHER, Petitioner,**

v.

**J.D. NETHERLAND, Warden,
Respondent.**

**Civil Action No. 3:95cv261.**

United States District Court,
E.D. Virginia,
Richmond Division.

Oct. 8, 1996.

John L. Hardiman, New York City, Lee Ann Anderson McCall, Greenville, SC, and Steven D. Benjamin and Betty Layne Des Portes, Steven D. Benjamin and Associates, Richmond, VA, for Petitioner.

Katherine P. Baldwin, Office of the Attorney General, Richmond, VA, for Respondent.

## MEMORANDUM OPINION

PAYNE, District Judge.

Michael Charles Satcher, having been convicted in the Circuit Court of Arlington County of capital murder, is held under penalty of death at the Mecklenburg Correctional Center in Boydton, Virginia. Pursuant to 28 U.S.C. § 2254, Satcher filed a Petition for a Writ of Habeas Corpus and an Amended and Restated Petition for a Writ of Habeas Corpus. The Respondent thereafter filed a Motion to Dismiss the Petition. The motion has been briefed and argued. There has been substantial supplemental briefing as a result of issues raised during oral argument, legislative amendments to the controlling statutes, and judicial response to that legislation.

## STATEMENT OF FACTS

At approximately 7:00 p.m. on March 31, 1990, Deborah Abel was riding her bicycle in the Rosslyn section of Arlington County on a bicycle path which runs roughly parallel to the Lee Highway and near the Air Force Association building. This section of the bicycle path is hidden from the view of motorists by a sound barrier wall approximately fifteen to twenty feet high. Abel had just passed the Air Force Association building when she noticed a man walking toward her. As they passed, they made eye contact. A few seconds thereafter, Abel was jumped from behind, pulled off her bicycle and dragged into a ditch alongside the bicycle path. The assailant beat Abel in the face and head and pulled her pants part way down. One of the attacker's early blows dislodged Abel's glasses, and thereafter he forcibly kept her head turned toward the ground.

Suddenly, the attacker stopped beating Abel, picked up her purse, and ran because, we know now, Mark Polemani, another cyclist, happened upon the scene as he was on his way to a banquet at Georgetown University which was to begin at 7:30 p.m. Polema-ni saw Abel's bicycle lying askew off the path and noticed a man, kneeling alongside the path, "throw a punch to the ground." This prompted Polemani to get off of his bicycle to investigate. As Polemani approached, the assailant stopped the attack, picked up Abel's purse and fled. Polemani pursued the attacker up the path, to the top of the street, but the assailant escaped. As Polemani returned to the scene, he noticed Abel, who was covered with blood and partially disrobed, emerge from the ditch. Polemani helped Abel to a nearby apartment complex where they called the police.

As a result of Polemani's report, a police officer arrived on the scene at 7:27 p.m. Shortly thereafter, several other officers arrived and, approximately one hour after the attack (8:00 p.m. or shortly thereafter), a tracking dog was brought to the area. The search of the area lasted for about an hour.

At 8:00 p.m. that same evening, Ann Borghesani was expected to arrive at her birthday party in the Crystal City area of Arlington County. Susan Cohen, Borghesani's roommate, was the last person to see Borghesani alive. According to Cohen, when, at approximately 7:10 p.m., she left the apartment which she and Borghesani shared to go to dinner with her fiance, Borghesani was ironing the clothes that she was to wear to her birthday party. It is a walk of about five minutes time from Borghesani's apartment to the Rosslyn Metro station where she would have taken a train to Crystal City. The record does not disclose Borghesani's expected route, but the most direct route to the Metro Station is along the bicycle path on which Abel was attacked. The Air Force Association building, adjacent to the bicycle path, is located between Borghesani's apartment and the Metro station.

When Borghesani failed to appear at the party, her friends became concerned because she was typically prompt; and they would have expected her to have informed them if she was running late. After alerting the authorities, several of Borghesani's friends began to search for her, looking, among other places, at her apartment and along the

bicycle path between the apartment and the Rosslyn Metro station.

The efforts of her friends were unsuccessful, but Borghesani's body was found shortly after 8:00 a.m. the next morning (April 1, 1990) at the bottom of a stairwell in the Air Force Association building which is located on the north side of the bicycle path and not far from the site of the attack on Abel. Borghesani was nude from the waist down, had been raped, stabbed 21 times with a sharp-tipped object, and robbed of her jewelry and purse. The record contains no evidence of the time at which Borghesani died.

One of Borghesani's shoes was found on the bicycle path between the stairwell and the intersection of Oak Street and Lee Highway by an individual who earlier that morning had placed it on a brick wall bordering the path. Borghesani's purse was found a few days later near Abel's purse in some bushes next to a parking lot which is located across the highway approximately two blocks away from the Air Force Association building. Neither purse contained any money.

Five months after the Abel attack and Borghesani's murder, Satcher was arrested for offenses committed on the Washington and Old Dominion Bike Trail, also located in Arlington County, but not the same bike trail on which the Abel attack had occurred and near which Borghesani's body was discovered. The background of Satcher's arrest bears some discussion.

At about 9:30 a.m. on August 18, 1990, Joanna Chusid was walking along the Washington and Old Dominion Bike Trail when she was grabbed from behind and forced into the woods by a black man wielding a Swiss army knife. The attack was terminated when Chusid involuntarily urinated.

Approximately two hours later, at 11:30 a.m., Regina Overholt was grabbed from behind by a black man as she walked along a bicycle path, approximately 30 yards from, but parallel to, the path on which Chusid had been assaulted. Overholt's assailant used a knife with a four-inch blade to force her off the path. The attack was interrupted when two people responded to Overholt's cries for help. After the attacker fled, Overholt and her rescuers, while looking for a telephone to report the attack, came upon Joyce Bern who recounted that she had just been "about knocked ... down" by a black man wearing an off-white shirt with faded red writing, red jogging pants, and "a black fanny pack." This description matched that given by Overholt and her rescuers.

At noon, approximately one-half hour after the attack on Overholt, Alice Rooney was jogging on the same bicycle path, about a mile from the other attacks. As Rooney crossed a footbridge, a black man gave chase. A motorcycle police officer, who previously had been alerted to the description of Overholt's assailant, observed the man running close behind Rooney, and realized that he matched the description of the suspect in the Overholt attack. The officer stopped the man who was running behind Rooney and identified him as Satcher. Another officer arrived at the scene, queried Satcher about what was in his hand and, when Satcher did not respond, the officer reached for the item in Satcher's hand. Satcher dropped the item and the officer identified it to be a white T-shirt with red letters wrapped around an open knife. Satcher then was arrested and Bern, who was brought to the scene, (about a ten minute walk from her condominium) identified Satcher as the person who almost knocked her down shortly after the thwarted attack on Overholt.

After Satcher was arrested, the police found an awl in the glove compartment of his car. Satcher acknowledged that he had owned the awl when Abel was attacked and Borghesani was murdered. The awl was not identified as the murder weapon, but in the medical examiner's opinion, the awl was "consistent with [Borghesani's] wounds." Even though nothing was said to Satcher about the Abel or Borghesani offenses upon the event of his arrest for the Overholt attack, Satcher, as he was being transported to police headquarters, responded to a police officer's question: "What's up?" with the statement that the police were "trying to frame [him] for a murder or something or a rape or something." *Satcher v. Commonwealth,* 244 Va. 220, 421 S.E.2d 821, 825 (1992).

Following the arrest, Satcher voluntarily gave blood, saliva, and hair samples. The serological analysis showed that Satcher is within a group comprised of seven percent of the national population who could have produced the semen found on Borghesani's pants.[1] Scientific testing by a forensics expert of the hair confirmed that pubic hairs found on Borghesani's clothing were neither Satcher's nor Borghesani's. However, DNA testing established a match between Satcher and the DNA recovered from the vaginal swabs taken from Borghesani's clothing.

Immediately after the attack on Abel in March 1990, Abel gave a description of her assailant as a black male who was 25 to 30 years of age, stood approximately 5'9" to 5'10" in height, and weighed 190 to 200 pounds. He reportedly had no visible facial hair or scars and wore a short Afro haircut. Polemani was likewise asked to give a description of the attacker the day after the attack. His description of Abel's assailant was virtually identical to that given by Abel.

At the time of his arrest in August 1990, Satcher was 21 years old, weighed 152 pounds, was 5'6", wore his hair short, and had a facial scar. Hence, the descriptions given by Abel and Polemani most proximate to the attack were substantially dissimilar to Satcher's appearance in August, just over four months later. There is nothing in the record to suggest that Satcher's appearance in August was different than it was in March.

On November 19, 1990, Satcher was indicted for the murder, rape, and robbery of Borghesani. On April 15, 1991, only three months before the commencement of trial, Satcher was indicted for the attack on, and robbery of, Abel.

Fifteen days before trial, Abel viewed a lineup in which Satcher participated. Before viewing the lineup, Abel viewed the police sketch based on the description she had given immediately after the attack on her in March. Thereafter, at the lineup, Abel iden-

tified someone other than Satcher; but, immediately after the lineup, Abel stated to Detective Carter that she also had a strong feeling that Satcher could have been her assailant. Polemani was unable positively to identify anyone out of that lineup. Nonetheless, Polemani testified at trial that, at the time of the lineup, he was "pretty sure" that "number four" (Satcher) was the assailant. Polemani was not asked at trial whether he could identify Satcher as Abel's assailant.

After having observed Satcher as he entered and left the courtroom in custody and as he sat at the defense table during the two-day jury selection process, Abel concluded that Satcher, the only black man at the defense table, was her assailant and so informed the prosecuting attorney. Over Satcher's objection, Abel was permitted to identify Satcher before the jury.

## PROCEDURAL HISTORY

In the first phase of a bifurcated trial conducted pursuant to Virginia Code §§ 19.2–264.3 and –264.4, a jury convicted Satcher of the robbery, assault and battery, and attempted rape of Deborah Abel, and the robbery, rape, and capital murder[2] of Ann Elizabeth Borghesani. The jury set Satcher's punishment at "imprisonment for life plus ten years and twelve months" for the offenses against Abel, and at two terms of life imprisonment for the noncapital offenses against Borghesani. In the capital sentencing phase of the trial, the jury returned the death penalty for the killing of Borghesani, based upon both statutory predicates of "future dangerousness" and "vileness."

The Circuit Court of Arlington County imposed the sentences fixed by the jury and pronounced the sentence of death on December 24, 1991. On direct appeal to the Supreme Court of Virginia, Satcher's conviction and sentence were affirmed. *Satcher v. Commonwealth*, 244 Va. 220, 421 S.E.2d 821 (1992). On February 22, 1993, the Supreme Court of the United States denied Satcher's petition for writ of certiorari. *Satcher v.*

---

**1.** Of eleven samples taken from possible suspects, Satcher and another suspect could not be eliminated as possible donors of the stain. The other donor was eliminated as a possible suspect through subsequent DNA testing.

**2.** Under Va.Code § 18.2–31(5), the "willful, deliberate, and premeditated killing of any person in the commission of, or subsequent to, rape or attempted rape, forcible sodomy or attempted forcible sodomy" constitutes capital murder.

*Virginia,* 507 U.S. 933, 113 S.Ct. 1319, 122 L.Ed.2d 705 (1993). Satcher's motion for rehearing on the petition for certiorari was denied on April 19, 1993. *Satcher v. Virginia,* 507 U.S. 1046, 113 S.Ct. 1888, 123 L.Ed.2d 504 (1993).

On November 23, 1993, Satcher, through counsel appointed at the expense of the Commonwealth, filed a habeas corpus petition in the Circuit Court of Arlington County reasserting the same arguments which he had raised on direct appeal. On February 14, 1994, the Circuit Court entered an order dismissing the petition on the basis of the rule of *Hawks v. Cox,* 211 Va. 91, 175 S.E.2d 271 (1970), which bars post-conviction relitigation on collateral attack of claims already raised and decided on direct appeal. Because of an error in the Circuit Court clerk's office, Satcher's state habeas counsel was not notified that the petition had been dismissed until April 10, 1994, after the time for filing a notice of appeal had expired. Accordingly, the Circuit Court vacated its February 14, 1994 dismissal order and, on April 12, 1994, entered a new order dismissing Satcher's petition. The stated purpose of the new order was to preserve Satcher's right to appeal the dismissal of his state habeas corpus petition. Satcher then filed a notice of appeal.

The Supreme Court of Virginia denied Satcher's petition for appeal on October 3, 1994 on the ground that the Circuit Court did not have jurisdiction to vacate its original February 14, 1994 order. This, of course, meant that Satcher's petition for appeal from the denial of his state habeas petition was untimely. The Supreme Court of the United States denied Satcher's petition for a writ of certiorari on February 27, 1995. *Satcher v. Netherland,* —— U.S. ——, 115 S.Ct. 1259, 131 L.Ed.2d 139 (1995). Subsequently, Satcher requested this court to appoint counsel to prepare and prosecute a federal habeas petition under 28 U.S.C. § 2254.

### DISCUSSION

### THE APPLICABILITY OF THE 1996 ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT

On April 24, 1996, while Satcher's petition was pending, the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("the Act"), became effective. Title I of the Act, entitled "Habeas Corpus Reform," substantially alters the substantive law governing habeas corpus petitions. Sections 101–106 of the Act modify pre-existing habeas corpus procedures contained in Chapter 153 of the Judicial Code, 28 U.S.C. §§ 2241–2255. Section 107(a) of the Act enacts a new Chapter 154, 28 U.S.C. §§ 2261–2266, which applies to petitions in capital cases.

The Respondent asserts that the Act, which amends and adds to pre-existing law governing habeas corpus review, should be applied retroactively in resolving the issues presented by Satcher's petition. Satcher argues that the law in effect at the time he filed the petition should govern. Before addressing the substance of Satcher's claims, it is, therefore, necessary to determine whether, and to what extent, the Act applies to Satcher's petition.

### I. New Chapter 154: Special Habeas Corpus Procedures In Capital Cases.

Section 107(a) of the Act, codified at Chapter 154, 28 U.S.C. §§ 2261–2266, essentially offers a system of expedited review and other "benefits" to States that qualify under either of two so-called "opt in" procedures: (1) the "post-conviction" procedure provided by Section 2261; or (2) the "unitary review" procedure provided by Section 2265. Virginia has no unitary review procedure so the issues in this action focus on the post-conviction review procedures specified in Section 2261.

Section 2261 establishes a "quid pro quo arrangement under which States are accorded stronger finality rules on federal habeas corpus review in return for strengthening the right to counsel for indigent capital defendants." H.R.Rep. No. 23, 104th Cong., 1st Sess. 10 (1995); *See* Ad Hoc Committee of the Judicial Conference on Federal Habeas Corpus in Capital Cases, 45 CRIM.L.REP. (BNA) 3239, 3240 (Sept. 27, 1989) (the "Powell Committee Report"). The quid pro quo

arrangement reflected in the "opt-in" provisions is the federal legislative acknowledgement that competent counsel throughout collateral review of state capital proceedings is "crucial to ensuring fairness and protecting the constitutional rights of capital litigants." Powell Committee Report at 3240; *See also* House Report at 8; 137 Cong.Rec. at S3220 and S3222 (March 13, 1991); *Ashmus v. Calderon*, 935 F.Supp. 1048 (N.D.Cal.1996).

The Act's substantive changes to the law governing federal habeas review in capital cases are succinctly summarized in *Hill v. Butterworth:*

> If a state opts in to the new habeas provisions, it receives several procedural benefits. First, petitions for habeas relief under Section 2254 must be filed in federal court within 180 days 'after final state court affirmance of the conviction and sentence on direct review or the expiration of the time for seeking such review.' 28 U.S.C. § 2264(a). Second, federal district courts are limited to only considering 'a claim or claims that have been raised and decided on the merits in the State courts.' 28 U.S.C. § 2264. Third, adjudication of a petition subject to Chapter 154 must be given priority by the district court and court of appeals 'over all noncapital matters.' 28 U.S.C. § 2266(a). Fourth, reviewing courts are forced to expedite their review of habeas petitions brought under the Chapter 154. District courts must render a final judgment on a habeas petition within 180 days after the petition is filed, allowing the parties at least 120 of those days to brief the case and have a hearing on the merits. A court of appeals must hear and render a final determination of an appeal within 120 days after the reply brief is filed. 28 U.S.C. § 2266. Fifth, no amendment to a habeas petition subject to Chapter 154 is permitted after the filing of the answer to the petition, except on certain grounds set forth in section 2244(b). 28 U.S.C. § 2266(b)(3)(B).

941 F.Supp. 1129, 1134–35 (N.D.Fla.1996) (footnotes and citations omitted); *see also Bennett v. Angelone*, 92 F.3d 1336, 1341–42 (4th Cir.1996).

The Fourth Circuit's analysis of the Act in *Bennett* requires that Satcher's petition be analyzed under § 107 of the Act, the provision applicable to capital petitions, *Bennett,* 92 F.3d at 1342, because that section specifically states that the Act "shall apply to cases pending on or after the date of enactment of this Act." *See* § 107(c). However, as explained by the Court of Appeals in *Bennett,* that does not end the inquiry "as to what effect the new provisions set up by § 107(a) will have on this petition." *Id.*

> Although, as discussed above, § 107 does give greater finality to state courts' resolution of issues later raised in federal petitions, it does so *only if the state has established procedures to ensure the appointment of qualified counsel to represent indigent petitioners in state post-conviction proceedings.*

*Id.* (citations omitted) (emphasis added). Thus, whether § 107(a) (new Chapter 154) applies to Satcher's petition turns on whether Virginia has established the requisite procedures under the "opt-in" provisions of the Act.

### A. "Opt-in" Requirements.

Although the new capital review provisions of Chapter 154 "shall apply to all cases pending on or after the date of enactment," the Act expressly makes those provisions applicable *only if* a state formally establishes:

> by statute, rule of its court of last resort, or by another agency authorized by State law, a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings ... The rule of court or statute must provide standards of competency for the appointment of such counsel.

28 U.S.C. § 2261(b). The statute further requires:

> *[a]ny mechanism* for the appointment, compensation, and reimbursement of counsel as provided [above] *must offer counsel to all State prisoners* under capital sentence *and must provide* for the *entry of an order by a court* of record—
>
> (1) appointing one or more counsels to represent the prisoner upon a finding

that the prisoner is indigent and accepted the offer or is unable competently to decide whether to accept or reject the offer;

(2) finding, after a hearing if necessary, that the prisoner rejected the offer of counsel and made the decision with an understanding of its legal consequences; or

(3) denying the appointment of counsel upon a finding that the prisoner is not indigent.

28 U.S.C. § 2261(c) (emphasis added). The plain language of the Act, therefore, makes the new Chapter 154 provisions apply only upon satisfaction of *all* of the criteria set forth in subsections (b) and (c) of new Section 2261. 28 U.S.C. § 2261(a) ("[This chapter] shall apply only if *the provisions* of subsections (b) and (c) are satisfied") (emphasis added); *See Hill v. Butterworth,* 941 F.Supp. 1129, 1140–41 (N.D.Fla.1996) ("[I]f Florida may take advantage of Chapter 154 of the Act, it may only do so if it meets *all the requirements for "post-conviction" procedures....* Failure to meet *any one* of these requirements would prevent a state from having qualifying 'post-conviction procedures'") (emphasis added); *Ashmus v. Calderon,* 935 F.Supp. at 1069 (interpreting parallel section § 2265 of the Act, which incorporates § 2261, to require that, "[f]ailure to comply with *any of these mandatory requirements* is fatal to a state's ability to opt-in under [the Act]") (emphasis added).

## B. Has Virginia Satisfied The "Opt-in" Requirements?

As the Fourth Circuit recognized in *Bennett,* "[s]ince July 1, 1992, Virginia has re-

quired appointment of competent counsel to represent indigent petitioners in its post-conviction proceedings." *Bennett v. Angelone,* 92 F.3d at 1342 (*citing* Va.Code §§ 19.2–163.7, –163.8 (Michie Supp.1995); Virginia Public Defender Commission, Standards for the Qualifications of Appointed Counsel in Capital Cases (1992)). In *Bennett,* the Court of Appeals did not decide whether Virginia's post-conviction appointment provisions qualified it as an "opt-in" state under the Act, because the system was set-up "after [the petitioner's] Virginia habeas petition had been finally denied by the Virginia Supreme Court." *Id.*[3] Here, however, Satcher's state habeas petition was originally filed and ultimately denied by the Supreme Court of Virginia *after* Virginia's 1992 post-conviction system was in place.[4] Thus, here it is necessary to decide the issue whether Virginia qualifies as an "opt-in" state under § 2261(a) of the Act.

▮ Under the Fourth Circuit's analysis in *Bennett,* it is necessary to assess the adequacy of the Virginia system as it stood on the date that Satcher's petition was "finally denied by the Virginia Supreme Court." *Id.* In Satcher's case, that occurred on October 3, 1994.[5] The Virginia post-conviction counsel appointment scheme, codified in Va. Code §§ 19.2–163.7, –163.8, was established on July 1, 1992 and remained unchanged until July 1, 1995, when certain amendments were added. Because the July 1, 1995 amendments were effected *after* Satcher's petition was "finally denied," these amendments need not be taken into account in the assessment of the Virginia system under the "opt-in" provisions of the Act. *See Bennett v. Angelone,* 92 F.3d at 1342.[6]

---

**3.** The Fourth Circuit also declined to decide the issue in both an unpublished order issued in *Dubois v. Netherland,* No. 96–10 (August 27, 1996) (holding that § 2263 of the Act did not apply retroactively where petitioner had not yet filed his first habeas petition before the Act's enactment date) and in *O'Dell v. Netherland,* 95 F.3d 1214 (4th Cir.1996) (en banc).

**4.** Satcher's petition was filed in the Circuit Court of Arlington County on November 23, 1993. The Supreme Court of Virginia finally denied Satcher's petition on October 3, 1994.

**5.** The Court notes that the finality date under the *Bennett* analysis to determine whether a state qualifies under the Act's opt-in provisions (the date on which the petitioner's state habeas petition was finally denied by the Supreme Court of Virginia) differs from that employed under the "new rule" analysis under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), (the date on which the defendant's certiorari petition from the disposition of his direct appeal is finally denied by the Supreme Court). *See, infra* note 41.

**6.** With one small exception noted below, the Virginia system in tact on October 3, 1994 was

The assessment to be made is whether the Virginia system meets each of the four "opt-in" requirements on which Congress has conditioned the right of a State to the benefits of the Act. In sum, those requirements are:

1. The State must establish by statute, rule of its court of last resort, or other agency authorized by state law, a "mechanism" for the *appointment, compensation, and payment of reasonable litigation expenses* of competent counsel in state post-conviction proceedings brought by indigent capital defendants. *See* § 2261(b).

2. Such mechanism must provide *standards of competency* for the appointment of such counsel. *See* § 2261(b).

3. Such mechanism must affirmatively offer counsel to *all* state prisoners under capital sentence. *See* § 2261(c).

4. Such mechanism must provide for the *entry of a court order* either appointing counsel to each indigent capital defendant, or explaining that such an appointment was not made on the basis that a defendant was not indigent or rejected the offer of counsel with an understanding of the legal consequences. *See* § 2261(c).

That assessment follows.

**1. Mechanism for the Appointment, Compensation, and Reimbursement of Litigation Expenses for Competent Post–Conviction Counsel.**

■ The parties agree that, since July 1, 1992, Virginia has required by statute the appointment of competent counsel to represent indigent petitioners in its post-conviction proceedings. The issue here is whether Virginia's statutes provide, as the Act requires, for the compensation and the reimbursement of litigation expenses for post-conviction counsel. *See* § 2261(b). The short answer is no. As the Fourth Circuit recently noted in *Bennett:*

> the Virginia statutes and regulations do not specifically provide for compensation or payment of litigation expenses of appointed counsel, as § 107 requires.

92 F.3d at 1342 n. 2.

The Commonwealth argues that it is in substantial compliance with new Section 2261(b) because "for many years" Virginia has provided for the payment of counsel and litigation expenses of appointed counsel by appropriations acts passed by the Virginia General Assembly.[7] That argument misses the mark because, although the budget legislation sets aside funds for a general category of state court expenditures, it does not establish "a mechanism for the ... compensation and payment of reasonable litigation expenses" as required by Section 2261(b). Nor is such a mechanism provided in Va.Code § 19.2–163.7, the statute which provides for the appointment of counsel. The Commonwealth has identified no other statute establishing a mechanism for the payment of those fees and expenses.

■ The Commonwealth's argument amounts to the assertion that, because it has, by statute, provided for appointment of qualified counsel and has, in fact, paid counsel in

---

identical to that in effect today. Petitioner contends that the relevant date should be that on which petitioner's habeas counsel is appointed, as opposed to that suggested by the Fourth Circuit's *dictum* in *Bennett*—when the petition is ultimately denied by the Supreme Court of Virginia. Petitioner's argument certainly has some merit, in light of the fact that the "opt-in" provisions focus heavily on the appointment of competent counsel. However, this issue is irrelevant here because the relevant Virginia post-conviction system remained unchanged between the date on which the petition was originally filed (November 23, 1993) and that when the Su-

preme Court of Virginia denied the writ (October 3, 1994).

**7.** *See* 1994 Acts of Assembly, Ch. 966, Item 28, line 3, page 2029:

Out of the amounts for Pre–Trial, Trial and Appellate Processes shall be paid:

\* \* \* \* \* \*

3. The state's share of expenses incident to the prosecution of a petition for a writ of habeas corpus by an indigent petitioner, including payment of counsel fees as fixed by the Court; the expenses shall be paid upon receipt of an appropriate order from a circuit court.

the past,[8] it has satisfied the requirements of the Act. That argument fails because the Act requires that the mechanism to appoint counsel, to pay counsel, and to pay counsel's litigation expenses be established by a state statute, a rule of the state's highest court or of an authorized state agency. In so doing, the Act requires a formal, institutionalized commitment to the payment of counsel and litigation expenses. The institutionalized and statutorily predicated condition set by Congress cannot be met unless the mechanism for these purposes is established by the State in the fashion prescribed by Congress.

If Congress had intended to afford the States the very significant benefits conferred by Chapter 154 on the basis of a finding of substantial compliance based on past performance, it could have done so. However, it elected not to do so; and, instead, Congress chose to confer those benefits only if the State made an affirmative, institutionalized, formal commitment to provide a post-conviction review system which Congress considered to be "crucial to ensuring fairness and protecting the constitutional rights of capital litigants." Powell Committee Report at 3240. Where, as here, that commitment has not been made in the manner, and to the extent, prescribed by Congress, the state is not entitled to the very significant benefits accorded by the Act.

### 2. Standards of Competency.

■ The standards of competency for appointed counsel for post-conviction proceedings in Virginia have been set and administered since July 1, 1992 by the Public Defender Commission, a state agency, pursuant to Va.Code § 19.2–163.8(B). Satcher does not contest the existence of, or the substantive adequacy, of those standards. Satcher *does* claim, however, that the standards are insufficient under the Act because they are not promulgated by *statute or court rule* as required by the last sentence of Section 2261(b) which provides that: *"[t]he rule of court or statute* must provide standards of competency for the

appointment of such counsel." (emphasis added).

As Satcher notes, there is a difference in the language in the first and last sentences of Section 2261(b). The first sentence provides that the mechanism for the appointment, the compensation, and the satisfaction of litigation expenses of post-conviction counsel must be established "by statute, rule of [the state's] court of last resort or by another agency authorized by law," while the last sentence requires that: "[t]he rule of court or statute must provide for the standards of competency...."

Satcher asserts that because the last sentence controls the setting of standards, it can be satisfied only if competency standards are set by statute or by rule of court. There is no obvious explanation for the omission of the language "or by another agency authorized by state law" from the second sentence of Section 2261(b). It could have been that careless drafting omitted parallelism with the first sentence. It also could have been that Congress chose not to restrict the kind of statutory system employed by a state to establish standards of competence. Of course, omission could have been for other reasons.

However, unartful drafting notwithstanding, the courts are instructed to construe statutes as a whole and in such a way as to avoid absurd results. *See King v. St. Vincent's Hosp.,* 502 U.S. 215, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (statute to be read as a whole, because meaning of statutory language depends on context); *Crandon v. United States,* 494 U.S. 152, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (in determining the meaning of a statute, court looks not only to the particular statutory language but to the design of the statute as a whole and to its object and policy); *McCarthy v. Bronson,* 500 U.S. 136, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991) (statutory language must always be read in its context); *Salomon Forex, Inc. v. Tauber,* 8 F.3d 966 (4th Cir.1993) (courts are bound to construe a statute to avoid absurd results, and to presume that statute is not

---

**8.** The state's showing is notably sparse in explaining what the past practice has been in paying for litigation expenses.

self-contradictory or otherwise irrational), *cert. denied,* —— U.S. ——, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994). The unduly formalistic interpretation urged by Satcher would offend both of these fundamental canons of statutory construction for it would invalidate a comprehensive scheme administered by a state agency charged by state statute with setting up detailed standards pursuant to a fairly specific statutory interpretation outlining what the standards should be.

The two sentences can be harmonized to further the obviously stated intent of the Act by reading Section 2261(b), as a whole, to mean that, where a state statute provides reasonable guidance to a state agency respecting competency standards and then vests the agency with authority to develop more specific standards, Section 2261(b) is satisfied. That is what Virginia has done.

Furthermore, Va.Code § 19.2–163.8(A), standing alone, satisfies the second "opt-in" requirement by "provid[ing]" standards of competency. *See* § 2261(b). In delegating the promulgation of competency standards to the Public Defender's Commission, the Virginia statute "provides" detailed guidance insofar as the particular considerations the standards should address:

> The Public Defender Commission … shall adopt standards for the appointment of counsel in capital cases, which take into consideration, to the extent practicable, the following criteria: (i) license or permission to practice law in Virginia; (ii) general background in criminal litigation; (iii) demonstrated experience in felony practice at trial and appeal; (iv) experience in death penalty litigation; (v) familiarity with the requisite court system; (vi) current training in death penalty litigation; and (vii) demonstrated proficiency and commitment to quality representation.

Va.Code § 19.2–163.8(A). In a very real sense, then, the Virginia statute actually contains standards of competency for appointed post-conviction counsel, as required by the Act as a condition of "opting-in."

For the foregoing reasons, the Court rejects Satcher's argument and finds that Virginia is in compliance with the second "opt-in" requirement.

### 3. & 4. Mandatory Provision of Court–Ordered Post–Conviction Counsel.

■ Virginia's method for determining the need for appointed counsel, however, does not comply with Section 2261(c) of the Act. Under the version of the statute in effect at the time Satcher's petition was "finally denied" by the Supreme Court of Virginia, counsel was appointed in state habeas capital proceedings only upon request of the prisoner. *See* Va.Code § 19.2–163.7 ("If the sentence of death is affirmed on appeal, the court shall, *upon request,* appoint counsel from the [list established by the Commission]") (as enacted July 1, 1992) (emphasis added).[9]

■ To qualify as an "opt-in" state under Section 2261(c), the statutory appointment mechanism must place an *affirmative* and *automatic* duty upon the State to offer competent post-conviction counsel to *all* prisoners sentenced to death. In addition, to qualify under the Act, a State may permit a convicted capital prisoner to proceed without counsel only if there is a court determination, which is memorialized in a formal order, that the prisoner is not indigent or that the prisoner declined appointed counsel and that the prisoner is fully competent to make such a determination. The Virginia system in effect when Satcher's petition was finally denied did not require the State affirmatively to offer counsel to all prisoners, and it did not require a court to issue an order pertaining to the appointment of counsel, or stating reasons for the absence of appointed counsel. Thus, the Virginia statutory scheme provided no protection to prisoners who either did not know how to go about obtaining counsel for state habeas proceedings, or who were not

---

**9.** Under the current statute, in effect as of July 1, 1995, the state court must automatically appoint habeas counsel in every death penalty case not more than thirty days after the decision of the Virginia Supreme Court on direct appeal. Va. Code Ann. § 19.2–163.7 (Michie 1995). For the reasons discussed above, however, the current statute is not applicable to the evaluation of the Virginia system in this case.

competent to decide that they did not want the services of counsel.[10]

The Commonwealth, relying on its long-standing "practices" respecting the appointment of post-conviction counsel, argues that it is in compliance with Section 2261(c).[11] It will be assumed here that the Commonwealth's assertions are accurate. But, the Court notes that, in Satcher's case, Virginia's system failed because his post-conviction counsel did not meet established standards.

■ Nonetheless, the plain language of the Act precludes a finding that a State's practices suffice to qualify it as an "opt-in" State under the Act. Section 2261(b) requires that a State establish the mandatory mechanism "by statute, rule of its court of last resort, or by another agency authorized by State law"—not by *practice.* 28 U.S.C. § 2261(b).

■ In so doing, the Act requires that the "mechanism" must be put down in a concrete fashion where it can be seen and relied upon, rather than be something which is subject to the vagaries of differing interpretations of what is done "in practice." *See Hill v. Butterworth,* 941 F.Supp. 1129, 1143 (holding that the insufficient standards of competency required by Florida law were not cured by the fact that the Supreme Court of Florida regulates the adequacy of post-conviction counsel; "a plain reading of Section 2261(b) indicates that Congress wanted more than the general supervision of a state high court. *Instead, a specific mechanism for competent counsel representing indigents in all post-conviction capital proceedings has to be established*") (emphasis added); Powell Committee Report at 3242 ("Unless a State *takes the affirmative steps* required in [section 2261(b) and (c) ], its litigation of capital cases under section 2254 will be governed by the statutory and court rules that presently apply to all federal habeas corpus cases").

This is confirmed by the Powell Committee Report which stressed the need for, and the importance of, a judicial order:

> [The state mechanism for appointment] must provide for the entry of an appropriate judicial order based on the state prisoner's response to the offer of counsel. Judicial control of this process is necessary to establish a clear point in time to determine the applicability of [new sections 2262 and 2263]. It is also necessary to assure that a full record exists showing which state prisoners have appointed counsel and which do not.

Powell Committee Report at 3242. Virginia's statutory mechanism fails to comply with this essential "opt-in" requirement.

Hence, past practices notwithstanding, Virginia is not in compliance with either the third or the fourth "opt-in" requirements of the Act.

### C. Virginia Is Not An "Opt–In" State Under the Act.

■ Section 2261(a) of the Act grants "opt-in" status to a state only if the state complies with *all* of the requirements contained in subsections (b) and (c) of section 2261. Virginia's system fails to satisfy three of the "opt-in" requirements.

Its pleadings concede as much by arguing for application of the doctrine of substantial compliance. That argument has met with no success in other federal courts which have been confronted with it. Indeed, the courts have strictly enforced the "opt-in" provisions which form the basis for the "quid pro quo" under the Act. *See Felker v. Turpin,* 83 F.3d 1303, 1305 n. 1 (11th Cir.) (noting that not all states with unitary or post-conviction procedures would automatically be able to avail themselves of the benefits under Chapter 154), *cert. granted,* — U.S. —, 116

---

10. One such situation recently was brought before this Court. *Danny Lee King v. J.D. Netherland,* (Docket No. 3:96cv535).

11. In its reply brief, the Commonwealth claims: The practice in every case since 1992 when § 19.2–163.7 was enacted, was for the Attorney General to notify the institutional attorney who, in turn, notified the inmate of his right to

habeas counsel and who, upon request of the inmate, prepared and filed a motion for appointment on behalf of the inmate.
*See* Warden's Response at 7 n. 4. In addition, the State claims that "[n]o Virginia death-row inmate ever has gone unrepresented in a state habeas corpus proceeding." *Id.* at 4.

S.Ct. 1588, 134 L.Ed.2d 685 (1996), *aff'd* on other grounds, —— U.S. ——, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996); *Austin v. Bell,* 927 F.Supp. 1058, 1061–62 (M.D.Tenn.1996) (declining to apply new Chapter 154 in considering petitioner's claims because Tennessee's systems of appointment of counsel and competency standards were insufficient to ensure that only qualified, competent counsel would be appointed and thus did not meet the requirements of § 2261); *Hill v. Butterworth,* 941 F.Supp. at 1140–48 (holding that Florida does not qualify as an "opt-in" state because its post-conviction system was insufficient in terms of both the standards for competency and offer of counsel); *Ashmus v. Calderon,* 935 F.Supp. at 1069–75 (noting that "[this] Court has previously held, that California does not qualify under § 2261's 'post-conviction' procedure" and that, although California did have a unitary review procedure, the court determined that the system was insufficient to "opt-in" under § 2265, a parallel provision to § 2261); *see also* C.R. S7814 (June 7, 1995) (statement of Mr. Specter agreeing with Senator Biden that "we have to be meticulous on right to counsel"); Powell Committee Report at 3242 ("The final judgment as to the *adequacy* of any system for the appointment of counsel under subsection (b), however, rests ultimately with the federal judiciary").

Strict interpretation of the stringent opt-in requirements of the Act is not mere formalism. Rather, strict interpretation is necessary to meaningfully effectuate the quid pro quo arrangement which lies at the core of Chapter 154. This is critically important because, if a state provides full and fair state habeas proceedings, the federal courts will be able to review cases more quickly and efficiently because they will have the benefit of a fully developed record of facts and constitu-

tional rulings to review. Congress has determined that competent counsel who will be reasonably compensated and who has the availability of funds for reasonable litigation expenses is essential to full and fair state habeas proceedings. *If any one of the safeguards of Section 2261 is not met, but the state is nonetheless provided with the "benefits" of opt-in status anyway, prisoners will be subjected to less than full and fair state habeas review and then truncated federal court review without having the guarantees thought by Congress to warrant the truncated review.* This was not Congress' intent under the Act. More importantly, it is not what Congress explicitly provided in the Act. Because Virginia's mechanism for the appointment of post-conviction counsel fails to meet three out of the four "opt-in" requirements under the Act, Chapter 154 of Title 28 does not apply to the petition in this case.[12]

## II. Chapter 153 Amendments: General Habeas Corpus Reform.

The issue still remains whether the Act's general habeas reform provisions, §§ 101–106, apply to Satcher's petition. These provisions effect a number of procedural changes to previous habeas corpus statutes codified in Chapter 153 of Title 28 including: a stricter, one-year period of limitations, *see* §§ 101, 105 (amending 28 U.S.C. §§ 2244(a), 2255); limits on second or successive petitions, *see* § 106 (amending 28 U.S.C. § 2244(b)); and limits on appeals, *see* §§ 102, 103 (amending 28 U.S.C. § 2253 and Rule 22 of the Federal Rules of Appellate Procedure). In addition, § 104 effects a number of substantive changes to the standards of review under 28 U.S.C. § 2254, by (1) limiting the grounds on which petitions may be granted (§ 2254(d)); (2) requiring greater defer-

---

12. This holding, that § 2261 of Chapter 154 is inapplicable to Satcher's petition, is in accordance with the teachings of the Fourth Circuit's unpublished order issued in *Dubois v. Netherland,* No. 96–10 (August 27, 1996). In *Dubois,* the Fourth Circuit applied the test under *Landgraf v. USI Film Prods.,* 511 U.S. 244, ——, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994), and held that § 2263(b) of the Act may not be applied retroactively. The Court noted that its "con-

struction of § 2263 as operating prospectively avoids a serious question of its constitutionality if it were deemed to have retroactive application." *Id.* at 6 n. 1 (*citing Landgraf,* 511 U.S. at —— n. 21, 114 S.Ct. at 1498 n. 21 (noting that "the interest in avoiding the adjudication of constitutional questions will counsel against a retroactive application")). Similarly, this Court finds that § 2261 should not be applied retroactively to bar or limit review of Satcher's petition in the federal

ence to state court findings of fact (§ 2254(e)(1)); (3) limiting the availability of evidentiary hearings in a habeas court (§ 2254(e)(2)); and (4) eliminating ineffectiveness or incompetence of post-conviction counsel as a ground for relief under section 2254 (§ 2254(i)).

Unlike Chapter 154, the general habeas provisions are not explicitly made applicable to petitions pending when the Act took effect. *See Bennett v. Angelone*, 92 F.3d at 1342–43. Nonetheless, the Commonwealth urges the retroactive application of the Chapter 153 amendments to Satcher's petition. For the reasons set forth below, the Court finds that the Act's general habeas reforms are inapplicable to this case.

## A. The Legal Standard for Determining the Retroactive Application of a Statute.

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), is the Supreme Court's most recent and definitive discussion of the retroactive application of new statutory provisions. As does the Commonwealth here, the petitioner in *Landgraf* sought the application of a new statute (Title VII of the Civil Rights Act of 1964) to cases pending on the date the new law was enacted. The Supreme Court rejected that interpretation of Title VII, which would have made that statute "applicable to conduct that occurred, and to cases that were filed, before the Act's effective date." *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1489.

In *Landgraf*, the Supreme Court recognized the "apparent tension" between two "generally applicable rules for interpreting statutes that do not specify their temporal reach." *Id.* at ——, 114 S.Ct. at 1489.

The first is the rule that 'a court is to apply the law in effect at the time it renders its decision' [*quoting Bradley v. Richmond School Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974)]. The second is the axiom that '[r]etroactivity is not favored in the law,' and its interpretive corollary that 'congressional enact-

ments and administrative rules will not be construed to have retroactive effect unless their language requires this result' [*quoting Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471–72, 102 L.Ed.2d 493 (1988)].

*Id.* 511 U.S. at ——, 114 S.Ct. at 1496. However, the Supreme Court made clear that the presumption against retrospective application maintains primacy over the former canon of interpretation. *Id.* at ——, 114 S.Ct. at 1503 ("[W]e now make it clear that *Bradley* did not alter the well-settled presumption against application of the class of new statutes that would have genuinely 'retroactive' effect.").

"The presumption against retrospective legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Id.* at ——, 114 S.Ct. at 1497; *see also Id.* at ——, 114 S.Ct. at 1499 ("Since the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights …"). The Supreme Court explained that retroactive application of legislation is disfavored because:

The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals.

*Id.* at ——, 114 S.Ct. at 1497.

In *Landgraf*, the Supreme Court held that first a court must examine the language of a statute to determine if it demonstrates the "clear intent" of Congress with respect to retroactivity. *See Id.* at ——, ——, 114 S.Ct. at 1501, 1505.[13] "Where the congressional intent is clear, it governs." *Id.* at ——, 114 S.Ct. at 1496 (*quoting Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 837–38, 110 S.Ct. 1570, 1576–78, 108 L.Ed.2d 842 (1990)). If the statute does not evince a clear congressional intent, a court must then

courts; the application of the Act in this case would raise a number of constitutional questions.

**13.** *See also id.* 511 U.S. at ——, 114 S.Ct. at 1501 ("Requiring clear intent assures that Congress

itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing interests").

determine whether each provision of the act at issue "attaches new legal consequences to events completed before its enactment" as judged by "familiar considerations of fair notice, reasonable reliance and settled expectations ..." *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1499. Under *Landgraf,* a statute would have "retroactive effect" if it "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed." *Id.* at ——, 114 S.Ct. at 1505. If the statute has such retroactive effect, the traditional presumption against retroactive application prohibits the retroactive application of the statute "absent clear congressional intent" to the contrary. *Id.*[14]

Both the language of the Act and the *Landgraf* analysis counsel against retroactive application of the Chapter 153 amendments.

## B. The Chapter 153 Amendments Are Not Applicable to Satcher's Petition.

### 1. The Language of the Act.

 In formulating the Act, Congress clearly contemplated the question of its retroactive application. Section 107(c) of the Act expressly states that "Chapter 154 ... shall apply to cases pending on or after the date of enactment of this Act." *The Act contains no similar provision, however, concerning the Chapter 153 Amendments. See Bennett v. Angelone,* 92 F.3d at 1342–43. This omission evinces a Congressional intent that *only* the new Chapter 154 provisions apply retroactively to cases pending on the date of enactment. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300–01, 78 L.Ed.2d 17 (1983) ("[W]here Congress includes particular language in one section of

a statute, but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (*quoting United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972)); *See also Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1494 ("Had Congress wished [Title VII] to have [retroactive effect], it surely would have used language comparable to its reference to the predecessor Title VII damages provisions in the 1990 legislation: that the new provisions 'shall apply to all proceedings pending on or commenced after the date of enactment of this Act' ").

Faced with this precise issue, the overwhelming majority of federal courts, including the Second and Tenth Circuits, have held that the Chapter 153 Amendments are not applicable to pending petitions. *See Boria v. Keane,* 90 F.3d 36, 38 (2nd Cir.1996) (per curiam) ("While Congress has spoken clearly in some portions of the new statute with respect to the application of the statute to pending cases, see, e.g., § 107(c), in the context of non-capital habeas cases the statute's silence is striking. *This silence, coupled with the presumption against retroactivity, leads us to hold that the new statute does not apply to this case.*") (emphasis added); *Edens v. Hannigan,* 87 F.3d 1109, 1111 n. 1 (10th Cir.1996) ("The only effective date provision specified within Title I of the habeas corpus amendments is under the special death penalty litigation procedures, which states that those provisions shall apply to cases pending on or after enactment. [Petitioner] filed his petition pursuant to 28 U.S.C. § 2254 ... well before the new habeas corpus amendments were enacted. Under these facts we conclude that the new law does not apply to this case").[15]

**14.** This is so even where it is asserted "that retroactive application of a new statute would vindicate its purpose more fully." *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1507. That consideration is "not sufficient to rebut the presumption against retroactivity." *Id.*

**15.** *See also, e.g., Cockrum v. Johnson,* 934 F.Supp. 1417, 1422–24 (E.D.Tex.1996) (finding that Congress did not express a clear intent that the Chapter 153 amendments be applied retroactively); *Hill v. Turpin,* No. 1:96–CV–988–GET,

slip op. at 4–5 (N.D.Ga. July 3, 1996) (applying *Landgraf,* the court concluded that the Act did not apply retroactively because there was no clear congressional intent for the Chapter 153 Amendments to apply); *Grady v. Artuz,* 931 F.Supp. 1048, 1054 n. 1 (S.D.N.Y.1996) (holding that the Chapter 153 amendments did not explicitly apply to pending cases because there was no effective date for the amendments); *United States v. Trevino,* 1996 WL 252570 at *2 n. 1 (N.D.Ill. May 10, 1996) (declining to apply Chapter 153 amendments due to inference that retroactivity

*Landgraf* directs application of the presumption against retroactivity unless clear Congressional intent favors retroactivity. 511 U.S. at ——, 114 S.Ct. at 1505. The explicit language of the Act clearly indicates that Congress had no intention to apply the Chapter 153 amendments retroactively. Thus, under the presumption against retroactivity, the Act's general habeas reform provisions are not applicable to Satcher's petition.

### 2. Retroactive Effect of the Act.

Because the Act does not evince a clear Congressional intent, it is necessary, under *Landgraf,* to determine whether the provisions of the Act "attach[ ] new legal consequences to events completed before its enactment." 511 U.S. at ——, 114 S.Ct. at 1499. The Act would have such "retroactive effect" if it "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed." *Id.* at ——, 114 S.Ct. at 1505. In this case, the Chapter 153 amendments of the Act

would have retroactive effect if applied to Satcher's petition.[16] Hence, the traditional presumption against retroactive application prohibits the retroactive application of the statute absent clear Congressional intent to the contrary. *Id.* And, as discussed above, there is no such clearly stated Congressional intent.

Relying on *Lindh v. Murphy,* 96 F.3d 856 (7th Cir.1996) (*en banc*), the Respondent urges that Section 2254(d)(1) applies to Satcher's petition. That section prohibits the grant of a writ of habeas corpus "unless the adjudication of the claim [in state court] resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In *Lindh,* the Seventh Circuit held that Section 2254(d)(1) applied to petitions which were pending on April 24, 1996, the effective date of the Act.

The reasoning of the Seventh Circuit in *Lindh* is interesting but not as persuasive as

was not intended because there was no provision stating that the amendments to § 2255 would apply to pending cases); *Wilkins v. Bowersox,* 933 F.Supp. 1496, 1505–06 (W.D.Mo.1996) (holding that the amendments to 28 U.S.C. § 2254 should not be given retroactive application); *Wilkins v. Delo,* No. 91–0861–CV–W–5, slip op. at 2–3 (W.D.Mo. May 15, 1996) (same); *Warner v. United States,* 926 F.Supp. 1387, 1390 n. 4 (E.D.Ark.1996) (declining to apply retroactively the amendments to § 2255); *Schlup v. Bowersox,* No. 4:92CV443 (JCH), slip op., at 19–20 (E.D.Mo. May 2, 1996) (same). *But see Reyes v. Keane,* 90 F.3d 676, 678–79 (2d Cir.1996) ("We believe the specification of applicability to pending cases in section 107 reflects only Congress' explicit concern as to death penalty cases, and carries no negative implication as to other habeas cases"); *Lindh v. Murphy,* 96 F.3d 856 (7th Cir.1996) (holding that new § 2254(d) was applicable to petition filed before the Act's enactment date); *Leavitt v. Arave,* 927 F.Supp. 394, 396–97 (D.Idaho 1996) (finding that Congress intended the entire Act to take retroactive effect despite the omission of such statements as to the Chapter 153 amendments).

16. The parties dispute the issue of to what extent the Chapter 153 amendments change the substantive and procedural standards under the old § 2254 and Chapter 153. The Commonwealth asserts that the amendments effect a *substantial curtailment* of petitioners' rights under the statutes. The petitioner urges an interpretation of the amendments which would *minimize* the alteration of prior habeas law. The Fourth Circuit has declined to address this issue in *Sherman v.*

*Smith,* 89 F.3d 1134, 1142 n. 1 (4th Cir.1996). This court does not address the issue of the precise extent to which the Act alters pre-existing law. It is sufficient under *Landgraf* to note that, as discussed above, sections 101–103, 105, and 106 of the Act effect a number of procedural changes, and section 104 effects a number of substantive changes to the standard of review under § 2254. Regardless of the *extent* to which Satcher's substantive and procedural rights would be altered were the Act to be applied retroactively, it is clear that the retroactive application of the Act would "impair rights [the petitioner] possessed when he acted." *Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1505; *See Boria v. Keane,* 90 F.3d 36, 37–38 (2nd Cir.1996) (per curiam) ("[A]pplication of the new statute to these circumstances would be retroactive" because it would attach new legal consequences to events completed before its enactment); *Hill v. Turpin,* No. 1:96–CV–988–GET, slip op. at 4–5 (N.D.Ga. July 3, 1996) (Describing the substantive and procedural changes the Act effects and holding that under *Landgraf,* "applying the Act to this case could have an impermissibly retroactive effect on petitioner's application"); *United States v. Trevino,* 1996 WL 252570, at *2 n. 1 (N.D.Ill. May 10, 1996) ("[W]e believe the Act would have a truly retroactive effect and therefore be subject to the 'traditional presumption against retroactive application of a statute' ") (*quoting Maitland v. University of Minnesota,* 43 F.3d 357, 363 (8th Cir.1994) (*quoting Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1505)).

that on which the Second and Tenth Circuits reached the result that no part of the amendments to Chapter 153, including Section 2254(d)(1), apply to pending petitions. Indeed, the rationale of *Lindh* is at odds with the clear instruction in *Landgraf*, just two terms ago, that absent a clear statement of Congressional intent to the contrary, the presumption against retroactivity prevails over the often contrary principle that a Court must "apply the law at the time it renders its decision."

More importantly, if Section 2254(d)(1) is given the construction urged by the Respondent and found in *Lindh*, it would be necessary to confront, as does the dissent in *Lindh*, whether Section 2254(d)(1) offends the Third Article of the Constitution. That is not necessary here because the only basis for granting the petition involves a state decision which was contrary to, and which did involve an unreasonable application of, "Federal law, as determined by the Supreme Court of the United States." Furthermore, the other issues presented in the petition are resolved on the basis of Supreme Court jurisprudence. Hence, it is unnecessary to reach the constitutional challenge which inherently is presented when Section 2254(d)(1) is interpreted as urged by the Respondent.[17]

For the reasons set forth above, the Court finds that new Chapter 154 of the Act is inapplicable to Satcher's petition because, at the time Satcher's petition was finally denied, Virginia did not qualify as an "opt-in" state under the Act. Likewise, the amendments to Chapter 153 are inapplicable under the Supreme Court's *Landgraf* analysis. Hence, the petition will be evaluated based on the law governing federal habeas corpus review in effect at the time Satcher filed his petition.

## THE CLAIMS ASSERTED IN THIS PETITION

In his federal habeas petition, Satcher raises the following claims:

I. Satcher is actually innocent;

II(A). The trial court erred in denying Satcher's motion to sever the Borghesani and Abel offenses;

II(B). The evidence was insufficient to convict;

II(C). The trial court committed constitutional errors in the selection of the jury;

II(D). The trial court erred in allowing testimony from Dr. Ferrara, a prosecution witness, in violation of the Confrontation Clause of the Sixth Amendment;

II(E). The prosecutor engaged in misconduct by presenting false testimony from Dr. Ferrara;

II(F). The prosecutor misled the jury about the significance of the DNA evidence in violation of the Due Process clause;

II(G). The courtroom identification of Satcher by Deborah Abel was unduly suggestive in violation of the Due Process clause;

II(H). The Commonwealth failed to preserve some of the forensic DNA sample for independent testing by the defense, in violation of the Due Process clause;

II(I). The prosecutor engaged in misconduct in violation of the Due Process clause by:

(1) violating a pretrial discovery agreement;

(2) falsely implying that the Commonwealth possessed the murder weapon, which was found in Satcher's car;

(3) falsely stating that the victims' purses were found together; and

(4) presenting Mark Polemani's testimony in a fashion that implied he had identified Satcher in a lineup;

II(J). The Commonwealth engaged in prejudicial conduct by injecting passion and prejudice into the jury's sentencing determination;

III(A). Trial counsel was constitutionally ineffective for failing properly to investigate, develop, and present psychiatric and neurological evidence at the penalty phase of trial;

---

**17.** Moreover, if the Court were inclined to follow *Lindh*, it would be necessary to defer decision to allow for briefing of the very serious constitution-

al issue raised by the dissent in *Lindh*. That is not necessary.

III(B). Trial counsel was constitutionally ineffective for failing to procure an independent DNA test;

III(C). Trial counsel was constitutionally ineffective for failing to object to testimony that the victims' purses were found together;

III(D). Appellate counsel was constitutionally ineffective for failing to raise on direct appeal significant constitutional errors that occurred during Satcher's trial;

IV(A). Virginia Code § 19.2–270.5, respecting the reliability of DNA evidence, is unconstitutional;

IV(B). Virginia Code § 19.2–264.4, respecting Virginia's capital murder aggravating factors, is unconstitutional; and

IV(C). The imposition of the death penalty is cruel and unusual punishment.

■ The assessment of Satcher's several claims must be made in perspective of two fundamental principles. First, the scope of review of a state court conviction on federal habeas corpus is confined to whether the petitioner is held in state custody as the result of a violation of federal constitutional or statutory law. *See* 28 U.S.C. § 2241(c)(3). If so, the petition will be granted. If not, the petition is to be denied even if the conviction offends state procedural, evidentiary or substantive law rules. Second, "28 U.S.C. § 2254(b) bars the granting of habeas corpus relief 'unless it appears that the applicant has exhausted the remedies available in the courts of the State.'" *Gray v. Netherland,* — U.S. —, —, 116 S.Ct. 2074, 2080, 135 L.Ed.2d 457 (1996).

### I. Exhaustion and Procedural Bar

The exhaustion requirement is grounded in principles of comity which are central to our system of federalism. *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 8, 112 S.Ct. 1715, 1719, 118 L.Ed.2d 318 (1992). Therefore, in the interest of giving state courts the first opportunity to consider the alleged constitutional errors in his conviction and sentencing, Satcher must have exhausted all state court remedies before this Court can even consider his claims. *See Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). A state

court must have "an opportunity to confront the federal constitutional issue on the merits" or else the federal court's review "would not be a 'review' of the state court judgment, but rather would be another avenue of direct appeal." *Kornahrens v. Evatt,* 66 F.3d 1350, 1363 (4th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1575, 134 L.Ed.2d 673 (1996).

A state court has not been given a full opportunity to rule on a claim unless it has been presented before the state's highest court. *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). And, in presenting a claim to the state court, the petitioner must "fairly present" claims cognizable under federal law. *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). That is, in order to exhaust a federal claim for purposes of federal habeas corpus review, a petitioner cannot simply raise the claim in state court, citing state law, even if the state claim is analytically similar to a federal claim. *Anderson v. Harless,* 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Duncan v. Henry,* — U.S. —, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (presentation of a "miscarriage of justice" claim under California law was not the same as an allegation of a violation of federal due process).

■ Furthermore, a federal habeas petitioner is not entitled to federal review of claims which are procedurally barred. The procedural bar rule complements the exhaustion requirement "[b]ecause '[the exhaustion] requirement ... refers only to remedies still available at the time of the federal petition,'" *Gray v. Netherland,* — U.S. at —, 116 S.Ct. at 2080 (citing *Engle v. Isaac,* 456 U.S. 107, 126 n. 28, 102 S.Ct. 1558, 1570 n. 28, 71 L.Ed.2d 783 (1982)), and therefore "it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.'" *Id.* (citing *Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989)). This rule of procedural bar is triggered when the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on the procedural bar. *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Also, the procedural bar rule is given effect where a claim

was never presented to the state court and the applicable state rule would clearly bar consideration of the new allegations. *Bassette v. Thompson,* 915 F.2d 932, 937 (4th Cir.1990), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991).

 In Virginia, no writ of habeas will be granted on the basis of any legal or factual claim which the petitioner previously could have made, but did not. *Gray v. Netherland,* — U.S. at —, 116 S.Ct. at 2080; *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975); Va.Code Ann. § 8.01–654(B)(2). Because Satcher already has filed a state habeas petition, a successive petition, if filed, would be barred by Virginia Code § 8.01–654(B)(2).

The procedural bar:

which gives rise to exhaustion provides an *independent and adequate state law ground for the conviction and sentence, and thus prevents federal habeas corpus review* of the defaulted claim, *unless* the petitioner can demonstrate *cause and prejudice* for the *default.*

*Gray v. Netherland,* — U.S. at —, 116 S.Ct. at 2080 (emphasis added); *see also Teague v. Lane,* 489 U.S. at 298, 109 S.Ct. at 1068–69; *Isaac,* 456 U.S. at 126, 102 S.Ct. at 1571; *Wainwright v. Sykes,* 433 U.S. 72, 90–91, 97 S.Ct. 2497, 2508–2509, 53 L.Ed.2d 594 (1977). Or, a petitioner can show that there has been a fundamental miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2564–65, 115 L.Ed.2d 640 (1991).

All of Satcher's federal habeas corpus claims have either been exhausted by virtue of previous presentation to the courts of Virginia, thereby preserving them for review here, or been waived by virtue of not having been presented at all, thereby resulting in procedural default by operation of state law.

## II. Defaulted Claims

The first step in reviewing the claims here made by Satcher is to determine those which have been defaulted. Then, it is necessary to assess whether, as to those defaulted claims, Satcher has established cause for, and prejudice from, the default, thereby reviving those defaulted claims for federal habeas review.

**Claim I:** *Actual Innocence.*

Satcher did not present his actual innocence claim to the Supreme Court of Virginia and, as will be discussed *infra,* Section B, it would therefore be useful to Satcher only if he could establish actual innocence as a gateway to permit revival of his defaulted constitutional claims under the fundamental miscarriage of justice escape from procedural default. Satcher does not contest that his claims of actual innocence are procedurally barred and cannot be reviewed absent cause and prejudice.

**Claim II(A):** *Misjoinder.*

 Satcher argues that the joinder of the Abel and Borghesani offenses for trial caused actual prejudice to him, thereby rendering his trial fundamentally unfair in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Under the principles set forth in *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), the misjoinder claim is defaulted unless Satcher fairly presented to the state court the contention that the joinder of these offenses for trial constituted a denial of those federal constitutional rights. If Satcher did not present those claims, this Court is not empowered to determine whether the misjoinder offended those federal constitutional principles.

### 1. Claims Presented On Direct Appeal.

On direct appeal, Satcher argued only that the trial court's denial of his motion for separate trials "constituted a violation of Rules 3A:10 and 3A:6(b) of the Rules of the Supreme Court of Virginia, which permit a court to order an accused to be tried for more than one offense at the same time if justice does not require separate trials and if the offenses are part of a common scheme or plan." *See* Ex. F to Petitioner's Memorandum in Opposition to Respondent's Motion to Dismiss at 33. Satcher's brief on direct appeal to the Supreme Court of Virginia advanced that argument by relying on a Virginia decision, *Godwin v. Commonwealth,* 6 Va.App. 118, 367 S.E.2d 520 (1988), which held that certain robbery and firearms of-

fenses were not properly tried together because they were not part of a common scheme or plan, and justice did not require that they be tried together. Likewise, Satcher argued on direct appeal that "since the offenses were not connected or part of a common scheme or plan, separate trials were required." *See* Petition Ex. F at 34.

The Supreme Court of the United States has made clear that "[i]f state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Duncan v. Henry,* —— U.S. at ——, 115 S.Ct. at 888. This requirement is not satisfied merely "by presenting the state courts only with the facts necessary to state a claim for relief." *Gray v. Netherland,* —— U.S. at ——, 116 S.Ct. at 2081. Nor is it sufficient "that a somewhat similar state-law claim was made." *Anderson v. Harless,* 459 U.S. at 6, 103 S.Ct. at 277. And, "it is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to the state court." *Gray v. Netherland,* —— U.S. at ——, 116 S.Ct. at 2081.

On direct review, Satcher did not apprise the state court of his claim that the joinder ruling was not only a violation of state law, but also a violation of the federal due process rights guaranteed by the Fourteenth Amendment. As in *Duncan v. Henry,* the state court in this case analyzed and decided the procedural joinder claim under state law. The Supreme Court of Virginia explicitly noted that "Satcher's separate-trial argument is based *solely* upon the trial court's alleged error in the application of Rules 3A:10(b) and 3A:6(b)." *Satcher,* 421 S.E.2d at 827 (emphasis added). Thereupon, the Court assessed whether the joinder of the offenses met the requirements for a single trial under Rule 3A:6(b), and whether the probative value of the joinder outweighed its prejudicial effect under Virginia law. Having so analyzed the issues which Satcher presented, the Court concluded that "Satcher's substantive rights were not affected by the trial court's application of Rules 3A:10(b) and 3A:6(b)" and that

the trial court "did not abuse its discretion in denying Satcher's motion for separate trials." *Id.* 421 S.E.2d at 828.

Although the joinder analysis under the Virginia rules resembles a federal due process inquiry in some ways, the Supreme Court of the United States

emphasize[s] that mere similarity of claims is insufficient to exhaust. [citations omitted]. The state court, when presented with respondent's claim of error under the [Rules of the Supreme Court of Virginia], understandably confined its analysis to the application of state law.

*Duncan v. Henry,* —— U.S. at ——, 115 S.Ct. at 888. While it is true that a petitioner need not cite the specific constitutional language in order to "fairly present" an issue, the federal constitutional substance of the claim must nevertheless be made evident. *Picard v. Connor,* 404 U.S. 270, 278, 92 S.Ct. 509, 513–14, 30 L.Ed.2d 438 (1971). For example, in *West v. Wright,* 931 F.2d 262 (4th Cir.1991), on which Satcher relies, the petitioner challenged the sufficiency of the evidence against him several different times during the trial, then again in an assignment of error on direct appeal, and later by raising it in state habeas proceedings. He asserted that the evidence was insufficient to convict him and that the Commonwealth had not proved his guilt beyond a reasonable doubt. The Fourth Circuit determined that this effectively alerted the courts that the petition was raising a constitutional claim, notwithstanding that he did not cite "book and verse on the federal constitution." *Id.* at 266.

In contrast, on direct review Satcher raised the joinder issue *specifically and solely* in terms of state criminal procedural rules. He cited only the joinder rules of the Supreme Court of Virginia as well as state decisional law on the issue of joinder. Nowhere did Satcher alert the state courts that he was alleging a federal due process violation. Consequently, the Supreme Court of Virginia addressed only the state law issues.

Satcher maintains that the issue was "fairly presented" to the state court because two Justices of the Supreme Court of Virginia

stated in dissent that the joinder of the Abel and Borghesani offenses was "so unfair and unjust that it constituted a denial of Satcher's rights to due process of law guaranteed by the federal constitution ...", *Satcher,* 421 S.E.2d at 850. However, the dissent mentioned the federal constitution only in the last sentence of a five page opinion which focused almost exclusively upon the state law of joinder. Moreover, the majority nowhere indicated that it was basing its decision upon federal law.

### 2. Claims Presented In State Habeas Petition.

Satcher next argues that, when he advanced the joinder claim in his state habeas petition, he alleged for the first time a federal constitutional violation. The Court finds, however, that Satcher failed to adequately raise a federal constitutional error in his state habeas petition.

Satcher's petition to the state circuit court discusses the misjoinder claim for exactly two full pages. *See* Petition Ex. B at 10–12. In that discussion, Satcher cites the two aforementioned Rules of the Supreme Court of Virginia, as well as three state court decisions in support of his argument that, under *Walker v. Commonwealth,* 28 Va. (1 Leigh) 574 (1829), the Abel and Borghesani offenses were not "intimately connected" so as to make joinder appropriate under the law of Virginia. No arguments are made under the federal constitution, and no federal case law is cited. *See Anderson v. Harless,* 459 U.S. at 7, 103 S.Ct. at 277–78 (inadequate presentment to state courts where petitioner, in state habeas petition, offered no support for his argument other than a citation to state

precedent). The last sentence of this section of the state habeas petition, however, contains the following conclusory statement: "As a result [of the improper joinder under Virginia case law], the trial court's failure to grant the defendant's motion to sever the two cases and try them separately constituted a violation of Mr. Satcher's due process rights under the Fourteenth Amendment to the Constitution of the United States ..." Petition Ex. B at 11–12.

The Supreme Court of the United States has recently held that such broad, conclusory statements are not sufficient to present federal claims to state courts. *See Gray v. Netherland,* —— U.S. ——, ——, 116 S.Ct. 2074, 2081, 135 L.Ed.2d 457 (1996). The Court explicitly stated that, *"it is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of a claim to a state court." Id. (citing Anderson v. Harless,* 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982)). Satcher's general reference to "due process" in his state habeas petition was precisely the type of insufficient presentation the Supreme Court so recently disdained in *Gray v. Netherland.* Hence, Satcher failed to present a federal constitutional challenge to the legal misjoinder in the state circuit court on habeas review.[18]

### 3. Effect Of Dismissal By Supreme Court of Virginia.

■ The Supreme Court of Virginia dismissed, as untimely, Satcher's petition for appeal from the circuit court's dismissal of his state habeas petition. Absent a showing of cause and prejudice,[19] the Supreme Court

---

**18.** Furthermore, in its disposition of Satcher's state habeas petition, the circuit court ruled that each claim presented—including the misjoinder claim—was barred based on the rule of *Hawks v. Cox,* 211 Va. 91, 175 S.E.2d 271 (1970). That rule holds that a "previous determination of the issues by either state or federal courts [is] conclusive." 175 S.E.2d at 274. By dismissing the petition on *Hawks* grounds, the state habeas judge—who was also the judge at Satcher's trial—apparently interpreted Satcher's misjoinder claim to be the equivalent of that brought on direct appeal, i.e. purely a state law claim. In light of the controlling Supreme Court precedent discussed above, and similar to the Supreme Court's observation in *Anderson v. Harless,* 459

U.S. at 7, 103 S.Ct. at 277–78, this Court finds it "[n]ot surprising" that the state habeas court "interpreted [petitioner's] claim as being predicated on the state-law rule of [joinder], and analyzed it accordingly." *Id.*

**19.** As discussed below, assuming that the time bar imposed by the Supreme Court of Virginia is an "adequate and independent" state ground barring federal review, Satcher cannot prove excuse for the procedural default by demonstrating "cause for the default *and* actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2564–65, 115 L.Ed.2d 640 (1991) (emphasis added).

of Virginia's procedural dismissal would act as a bar to federal review if it were based on an "adequate and independent" state law ground for dismissal. Where a petitioner fails to comply with a state procedural rule when he presents a claim to the state courts,[20] the petitioner thereafter may be barred from federal habeas corpus relief on that claim because of the "adequate and independent state procedural grounds" doctrine. The Commonwealth asserts that Satcher's failure to comply with Virginia Supreme Court Rule 5:9(a), providing that no appeal shall be allowed unless a notice of appeal is filed with the circuit court within 30 days of its disposition, constitutes such an "adequate and independent state procedural ground" for dismissal.

■ It must first be noted that, even assuming the time bar imposed by the Supreme Court of Virginia is an "adequate and independent state procedural ground" barring federal review, the procedural dismissal would only act as a bar to this Court's consideration of the claims which were the subject of the dismissal (i.e. those presented in Satcher's state habeas petition) and which otherwise were not preserved on direct appeal. *See Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In other words, Satcher's alleged procedural default would bar federal review only of claims presented for the first time in the state habeas petition. *See Id.* In this case, such a default would have little effect on this Court's authority to review Satcher's claims because the claims raised in the state habeas petition are effectively identical to those raised on direct appeal.[21] Because Satcher presented no claims for the first time in the state habeas petition, and because the alleged default cannot restrict this Court's authority to review claims presented to the Supreme Court of Virginia on direct appeal, Satcher's default is effectively irrelevant in this case.

■ As discussed above, however, Satcher contends that when he advanced the misjoinder claim in his state habeas petition, he alleged for the first time a federal constitutional violation. Satcher then argues that, because the Supreme Court of Virginia's dismissal of the petition does not constitute an "adequate and independent state procedural ground" for dismissal, this Court is not barred from considering the misjoinder claim. This Court has already rejected the premise of this argument, finding that the state petition failed to adequately raise a federal constitutional error. However, even had Satcher adequately raised the federal claim for the first time in his state petition, the misjoinder claim would not have been useful to Satcher in state habeas.

■ In light of two established doctrines under Virginia law, it is evident that, even if the Supreme Court of Virginia had excused Satcher's untimeliness and considered the state habeas petition on its merits, the misjoinder claim would not have been considered. If that Court had read the petition as presenting only a state law misjoinder claim, that claim would have been dismissed based on the rule of *Hawks v. Cox,* 211 Va. 91, 175 S.E.2d 271 (1970), requiring dismissal of any claim previously determined on direct appellate review. If the Court had read the petition as stating a *federal* constitutional challenge, the claim would have been dismissed under the rule of *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974). Under *Slayton,* a Virginia habeas court is not permitted to consider any claim which the petitioner could have made on direct appeal, but did not. Since the Virginia courts strictly enforce the *Slayton* rule, "it would serve no useful purpose and would only prolong the final resolution of this matter to require [Satcher] to file a futile [successive] state petition." *Bassette v. Thompson,* 915 F.2d 932, 937 (4th Cir.1990), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991).

---

**20.** A procedural infraction of this sort may happen at any of several stages of the state court proceedings. *See* 2 Liebman & Hertz, *Federal Habeas Corpus Practice and Procedure,* § 26.1 at 807–08, n. 2 (1994).

**21.** The state circuit court's dismissal of Satcher's petition under the *Hawks* rule indicates the identity between the claims raised on direct review and those presented on state habeas. *See,* supra note 18.

 Therefore, even if the Supreme Court of Virginia's dismissal did not constitute an "adequate and independent state ground" barring federal review of the misjoinder claim, Satcher was not prejudiced by the dismissal. *Teague* teaches that "when it is clear that the state law would bar state review, exhaustion is not required, and federal review is precluded." *Bassette v. Thompson,* 915 F.2d at 937; *see Whitley v. Bair,* 802 F.2d 1487 (4th Cir.1986) (claims barred from federal review that *would* have been properly dismissed by the Supreme Court of Virginia under *Slayton* rule), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1618, 94 L.Ed.2d 802 (1987).[22]

There is serious doubt whether the Supreme Court of Virginia's dismissal constitutes an "adequate and independent state ground" which bars federal review of Satch-

er's misjoinder claim.[23] However, in light of the *Slayton* and *Hawks* doctrines, and because Satcher failed to even raise a federal constitutional challenge to the alleged misjoinder in the state courts on either direct review or collateral attack, under controlling Supreme Court and Fourth Circuit precedent he is procedurally barred from asserting such a claim in his federal petition. *See Kornahrens v. Evatt,* 66 F.3d at 1362–63. Therefore, this Court cannot review the merits of Claim II(A).

**Claim II(D):** *Hearsay Testimony.*

 Satcher next contends that the trial court erroneously permitted Dr. Paul B. Ferrara to testify about the contents of an unpublished draft of the report of the National Research Council, Committee on DNA Technology in Forensic Science ("NRC Report"). Ferrara originally was called by the prosecu-

---

**22.** Because Satcher was not prejudiced in any sense by the Supreme Court of Virginia's procedural dismissal, he cannot prove excuse for the default by "demonstrat[ing] ... cause for the default *and actual prejudice* as a result of the alleged violation of federal law." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2564–65, 115 L.Ed.2d 640 (1991) (emphasis added). The Court notes, however, that Satcher successfully has demonstrated "cause" for the procedural default. Cause is shown where "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488–90, 106 S.Ct. 2639, 2646, 91 L.Ed.2d 397 (1986). As mentioned above, Satcher's notice of appeal was untimely only because the circuit court failed to notify Mr. Satcher of its dismissal of his petition until *after* the time for filing a notice of appeal had expired. "Actions of the state or the state courts" which "prevent [or] hinder ... the raising of a claim" is sufficient cause to excuse the default. *See* 1 James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure,* § 24.5(b) at 354 (1988); *see Dobbs v. Zant,* 506 U.S. 357, 358–60, 113 S.Ct. 835, 836, 122 L.Ed.2d 103 (1993) (per curiam) (petitioner permitted to make use of transcript of closing argument that he had not previously used and that his counsel was not previously aware of because delay in its discovery "resulted substantially from the State's own erroneous assertions that closing arguments had not been transcribed"); *Tippitt v. Lockhart,* 903 F.2d 552, 555 (8th Cir.), *cert. denied,* 498 U.S. 922, 111 S.Ct. 301, 112 L.Ed.2d 254 (1990) (there is "cause" for failure to appeal if "state trial court prevent[s] [petitioner] from properly appealing his [state postconviction] petitions"). However, because Satcher suffered no *"actual*

and substantial disadvantage," *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (original emphasis), as a result of the circuit court's error, he suffered no "prejudice."

**23.** Although the Court need not decide this issue, it notes that it is unlikely that the Supreme Court of Virginia's dismissal is an "adequate state ground" that must be enforced in federal habeas to foreclose review of any federal misjoinder claim. Satcher's failure to timely file was caused by factors external to the petitioner and wholly within the control of the state. The Supreme Court of Virginia knew the cause of Satcher's late filing: Satcher's counsel was never notified that the state trial court had ruled on the petition until well after the time for appeal had run. *See* Exhibit A to Petitioner's Supplemental Memorandum In Opposition to Respondent's Motion to Dismiss. *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), does not stand for the proposition that a state court's failure to notify counsel that it has ruled until after the time for appeal has run which results in a subsequent dismissal of an appeal as untimely is an "adequate" state law ground. *See Dobbs v. Zant,* 506 U.S. 357, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993) (per curiam) (holding that court of appeals erred in refusing to consider late-discovered transcript of sentencing-phase closing arguments when the delay in discovering transcript was substantially caused by the state's erroneous assertion that closing arguments had not been transcribed); *Delap v. Dugger,* 890 F.2d 285, 300 (11th Cir.1989) ("A state procedural rule is not 'independent and adequate' if the state applies the rule in a sporadic or surprisingly harsh manner."), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990).

tor as a fact witness to testify about the procedures of the Tidewater Laboratory, which conducted the DNA tests in this case. After testifying about those procedures, however, Ferrara went on to testify that the NRC Committee had reached a "consensus" as to the appropriate standards and methodologies for DNA testing and that the Tidewater Laboratory, which conducted the tests in Satcher's case, was in conformity with those standards. Ferrara's testimony was based on an unpublished draft of the NRC Report, which had not been produced to defense counsel before trial. Only after he testified was Ferrara asked to produce to defense counsel those pages from the report upon which Ferrara claimed to have based his testimony. This, says Satcher, violated his Sixth Amendment right to confront a witness who testified against him, as well as his rights under the Fifth, Eighth, and Fourteenth Amendments.

However, on direct appeal to the Supreme Court of Virginia, Satcher's claim on this topic revolved around an alleged breach of a discovery agreement, which provided that each party would "exchange the names, addresses, telephone numbers and curricula vitae of any expert witnesses...." *See* Amended and Restated Petition for a Writ of Habeas Corpus at 100. Satcher's sole complaints about Ferrara's testimony were: (1) that Ferrara was allowed "to testify as an expert when the Commonwealth had not provided the defense with his curriculum vitae" first as required by the agreement, thereby denying Satcher the ability effectively to cross-examine the witness; and (2) that, while Ferrara was "called solely as a fact witness," he was not excluded from the courtroom pursuant to a rule requiring sequestration of factual witnesses. *See* Ex. F to Petitioner's Memorandum in Opposition to Respondent's Motion to Dismiss at 19–20.

In this federal habeas corpus petition, Satcher asserts the entirely different argument that Ferrara was allowed to testify as to hearsay (the contents of the unpublished NRC Report), thereby violating Satcher's

right effectively to confront adverse witnesses. Although on direct appeal Satcher alleged the deprivation of federal due process rights and the right effectively to cross-examine witnesses testifying against him, he did so only in the context of the failure to supply a curriculum vitae and the violation of the sequestration of witnesses rule. He made no mention of the unpublished draft or the NRC Committee "consensus." Nor did he assert a hearsay objection. Accordingly, the Supreme Court of Virginia, in addressing this claim, determined only that "the trial court correctly treated Dr. Ferrara as a factual witness not subject to the curriculum-vitae provision" of the discovery agreement and that the trial court did not abuse its discretion in finding "that 'no harm resulted from [Ferrara's] presence ... in [the] court[room].'" *Satcher*, 421 S.E.2d at 836.

The Court did not, and had no reason to, address whether Ferrara's testimony about the unpublished NRC Report and the NRC "consensus" constituted inadmissible hearsay and violated Satcher's right to confront witnesses testifying against him respecting that topic.[24] Because this particular claim was not fairly presented to the state courts, it is procedurally defaulted and not reviewable by this Court absent a demonstration of cause and prejudice.

**Claim II(E):** *The Alleged Use of False Testimony.*

 Satcher also complains that the prosecutor engaged in misconduct because she should have known that the testimony elicited from Dr. Ferrara about the NRC Report was false. Satcher argues that, contrary to Ferrara's testimony, it does not appear that the NRC had reached any "consensus" regarding DNA standards and methodologies at the time of trial. In fact, according to Satcher, it was not until ten months after his trial that the report actually was completed and at that time, the report stated that "[a]fter much strife, a threatened minority opinion, and countless leaks of confidential drafts, ... the committee achieved

24. In fact, in his Amended and Restated Petition for a Writ of Habeas Corpus in this Court, Satcher complains that his appellate counsel rendered ineffective assistance because he failed to raise

on appeal that the "trial court entertained the testimony of Dr. Ferrara concerning the NRC Report and related issues." *See* Amended Petition at 140.

what at times seemed an almost impossible goal: a unanimous report." *See* Amended and Restated Petition for Writ of Habeas Corpus at 79.

Satcher further contends that the final report indicated that some standards recommended by the Committee were, in fact, more stringent than the guidelines with which Dr. Ferrara testified the Tidewater Laboratory complied. On that basis, Satcher argues that the Tidewater Laboratory was not, in fact, in complete compliance with the recommendations of the NRC Committee, as Dr. Ferrara testified, and that either there was no NRC consensus about DNA testing standards or that Dr. Ferrara misled the jury as to what that consensus was.

On those grounds, Satcher asserts that, when a trial involves testimony which the prosecutor knew, or should have known, was false or misleading, the ensuing conviction that is obtained is fundamentally unfair and must be set aside as violative of a defendant's right to due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 341–42, 79 L.Ed. 791 (1935). As a general proposition that is true; however, that claim was not presented to, or addressed by, the Supreme Court of Virginia, and is thus defaulted. Indeed, Satcher does not contest that he failed to present this claim of error to the state courts. Accordingly, there can be no federal habeas review of this claim unless Satcher can show cause and prejudice for the default.

### Claim II(F): *DNA Evidence.*

■ Satcher alleges that the prosecution presented false or misleading DNA evidence in violation of the Fifth, Eighth, and Fourteenth Amendments. This contention is based upon the conclusion of Dr. Aimee Bakken, a molecular geneticist, that there were extra bands on the DNA test performed by the Tidewater Laboratory, rendering its results unreliable.[25] Satcher maintains that the Commonwealth knew, or should have known, that there were extra

bands on the autoradiograms, or x-rays, for the D2S44 probe, and that their existence was not reported, or mentioned, at trial. Satcher asserts that there is a reasonable likelihood that the presentation of this so-called "false" DNA evidence had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993).

This claim too is being presented for the first time in this Court, and it is therefore procedurally defaulted absent cause and prejudice.

### Claim II(H): *Failure to Preserve DNA Sample.*

■ Satcher next argues that the Commonwealth's failure to preserve for independent testing by defense experts some of the forensic DNA sample violated his rights under the Fifth, Eighth, and Fourteenth Amendments. This claim is based on the fact that, when the Tidewater Laboratory performed the initial DNA test in November of 1990, it consumed all of the forensic DNA from the vaginal swabs taken from Borghesani. However, on June 12, 1991, the Commonwealth assured Satcher's defense counsel that some of that DNA would be preserved for independent testing until June 21, 1991. Satcher's counsel never requested production of the DNA for independent testing, and it was only at trial that Satcher's counsel learned that the forensic DNA, in fact, had not been preserved.

Satcher now argues that this sequence of events demonstrates that the Commonwealth acted in bad faith in failing to preserve the DNA sample. Satcher also claims that the trial court's error in permitting introduction of the results of the DNA test performed by the Tidewater Laboratory, without ensuring that Satcher was given the opportunity to perform an independent analysis, had a "substantial and injurious" influence on the jury's verdict. *Brecht,* 507 U.S. at 623, 113 S.Ct. at 1714.

---

**25.** A more complete discussion of Dr. Bakken's conclusion follows *infra* at II, Section B in the

fundamental miscarriage of justice analysis.

However, this claim was not presented to the Supreme Court of Virginia and Satcher does not contend otherwise. It is thus procedurally defaulted and not appropriate for federal habeas review, absent a showing of cause and prejudice.

**Claim II(I):** *Prosecutorial Misconduct.*

■ In this claim, Satcher argues that:

(1) the prosecutor breached a pretrial agreement, which required the parties to provide a curriculum vitae for all expert witnesses, by failing to provide Satcher with a copy of either Dr. Ferrara's or Dr. McElfresh's vitae prior to trial;

(2) the prosecutor misled the jury when he asked Dr. Mueller, a defense DNA expert, a hypothetical question in which it was assumed that the murder weapon was an awl, and then asked him to assume that the defendant was in possession of an awl, implying without factual basis that the Commonwealth was in possession of evidence that the murder weapon was an awl and that Satcher had been caught with that awl;

(3) the prosecutor falsely stated that the victims' purses were found together when, in actuality, Detective Carter testified that Borghesani's purse was found at the crime scene; and

(4) the prosecutor adduced testimony in a manner that misled the jury into believing that Mark Polemani made an independent in-court identification of Satcher when Polemani indicated that "number four" in the lineup photograph was Satcher, when in actuality Polemani could not positively identify Satcher at the lineup but had been told afterwards that Satcher was "number four" and had been arrested for the Abel offense.

In the aggregate, Satcher maintains that these incidents of prosecutorial misconduct so infected his trial as to make his resulting conviction a denial of due process.

The Commonwealth argues, and Satcher does not contest, that Claims II(I)(2), (3), and (4) are defaulted because they were not raised in state court. These claims, therefore, are not subject to federal habeas review absent a demonstration of cause and prejudice.

■ However, Claim II(I)(1), respecting the pretrial discovery agreement, was fairly presented to the Supreme Court of Virginia, and thus has been preserved for federal review. Satcher complained on direct appeal that he was denied due process and an opportunity effectively to cross-examine Dr. Ferrara because Ferrara was permitted "to testify as an expert when the Commonwealth had not provided the defense with his curriculum vitae in a timely fashion, and had maintained from the start of the trial that he was being called solely as a factual witness." *See* Ex. F to Petitioner's Memorandum in Opposition to Respondent's Motion to Dismiss at 19–20. Likewise, Satcher argued on direct appeal that he was denied the ability effectively to cross-examine Dr. McElfresh when the trial court allowed McElfresh, "whom the defense had called as a custodian of the records—to testify as a Commonwealth expert on rebuttal." *Id.* at 20. The Supreme Court of Virginia addressed both of these claims and determined that Satcher was not prejudiced by either. *Satcher*, 421 S.E.2d at 836. Accordingly, this part of the claim has been preserved for federal review and will be addressed later (*see infra,* III, Section D, Claim II(I)(1)).

**Claim II(J):** *Prejudicial Prosecutorial Conduct At Sentencing.*

■ Satcher asserts that the Commonwealth injected passion and prejudice into the jury's sentencing determination in violation of the Fifth, Eighth, and Fourteenth Amendments. His contention here is that, on direct appeal, the Supreme Court of Virginia failed properly to review his case under Virginia Code § 17–110.1(C), which requires the Court to ensure that the death penalty was not "imposed under the influence of passion, prejudice or any other arbitrary factor." In support of this claim, Satcher contends here that:

(1) the Supreme Court of Virginia improperly concluded that there was nothing in the record to suggest that an all-

white jury convicted Satcher, a black man, for raping and murdering a white woman on the basis of race;

(2) the prosecution made race and class prejudice an issue by emphasizing that Satcher lived in a poor, black area of Washington, D.C., and should not have come over into Arlington County;

(3) the prosecutor confronted Satcher with gruesome photographs of Borghesani in order to inflame the jury and used his unremorseful reaction to them against him during rebuttal;

(4) the prosecutor used a cumulative and prejudicial close-up photograph of Borghesani in order to inflame the jury;

(5) the prosecutor impassioned the jury by urging that it should stop Satcher from doing to others what he did to Borghesani;

(6) the prosecutor inflamed the jury with argument about unadjudicated crimes (the 1990 August attacks immediately preceding Satcher's arrest); and

(7) the prosecutor improperly used evidence of unadjudicated crimes (the August attacks) which were later *nolle prossed* because of a lack of evidence.

*See* Amended and Restated Petition for a Writ of Habeas Corpus at 114–19.

Satcher argued on direct appeal that his sentence was imposed under the influence of passion, prejudice, and other arbitrary factors, and was disproportionate to the penalty imposed in similar cases. On direct appeal, he specifically complained that:

(1) the jury that convicted Satcher for the rape and murder of a white woman was all-white;

(2) the evidence admitted at sentencing regarding unadjudicated assaults

against three other white women prejudiced the jury against him;

(3) the testimony of Borghesani's mother and friends impassioned the jury;

(4) the crimes against Borghesani and Abel were improperly and prejudicially consolidated; [26]

(5) several jurors stated during voir dire that they were predisposed toward imposing the death penalty and would have to be convinced that a sentence of death for a crime such as the one for which Satcher was convicted was not appropriate; [27] and

(6) Satcher had no history of violence and was described by family and friends as a caring, non-violent person.

*See* Ex. F to Petitioner's Memorandum in Opposition to Respondent's Motion to Dismiss at 45.

A review of the record shows that the following claims made by Satcher on federal habeas corpus respecting the injection of passion and prejudice into his sentencing determination were preserved for federal review as fairly presented to, and addressed by, the Supreme Court of Virginia on direct review: (1) Satcher was convicted for the murder and rape of a white woman by an all-white jury; and (2) the prosecutor inflamed the jury with argument about unadjudicated crimes. Whether the Supreme Court of Virginia conducted a proper review of Satcher's case under Virginia Code § 17–110.1(C) with respect to these two factors will be addressed later (*see infra*, at III, Section D). None of the other claims made by Satcher in Claim II(J) were presented on direct appeal and are thus procedurally defaulted, barring federal review, absent a showing of cause and prejudice.[28]

---

**26.** The claim of misjoinder of the Borghesani and Abel offenses, as discussed *supra*, has been defaulted for other reasons.

**27.** Satcher has preserved his constitutional challenge to the jury selection process in a separate habeas claim, *see* Claim II(C) *infra*, in III, Section D.

**28.** The Fourth Circuit recently has suggested, without deciding, that because the Supreme Court of Virginia is statutorily required to review

Satcher's capital sentence to determine if it was "imposed under the influence of passion, prejudice or any other arbitrary factor," that court must be deemed to have implicitly ruled on the "passion and prejudice" claims which Satcher failed to explicitly raise on direct review. *See Bennett v. Angelone*, 92 F.3d 1336, 1344 (4th Cir.1996) (*citing Beam v. Paskett*, 3 F.3d 1301 (9th Cir.1993), *cert. denied*, sub nom *Arave v. Beam*, —— U.S. ——, 114 S.Ct. 1631, 128 L.Ed.2d 354 (1994)). Even if Satcher's claims are *not*

■ Satcher next asserts a variety of ineffective assistance of counsel claims for the first time.

**Claim III(A):** *Failure of Counsel to Present Psychiatric Evidence.*

Satcher first asserts that his trial counsel:

(1) ignored obvious signs of mental problems;

(2) provided inaccurate information to, and unreasonably limited the work of, psychological evaluators;

(3) failed to seek the assistance of a neurologist or neuropsychologist despite strong indications that one was necessary;

(4) failed to investigate properly Satcher's childhood and obtain necessary records;

(5) failed to follow recommendations of defense evaluators;

(6) limited penalty-phase evidence to favorable character witnesses.

According to the petition, if counsel had sought appropriate expert assistance, evidence of Satcher's psychiatric problems and brain abnormalities would have been discovered and could have mitigated the damaging sentence-phase evidence presented by the Commonwealth.

**Claim III(B):** *Failure of Counsel to Test DNA.*

Satcher next complains that trial counsel's failure to run an independent DNA test on his blood in order to investigate the validity of the results of the Commonwealth's DNA test fell below the benchmark of professional competence set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**Claim III(C):** *Failure of Counsel to Object.*

Satcher also alleges that his trial counsel failed to object to the prosecutor's misrepresentation that Abel's and Borghesani's purses were found near each other, when a prosecution witness testified that Borghesani's purse was actually discovered near her body at the crime scene.

**Claim III(D):** *Failure of Counsel to Appeal Errors.*

Finally, Satcher contends that appellate counsel's failure to raise or preserve significant and obvious constitutional errors[29] on appeal provides grounds for an ineffective assistance of counsel claim.

Satcher does not maintain that he presented any of these claims to the Supreme Court of Virginia. Because no state court has had the opportunity to address these claims of ineffective assistance of counsel, they are foreclosed from federal court review unless Satcher can demonstrate cause for their default and prejudice resulting therefrom.

**Summary: Claims Defaulted and Claims Preserved.**

For the reasons set forth above, the Court finds that Satcher's Claims I, II(A), II(D), II(E), II(F), II(H), II(I)(2), (3), (4), II(J) (portions), III(A), III(B), III(C), and III(D) are procedurally defaulted. These claims were not presented to the Supreme Court of Virginia on direct appeal or on state habeas corpus review.[30] The remaining claims—

procedurally defaulted for this reason, the Court cannot find that the alleged prosecutorial misconduct rendered Satcher's sentence constitutionally infirm.

In analyzing the effects on due process of improper prosecutorial sentencing-phase argument, we look to see "whether the proceeding at issue was rendered fundamentally unfair by the improper argument." *Lawson v. Dixon*, 3 F.3d 743, 755 (4th Cir.1993) (*citing Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), *cert. denied*, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 556 (1994)); *Bennett v. Angelone*, 92 F.3d at 1345. "[N]ot every improper trial argument amounts to a denial of due process." *Ben-*

*nett*, 92 F.3d at 1346. Under the applicable standard, the Court is convinced that the Commonwealth's arguments, even if they were improper, did not so infect the sentencing proceedings as to render them constitutionally infirm.

**29.** These alleged constitutional errors are those presented in Claims II(D), II(E), II(I)(2), and II(I)(3) of Satcher's petition, all of which are procedurally barred.

**30.** As discussed, the state habeas appeal in the Supreme Court of Virginia was forfeited when the Court dismissed the petition as untimely. However, even if there had been no forfeiture, this Court would still be unable to review the state habeas claims because the only claims

II(B), II(C), II(G), II(I)(1), II(J)(1), II(J)(2), IV(A), IV(B), and IV(C)—have been preserved for federal habeas review and will be addressed below in III, Section D.

However, before turning to that task, it is necessary to assess whether, as to the defaulted claims, Satcher can show (1) cause for, and prejudice from, the default, or (2) the existence of a fundamental miscarriage of justice. Satcher asserts that all defaulted claims are revived by virtue of cause and prejudice and by virtue of a demonstrated miscarriage of justice. Each contention is considered in turn below.

## A. Cause and Prejudice Analysis

Cause for a procedural default is quite properly difficult to establish under the controlling Supreme Court precedent. In general, a petitioner can demonstrate cause for a procedural default only if he "can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). There are three circumstances in which sufficient cause for a state procedural default can be demonstrated: (1) inability of counsel reasonably to know of a legal or factual issue; (2) interference by the government's attorney with the habeas petition; and (3) ineffective assistance of counsel as defined by the exacting standards established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). The first two circumstances are not implicated in this petition.

It is also difficult to demonstrate constitutionally ineffective assistance of counsel. Indeed, there is a strong presumption against ineffective assistance because "[i]ntensive scrutiny of counsel ... could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." *Strickland v.*

which were raised in the state habeas petition were claims which had already been preserved

*Washington,* 466 U.S. at 690, 104 S.Ct. at 2066.

In *Strickland,* the Supreme Court of the United States held that a defendant could establish ineffective assistance of counsel only by "showing that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. at 2064. Additionally, the defendant must show that, but for the counsel's errors, there is a reasonable probability that the results in the case would be different. *Id.* at 694, 104 S.Ct. at 2068. "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Smith v. Murray,* 477 U.S. 527, 535, 106 S.Ct. 2661, 2666–67, 91 L.Ed.2d 434 (1986) (quoting *Murray v. Carrier,* 477 U.S. at 486–87, 106 S.Ct. at 2644–45).

Satcher asserts four ineffective assistance of counsel claims. Claim III(A) contends that trial counsel was ineffective for failing to pursue psychiatric and neurological evidence for use in the sentencing phase of trial. Claim III(B) asserts that trial counsel was ineffective for failure to have an independent DNA test run on Satcher's blood. Claim III(C) faults trial counsel for failing to object to testimony that Abel's and Borghesani's purses were found together. Claim III(D) charges that counsel on direct appeal was ineffective for failing to appeal what are presented as Claims II(D), II(E), II(I)(2), and II(I)(3) in this petition.

 Under Virginia law, ineffective assistance of counsel claims may be presented for the first time only in the state habeas petition. They may not be raised on direct appeal. *Browning v. Commonwealth,* 19 Va. App. 295, 452 S.E.2d 360, 362 n. 2 (1994). Here, none of the four ineffective assistance of counsel claims were raised in the state habeas proceedings.

 Satcher asserts the failure of his *state habeas counsel* to raise the four ineffective assistance claims as cause for the default

for federal court review on direct appeal. *See Hawks v. Cox,* 211 Va. 91, 175 S.E.2d 271 (1970).

both of the ineffective assistance claims [Claims III(A), (B), (C), and (D) ] as well the substantive issues upon which those claims are based [Claims II(D), II(E), (I)(2), and (I)(3) ].

In determining cause for the default on those claims, the critical issue is the claimed ineffective assistance of state habeas counsel, for without that linchpin, the entire cause argument fails. Satcher correctly points out that his state habeas counsel limited the state habeas petition to a rehash of the arguments raised on direct appeal, a strategy doomed to failure under *Hawks v. Cox,* 175 S.E.2d 271 (where petitioner alleged no new grounds for relief and did not rely on any new constitutional mandate or change in the law, he was not entitled to further consideration because the prior unsuccessful litigation of the issues was conclusive). The Circuit Court of Arlington County relied on the rule in *Hawks* when it dismissed Satcher's state habeas petition in its entirety.[31] If these were valid constitutional claims, state habeas counsel was deficient in failing to raise them in the state habeas proceedings.

However, for counsel's ineffectiveness to establish cause, the petitioner must demonstrate that some factor external to the defense impeded counsel's efforts to comply with the state procedural rule in question. *Coleman v. Thompson,* 501 U.S. 722, 754, 111 S.Ct. 2546, 2567, 115 L.Ed.2d 640 (1991). If, for example, in a case where the petitioner has a constitutional right to counsel, and the procedural default is the result of ineffective assistance of counsel, "the Sixth Amendment itself requires that responsibility for the default be imputed to the State." *Murray v. Carrier,* 477 U.S. at 488, 106 S.Ct. at 2645. In such a case, it is the state, rather than the petitioner, which must bear the cost of any resulting default. However, "[a] different allocation of costs is appropriate in those circumstances where the State has no responsibility to ensure that the petitioner was represented by competent counsel." *Coleman,* 501 U.S. at 754, 111 S.Ct. at 2567. In that circumstance, it is the petitioner who

must bear the burden of counsel's failure to comply with state procedural rules. *Id.*

This is a case in which the petitioner must bear that burden because there is no constitutional right to effective assistance of counsel when a defendant is collaterally attacking a conviction on habeas corpus appeal. *Coleman,* 501 U.S. at 750, 111 S.Ct. at 2564–65; *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539 (1987). This is true even in capital cases. *Murray v. Giarratano,* 492 U.S. 1, 10, 109 S.Ct. 2765, 2770–71, 106 L.Ed.2d 1 (1989). Moreover, as discussed *supra,* Satcher had no absolute stationary right to state habeas counsel under Virginia law. If there is no right to counsel, then counsel's alleged incompetence cannot constitute cause under *Strickland v. Washington. See Coleman,* 501 U.S. at 757, 111 S.Ct. at 2568 ("Because [petitioner] had no right to counsel to pursue his appeal in state habeas, any attorney error that led to the default of [his] claims in state court cannot constitute cause to excuse the default in federal habeas."); *Wainwright v. Torna,* 455 U.S. 586, 587–88, 102 S.Ct. 1300, 1301–02, 71 L.Ed.2d 475 (1982). Satcher, therefore, cannot show cause by alleging that his state habeas counsel performed ineffectively in failing to allege the ineffectiveness of his trial and appellate counsel.

Satcher seeks to escape that result by arguing that a criminal defendant has the right to effective assistance of counsel on his first appeal of right, *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), and, that, in Virginia, the first appeal of right in which he could have vindicated his right to the effective assistance of counsel was his state habeas proceedings. As a consequence, Satcher contends that he was entitled to effective assistance of counsel at his state habeas proceedings. This, as Satcher asserts, is the question arguably left open in *Coleman v. Thompson,* 501 U.S. at 755, 111 S.Ct. at 2567–68: Does a prisoner have a constitutional right to counsel in a collateral proceeding where that proceeding is the first one in which such a challenge could have been presented?

---

**31.** Satcher is correct in observing that state habeas counsel did not even need to repeat these arguments because they had been raised on direct appeal, and thus were already preserved for

federal habeas review. *Correll v. Thompson,* 63 F.3d 1279 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 688, 133 L.Ed.2d 593 (1996).

In *Coleman,* the petitioner contended that his counsel was ineffective for filing his state habeas appeal late, thereby resulting in a procedural default of Coleman's claims. That, of course, was deficient performance. However, the Supreme Court did not find that the error constituted cause for a procedural default because cause "must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Coleman,* 501 U.S. at 753, 111 S.Ct. at 2566 (quoting *Murray v. Carrier,* 477 U.S. at 488, 106 S.Ct. at 2645–46). That is, "it is not the gravity of the attorney's error that matters, but that it constitutes a violation of petitioner's right to counsel, so that the error must be seen as an external factor, *i.e.,* 'imputed to the State.'" *Id.* 501 U.S. at 754, 111 S.Ct. at 2567. But, "where the State has no responsibility to ensure that the petitioner was represented by competent counsel, . . . it is the petitioner who must bear the burden of a failure to follow state procedural rules." *Id.* Thereupon, the Supreme Court concluded that the ineffective assistance of Coleman's counsel did not constitute cause.

The Supreme Court arguably left open the question whether "there must be an exception to the rule of *Finley* and *Giarratano* [that there is no right to counsel in state collateral proceedings] in those cases where state collateral review is the first place a prisoner can present a challenge to his conviction." *Id.* at 755, 111 S.Ct. at 2567. The circuits which have addressed *Coleman's* supposedly unanswered question, whether there is a right to counsel where collateral review is the first occasion on which a prisoner can raise an issue, have responded in the negative.

For example, the Ninth Circuit held recently that there is "no Sixth Amendment right to counsel during [a] state habeas proceeding[ ] even if that was the first forum in which [the petitioner] could challenge constitutional effectiveness on the part of his counsel." *Jeffers v. Lewis,* 68 F.3d 299, 300 (9th Cir.) (en banc), *cert. denied,* — U.S. —, 116 S.Ct. 36, 132 L.Ed.2d 917 (1995).

Satcher's argument for an exception to *Coleman* is the same argument which the Ninth Circuit rejected in *Bonin v. Vasquez,* 999 F.2d 425 (9th Cir.1993). Satcher relies on the passage in *Coleman* which states:

> [f]or Coleman to prevail, . . . there must be an exception to the rule [that there is no right to counsel in state habeas proceedings] in those cases where state collateral review is the first place a prisoner can present a challenge to his conviction.

*Coleman,* 501 U.S. at 755, 111 S.Ct. at 2567. The Ninth Circuit interpreted this passage to be merely an observation that *Coleman* could prevail only if there was an exception to *Finley* and *Giarratano,* not as creating such an exception. Considering *Coleman* in its entirety, that is the soundest interpretation of the cited passage. Moreover, as explained in *Bonin,* there are important practical considerations which support that interpretation and which counsel against the interpretation urged by Satcher:

> The actual impact of such an exception would be the likelihood of an infinite continuum of litigation in many criminal cases. If a petitioner has a Sixth Amendment right to competent counsel in his or her first state postconviction proceeding because that is the first forum in which the ineffectiveness of trial counsel can be alleged, it follows that the petitioner has a Sixth Amendment right to counsel in the second state postconviction proceeding, for that is the first forum in which he or she can raise a challenge based on counsel's performance in the first state postconviction proceeding. Furthermore, because the petitioner's first federal habeas petition will present the first opportunity to raise the ineffective assistance of counsel in the second state postconviction proceeding, it follows logically that the petitioner has a Sixth Amendment right to counsel in the first federal habeas proceeding as well. And so it would go. Because any Sixth Amendment violation constitutes cause, . . . federal courts would never be able to avoid reaching the merits [of] any ineffective-assistance claim, regardless of the nature of the proceeding in which counsel's competence is alleged to have been defec-

tive. As a result, the 'exception' would swallow the rule.

*Bonin,* 999 F.2d at 429–30.

Similarly, the Eleventh Circuit has rejected the so-called *"Coleman* exception." In *Hill v. Jones,* 81 F.3d 1015 (11th Cir.1996), the Court of Appeals held that "a petitioner may not rely on his collateral counsel's ineffectiveness to excuse the procedural default of a claim even when the state collateral proceeding was the petitioner's first opportunity to raise the claim." *Id.* at 1025. Indeed, as the Court explained: "[t]o recognize such error as cause, we would have to find a petitioner has a constitutional right to counsel in collateral proceedings," contrary to the mandates of *Finley* and *Giarratano. Id.* at 1025–26.

The Supreme Court, too, has to a certain extent weighed in on the propriety of a *"Coleman* exception." In *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), Justice O'Connor, in dissent, argued against the harsh results of rejecting an exception to *Finley* and *Giarratano* because, where "the state factfinding occurs at a postconviction proceeding, the petitioner *has* no constitutional right to the effective assistance of counsel, so counsel's poor performance can *never* constitute 'cause' under the cause and prejudice standard." *Id.* at 22, 112 S.Ct. at 1726–27 (emphasis added). The majority agreed with Justice O'Connor that a claim that material facts were not adequately developed at the state court proceedings would not be availing where the cause asserted is attorney error; *"[s]uch was the intended effect of [Murray v. Carrier* and *Coleman v. Thompson ]." Id.* at 10 n. 5, 112 S.Ct. at 1720 n. 5 (emphasis added).

■ For the reasons which are expressed in *Coleman, Jeffers, Bonin,* and *Hill,* the ineffective assistance of Satcher's state habeas counsel does not constitute cause for the procedural default which resulted in the foreclosure from federal habeas corpus review of Satcher's ineffective assistance claims. The

absence of cause, of course, forecloses the necessity to assess the prejudice component of the cause and prejudice analysis. Accordingly, neither the ineffective assistance claims (Claims III(A)–(D)) nor the substantive issues on which those claims are based (Claims II(D), (E), (I)(2), and (I)(3)) can be reviewed by this Court.[32]

## B. Fundamental Miscarriage of Justice Analysis

Satcher next claims that, notwithstanding the lack of cause and prejudice for his default, there has been here a fundamental miscarriage of justice because he is actually innocent of criminal guilt and of the death penalty. This, according to Satcher, requires federal habeas review of all defaulted claims.

### 1. Actual Innocence of Guilt.

In *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Supreme Court held that, absent cause and prejudice, a habeas petitioner may avoid a procedural bar to consideration of the merits of a constitutional claim only by showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at ——, 115 S.Ct. at 867 (quoting *Murray v. Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649–50). Actual innocence is a very narrow exception to the rule that cause and prejudice must be demonstrated in order to preserve defaulted claims. *Sawyer v. Whitley,* 505 U.S. 333, 341, 112 S.Ct. 2514, 2519–20, 120 L.Ed.2d 269 (1992). A petitioner must demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup,* 513 U.S. at ——, 115 S.Ct. at 868.

A claim of actual innocence is not a freestanding claim the assertion of which is grounds for granting a federal writ of habeas corpus. Rather, actual innocence, if shown, is only "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins,* 506 U.S. 390,

**32.** Under *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, Satcher cannot show cause for excusing the procedural default with regards to the remainder of his defaulted claims (i.e. Claims I,

II(A), II(F), II(H), II(I)(4), II(J)). As to these claims, Satcher can point to no factor external to the defense which prevented them from being raised in the state courts.

404, 113 S.Ct. 853, 862, 122 L.Ed.2d 203 (1993); *Spencer v. Murray,* 5 F.3d 758 (4th Cir.1993), *cert. denied,* 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994); *Payne v. Thompson,* 853 F.Supp. 932 (E.D.Va.1994).

Claims of actual innocence which are unconnected to any constitutional errors are matters to be considered in state clemency proceedings, not in federal court under the auspices of federal habeas corpus review. *Herrera,* 506 U.S. at 417, 113 S.Ct. at 869 ("[T]he traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency"). Accordingly, Virginia provides executive clemency as an avenue for claims of "actual innocence" made after the trial judgment has become final. *See* Va.Code § 53.1–229 to 231.

There is, as Satcher asserts, some authority in the concurring opinions in *Herrera* that a truly persuasive demonstration of actual innocence would render an execution unconstitutional; and that, therefore, federal habeas relief would be warranted if no state avenue were open to process the claim. *Id.* 506 U.S. at 427, 113 S.Ct. at 874. Even so, the Commonwealth argues that Satcher has failed to present any "truly persuasive" evidence of actual innocence because under *Schlup,* the petitioner is required to "unquestionably establish ... innocence," 513 U.S. at ——, 115 S.Ct. at 862, and Satcher has not made that showing.

■ As evidence of his actual innocence, Satcher advances new DNA test results. That evidence allegedly eviscerates the effect of the Tidewater Laboratory DNA tests which were introduced at Satcher's trial. Specifically, in April of 1995, a new sample of Satcher's blood was sent to Lifecodes Corporation for an analysis using the same probes and restriction enzyme used by the Tidewater Laboratory in 1990. The results of the two tests were sent to Dr. Aimee Bakken, an independent molecular geneticist, for analysis pursuant to the match criteria used by the Tidewater Laboratory in 1990. Dr. Bakken determined that, based upon one probe, the results of the Lifecodes test excluded Satcher as the contributor of the DNA taken from Borghesani's clothing. According to Dr. Bakken, the two bands for the D2S44 probe in the Lifecodes test differed respectively by 3.66% and 3.06% from the measurements of the two dark bands that the Tidewater Laboratory demonstrated in 1990, and this fell outside the ±2.5% window of acceptability used by the Tidewater Laboratory.

In that regard, Richard A. Guerrieri, the forensic serologist who in 1990 performed the Tidewater Laboratory's DNA test which was used to connect Satcher to the Borghesani murder, testified at trial that if there was an exclusion on any one of the four probes run, he would not run any additional probes because "[i]f you can eliminate an individual in forensic cases with one probe, then they could not have made the stain, period." *See* Trial Tr., July 22, 1991 at 193. Satcher, therefore, argues that because the Lifecodes test has revealed a non-match on one probe, he is excluded as the contributor of the DNA, since under Guerrieri's own protocol, when one probe fails there can be no match.

Satcher further supports his actual innocence claim with affidavits from Dr. Bakken, Dr. Peter D'Eustachio, a molecular geneticist, and Dr. Laurence D. Mueller, a population geneticist. All three express the view that the 1995 Lifecodes result is scientifically meaningful and that the inconsistency between it and the 1990 Tidewater Laboratory analysis raises significant questions about the reliability of the 1990 Tidewater Laboratory test results. *See* Bakken aff. ¶ 2 (Ex. A to Petitioner's Memorandum in Opposition to Respondent's Motion to Dismiss); D'Eustachio aff. ¶ 8 (Ex. B); Mueller aff. ¶ 7 (Ex. C).

Based on these affidavits, Satcher contends that, because DNA was the critical evidence linking him to the Borghesani murder, and because the DNA evidence has been determined unreliable by subsequent testing, no reasonable juror with knowledge of the 1995 Lifecodes test could have found Satcher guilty of those crimes beyond a reasonable doubt.

However, Satcher's new evidence falls short of the actual innocence standard required by *Schlup* to revive his defaulted claims. The Fourth Circuit has determined

that, in general, deficiencies of DNA testing are insufficient to meet the *Schlup* standard. *Spencer v. Murray,* 5 F.3d 758, 765 (4th Cir.1993) ("an assertion that the DNA results were flawed and he was wrongly convicted.... is a claim of *factual* innocence. The errors [petitioner] points to—potential errors in the results of the DNA test—are errors of fact, not law."). Claims of that sort may be the basis for state clemency relief but, because they do not present federal constitutional errors of law, they do not constitute a showing of actual innocence sufficient to permit federal habeas review of defaulted claims. *See Herrera,* 506 U.S. at 417, 113 S.Ct. at 869.

What Satcher presents to this Court is likewise a claim of factual innocence: the 1990 Tidewater test was flawed and he was wrongly convicted. In support of his claim, Satcher offers the results of the 1995 Lifecodes test, which indicates a non-match between the DNA recovered from the crime scene and Satcher's DNA. In addition, he has tendered the affidavits of experts, contending that the difference in test results is scientifically meaningful. However, this establishes only that there is a continuing disagreement among experts.

Five experts for the Commonwealth have categorically disagreed with the assertion that the 1990 Tidewater Laboratory test was inconclusive. *See* Respondent's Exs. A–E. Dr. Kevin McElfresh, the director of Lifecodes' forensic testing at the time of trial, recently compared the 1995 Lifecodes results with those of the 1990 Tidewater results. He averred that, when the two autoradiograms are overlaid and aligned, the two DNAs match. That is, the two major dark bands produced by the 1995 Lifecodes test match the same two major bands on the 1990 Tidewater test. *See* Respondent's Ex. B.

In addition, five Commonwealth experts discount, as scientifically meaningless, Dr. Bakken's observation that the 1995 Lifecodes bands fall outside the ± 2.5% match window used by the 1990 Tidewater Laboratory because the two tests were run "on different

gels, using different molecular weight sizing ladders, run by different individuals in different laboratories at different times ..." *See* Respondent's Exs. A–E at ¶ 6. Dr. McElfresh concluded that Dr. Bakken's comparison is "scientifically untenable," *see* Respondent's Ex. B at ¶ 6, and Dr. Risch noted that the match data for all four loci between the two laboratories is "remarkably consistent," *see* Respondent's Ex. D at ¶ 6. In sum, the Commonwealth's experts aver that the 1995 Lifecodes test, in fact, confirms the four-probe match found by the 1990 Tidewater test, and that the chance of anyone other than Satcher being the rapist-murderer is "extremely remote." *See* Respondent's Exs. A–E at ¶ 10.

In addition to the discrepancies between the 1990 and 1995 tests, Dr. Bakken has asserted that there are "extra bands" appearing on the D2S44 autoradiogram produced by the Tidewater Laboratory but not reported by the subsequent Lifecodes test. According to Dr. Bakken, these unexplained anomalies render the 1990 Tidewater Laboratory's results inconclusive. However, the Commonwealth experts have explained that the "extra bands" on the 1990 Tidewater Laboratory test, which were known by the Commonwealth experts who testified at trial, were attributable to a high concentration of DNA on the gel, *see* Respondent's Exs. A–D at ¶ 4, run with a long exposure time, *see* Respondent's Ex. B and D at ¶ 4, rather than to any source other than Satcher, *see* Respondent's Exs. A–E. According to the affidavit of Dr. McElfresh, if the 1995 Lifecodes autoradiogram had been exposed longer or if more DNA had been loaded on the gel, it would have displayed the same "artifacts" as the 1990 Tidewater autoradiogram.

This disagreement among experts does not show that no reasonable juror would have found Satcher guilty beyond a reasonable doubt. Therefore, Satcher's asserted actual innocence of guilt, which is offered as a gateway to reach his defaulted constitutional claims, must be rejected.[33]

---

**33.** In *O'Dell v. Netherland,* 95 F.3d 1214 (4th Cir.1996), the Fourth Circuit recently rejected actual innocence claims similar to those present-

ed by Satcher. There, the Petitioner asserted his actual innocence based on DNA tests of the blood found on Petitioner's clothing. The Fourth Cir-

### 2. Actual Innocence of the Death Penalty.

A petitioner may obtain review of a defaulted sentencing issue by showing actual innocence of the death penalty. In order to do so, the petitioner must establish "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S.Ct. 2514, 2517, 120 L.Ed.2d 269 (1992). A petitioner, however, cannot satisfy the burden by simply demonstrating the existence of mitigating evidence not considered at trial. Rather, the focus must be "on those elements which render a defendant eligible for the death penalty, and not on additional mitigating evidence which was prevented from being introduced as a result of a claimed constitutional error." *Id.* at 347, 112 S.Ct. at 2523. In addition, a petitioner can show the absence of any aggravating circumstances. *Id.* at 344–45, 112 S.Ct. at 2521–22.

 Satcher argues that, but for counsel's unprofessional errors in preparing for and conducting the sentencing phase of his trial,[34] no reasonable juror would have sentenced him to death. Additionally, Satcher asserts that, but for the Commonwealth's misconduct in deliberately injecting passion and prejudice into his sentencing determination,[35] no reasonable juror would have sentenced him to death. These assertions are insufficient because they are simply the recasting of the claims of cause and prejudice which have been rejected in Section A above. To prove actual innocence of the death penalty, the "petitioner must show something more ..." *Id.* at 345, 112 S.Ct. at 2522. Specifically, a petitioner must show that absent a constitutional error, no reasonable juror would have found him *eligible* for the death penalty under state law.

Under Virginia law, a defendant becomes eligible for the death penalty when a jury finds one of two aggravating circumstances: (1) there is a reasonable possibility that the defendant would commit criminal acts of violence which would constitute a continuing serious threat to society ("future dangerousness"); or (2) the defendant's conduct in committing the offenses was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind, or aggravated battery to the victim ("vileness"). Va. Code § 19.2–264.4(C).[36]

To establish the "future dangerousness" aggravating circumstance, the Commonwealth introduced evidence that, on two separate occasions on the morning of August 18, 1990, the day Satcher was arrested, he had

cuit stated that, "[t]he district court, in making this determination, must look at two elements: first, all of the evidence that the jury heard at trial, and second, the newly proffered evidence." *Id.* at 1249 (*citing Schlup*, 513 U.S. at ——, 115 S.Ct. at 867). The evidence presented at trial is discussed in detail above with regards to Claim II(G) (the Abel in-court identification). It suffices here to state that, in light of all the evidence that the jury heard at trial, the newly proffered evidence of the disagreement among DNA experts does not show that no reasonable juror would have found Satcher guilty beyond a reasonable doubt.

**34.** In support of this assertion of error, Satcher points to the selection of jurors predisposed towards imposing the death penalty. This claim is addressed independently in Claim III(C)(2) *infra,* at III, Section D.

**35.** In support of this assertion of error, Satcher points to the injection of racial issues, the introduction of gruesome photographs, and the inflammation of the jury with argument about unadjudicated crimes. This claim is addressed independently in Claim II(J), *infra*, III, Section D.

**36.** At Satcher's sentencing hearing, the Commonwealth introduced evidence to prove both aggravating circumstances, either of which, if found, would support the imposition of death as punishment for capital murder under Virginia law. *See Smith v. Commonwealth*, 219 Va. 455, 248 S.E.2d 135, 145 (1978), *cert. denied*, 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979); *Zant v. Stephens*, 462 U.S. 862, 884, 103 S.Ct. 2733, 2746–47, 77 L.Ed.2d 235 (1983); *Tuggle v. Netherland*, 79 F.3d 1386, 1393 (4th Cir.1996).

When assessing whether to impose a sentence of death or life imprisonment, the jury must first determine whether the state established one or both of the statutory aggravating circumstances. *See* Va.Code § 19.2–264.4(C). If the jury finds that the state has met its burden with respect to one or both of the aggravating circumstances, the jury, after considering the evidence in mitigation, may exercise its discretion to impose either a sentence of death or life imprisonment. *See* Va.Code § 19.2–264.4(D).

grabbed two different women from behind, brandished a knife, and forced them off a bike path. Moreover, when Satcher was apprehended, he was in hot pursuit of a third woman. The Supreme Court of Virginia noted that Satcher "was a veritable one-man crime wave on the bicycle paths of Arlington County ..." *Satcher*, 421 S.E.2d at 845. Even if, as Satcher asserts, that conclusion overstates the record, there is no doubt that the record is legally sufficient to establish the future dangerousness predicate.

To meet its burden under the "vileness" aggravating factor, the Commonwealth relied upon the violent circumstances surrounding the murder, which included 21 stab wounds, severe beating, and brutal rape. The Supreme Court of Virginia commented that "the violence of [Satcher's] attack upon Ann Borghesani is almost unparalleled in our death-penalty cases." *Satcher*, 421 S.E.2d at 845. The facts reasonably support that assessment.

After its deliberations, the jury found in the murder of Borghesani both "future dangerousness" and "vileness" and exercised its discretion to sentence Satcher to death.

Without a suggestion from Satcher about how the alleged errors (a tainted jury and an element of passion and prejudice injected into the sentencing determination) would have affected a reasonable juror in determining whether he was eligible for the death penalty because he presented a future threat to society or because of the vileness of his crime, the *Sawyer* test is difficult to apply. For example, even if Satcher can show that some members of his jury were predisposed towards imposing the death penalty, he cannot prove that *no* juror would have found him eligible for the death penalty based upon the presence of Virginia's aggravating fac-

tors. Similarly, even if Satcher were to prove that the introduction of the gruesome photographs filled the jury with passion and prejudice against him, thus negating the vileness aggravator, the sentence need not be vacated because the jury also found the future dangerousness aggravator. *See Tuggle v. Netherland*, 79 F.3d at 1393. Moreover, as discussed *supra*, the passion and prejudice claim is procedurally barred from adjudication in this Court and has not been revived by a showing of cause and prejudice. *See, supra* note 28 and accompanying text.

Because Satcher cannot prove that, but for constitutional error, no reasonable juror would have found him eligible for the death penalty under Virginia law, Satcher cannot prove that he is actually innocent of the death penalty thus rendering his death sentence a fundamental miscarriage of justice.

In sum, Satcher cannot establish cause and prejudice for defaulting certain of his constitutional claims. Neither can he establish a fundamental miscarriage of justice by way of actual innocence of guilt or actual innocence of the death penalty to revive those defaulted claims in the absence of cause and prejudice. Accordingly, Satcher's defaulted claims are not reviewable by this Court. We next turn to the merits of Satcher's non-defaulted claims.

## III. Non–Defaulted Claims

### A. Standard of Review.

The review of Satcher's non-defaulted claims proceeds under the statutory presumption of correctness which attaches to the factual findings made by the state courts. That presumption is rebutted upon certain specified circumstances. *See* 28 U.S.C. § 2254(d)(1)–(8).[37] If the presumption of

---

**37.** A state court finding of fact, if "evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct," unless it appears "(1) that the merits of the factual dispute were not resolved in the State court hearing; (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing; (3) that the material facts were not adequately developed at the State court hearing; (4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant

in the State court proceeding; (5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding; (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or (7) that the applicant was otherwise denied due process of law in the State court proceeding; (8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the suffi-

correctness applies, i.e., where none of the eight factors is present, it may be overcome only by "convincing evidence that the factual determination by the state court was erroneous," with the burden of persuasion on the petitioner. *See* 28 U.S.C. § 2254(d). Deference is due to the findings of fact made by state trial and appellate courts. *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (per curiam). And, if, in a habeas corpus proceeding, a federal court makes a finding of fact contrary to one made by a state court, the federal court must explain why § 2254(d) does not mandate a different result. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). There is, however, no corresponding presumption of correctness given to questions of law or mixed questions of law and fact—this court must review those issues *de novo. Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

Those claims which were adjudicated on the merits by the Supreme Court of Virginia are amenable to federal habeas review. They are: Claim II(C) jury selection; Claim II(G) the Abel in-court identification; Claim II(I)(1) the alleged prosecutorial misconduct regarding the curriculum vitae; Claims II(J)(1) and (2) the injection of passion and prejudice into Satcher's sentencing by way of his conviction by an all-white jury and the prosecutor's arguments about unadjudicated crimes; Claim IV(A) the constitutionality of Virginia's DNA statute; Claim IV(B) the constitutionality of Virginia's aggravating factors; Claim IV(C) the constitutionality of the death penalty; and Claim II(B) the suffi-

ciency of the evidence. As to each of these claims, this Court must presume the determination of the underlying facts made by the trial court and the Supreme Court of Virginia to be correct unless any of the eight circumstances in 28 U.S.C. § 2254(d) is present.

## B. Harmless Error, Trial Error and Structural Error.

 Federal habeas courts routinely conduct harmless error analysis of errors occurring in capital cases. *See, e.g., Cabana v. Bullock,* 474 U.S. 376, 391 n. 6, 106 S.Ct. 689, 700 n. 6, 88 L.Ed.2d 704 (1986); *Smith v. Dixon,* 14 F.3d 956, 978 (4th Cir.) (en banc), *cert. denied,* ——— U.S. ———, 115 S.Ct. 129, 130 L.Ed.2d 72 (1994); *Gaskins v. McKellar,* 916 F.2d 941, 950–51 (4th Cir.1990), *cert. denied,* 500 U.S. 961, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991); *Waye v. Townley,* 871 F.2d 18, 21 (4th Cir.), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 710 (1989). Under this analysis, a federal court on collateral review must, upon finding constitutional error in the state court proceedings, determine whether that error is a "trial" or a "structural" error. Both the Supreme Court and the Fourth Circuit have recognized that "most errors do not render a trial unfair and thus, can be harmless." [38] *Sherman v. Smith,* 89 F.3d 1134, 1137 (4th Cir.1996) (*citing Arizona v. Fulminante,* 499 U.S. 279, 306–07, 111 S.Ct. 1246, 1262–64, 113 L.Ed.2d 302 (1991)). Errors amenable to such harmless-error review are "trial errors." *Tuggle v. Netherland,* 79 F.3d 1386, 1391 (4th Cir. 1996).

---

ciency of the evidence to support such factual determination, is produced as provided hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record."

**38.** In *Arizona v. Fulminante,* 499 U.S. at 306–07, 111 S.Ct. at 1262–64, the Supreme Court enumerated the wide variety of constitutional errors subject to harmless error analysis. They include: improper admission of an involuntary confession; overbroad jury instructions at the sentencing stage of a capital case; improper admission of evidence at the sentencing stage of a capital case; jury instructions containing erroneous conclusive or rebuttable presumptions; erroneous

exclusion of a defendant's testimony regarding the circumstances of a confession; improper restriction on a defendant's right to cross-examine witness for bias; denial of a defendant's right to be present at trial; improper comment on a defendant's silence at trial; improper prohibition on the provision of a lesser included offense instruction in a capital case; failure to instruct the jury on the presumption of innocence; improper admission of identification evidence; erroneous admission of an out-of-court statement of a nontestifying codefendant; improper admission of a confession made to an undercover officer; admission of evidence obtained in violation of the Fourth Amendment; and improper denial of counsel at a preliminary hearing. *Id. See also Sherman v. Smith,* 89 F.3d at 1137–38.

However, "certain structural errors are so severe as to render a trial inherently unfair and thus, should not be subject to harmless error analysis." *Sherman v. Smith*, 89 F.3d at 1137 (citations omitted). Unlike trial errors, structural errors deny the basic protections guaranteed by the Constitution, and "[w]ithout these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Id.* at 1138.[39]

■ In *Sherman v. Smith*, the Fourth Circuit recently demarcated the line between structural and harmless error: a structural error "affect[s] the 'entire conduct of the trial from beginning to end,'" while trial errors can be confined to "discrete moments in the course of an otherwise fair trial." *Id.* at 1138 (*quoting Fulminante*, 499 U.S. at 309, 111 S.Ct. at 1264–65). Because structural errors "infect the entire trial process," *Brecht*, 507 U.S. at 630, 113 S.Ct. at 1717, "'[a]ssessment of the impact of [the error is] impossible.'" *Tuggle v. Netherland*, 79 F.3d at 1391 (*quoting Smith v. Dixon*, 14 F.3d 956, 974 (4th Cir.) (*en banc*) *cert. denied*, —— U.S. ——, 115 S.Ct. 129, 130 L.Ed.2d 72 (1994)).

■ The applicable harmless error test on federal habeas corpus review is different from the "harmless beyond a reasonable doubt" standard used on direct appellate review in the federal courts. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Principles of "federalism, comity, and ... the weighty state interest [in] ... finality" dictate a narrower standard of review on collateral review. *Sherman v. Smith*, 89 F.3d at 1141. Accordingly, in federal habeas corpus proceedings an error is deemed harmful only if it "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (cit-

ing *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (*quoting Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946))). No relief is appropriate based on trial error unless it resulted in "actual prejudice." [40] However, "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, ——, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995).

As discussed above, the *Brecht* modified harmless error test applies to most constitutional errors at the trial level. However, the harmless error analysis "presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury." *Rose v. Clark*, 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). That is, jury partiality, like trial by a biased judge, constitutes a "structural defect[ ] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards." *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991); *Tuggle v. Netherland*, 79 F.3d at 1391.

Claim II(C), Satcher's challenges to the jury selection process, raises a structural error. All other preserved claims raise trial errors, to which the *Brecht* harmless error analysis is applicable.

### C. New Rule Doctrine.

Federal courts may not grant state prisoners relief in collateral proceedings if to do so would create a new rule of constitutional law. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256

---

**39.** In *Fulminante*, the Supreme Court identified the deprivation of the right to counsel, trial by a biased judge, the unlawful exclusion of members of the defendant's race from a grand jury, and the denial of the right to a public trial as examples of structural errors. 499 U.S. at 309–10, 111 S.Ct. at 1264–65; *See also Tuggle v. Netherland*, 79 F.3d at 1391; *Sherman v. Smith*, 89 F.3d at 1138.

**40.** In *Brecht*, the Supreme Court concluded that a less onerous harmless error standard was "better tailored to the nature and purpose of collateral review and more likely to promote the considerations underlying" its habeas jurisprudence. 507 U.S. at 638, 113 S.Ct. at 1722.

(1989). In other words, if a state court judgment was constitutionally valid when entered, it must be upheld. Otherwise, there would be a never-ending need to re-examine final judgments. *Sawyer v. Smith*, 497 U.S. 227, 234, 110 S.Ct. 2822, 2827, 111 L.Ed.2d 193 (1990).

The question of whether a rule is "new" for purposes of *Teague* arises in two different circumstances: first, "where a particular case is decided after petitioner's conviction becomes final, and petitioner seeks the benefit of that case;" and second, where, as here, "petitioner seeks the extension of longstanding precedent." *O'Dell v. Netherland*, 95 F.3d 1214, 1220 (4th Cir.1996) (*citing Stringer v. Black*, 503 U.S. 222, 227–28, 112 S.Ct. 1130, 1134–35, 117 L.Ed.2d 367 (1992)). As explained recently by the Supreme Court in *Caspari v. Bohlen*, 510 U.S. 383, 389, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994), and the Fourth Circuit in *O'Dell v. Netherland*, 95 F.3d at 1221:

> a federal court should apply *Teague* by proceeding in three steps. First, the court must ascertain the date on which the defendant's conviction and sentence became final for *Teague* purposes. Second, the court must survey the legal landscape as it then existed, and determine whether a state court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution. Finally, even if the court determines that the defendant seeks the benefit of a new rule, the court must decide whether that rule falls within one of the two narrow exceptions to the nonretroactivity principle.

*Id.* (internal quotation marks and citations omitted).

▮▮▮▮ "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or Federal government.... [A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070.[41] A rule is not dictated by precedent, however, if it is "susceptible to debate among reasonable minds." *Butler v. McKellar*, 494 U.S. 407, 415, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990). As the Fourth Circuit recently explained, "a rule sought by a habeas petitioner is 'new,' and thus consideration of the underlying claim is barred, unless reasonable jurists considering the petitioner's claim at the time his conviction became final 'would have felt *compelled by existing precedent*' to rule in his favor." *O'Dell*, 95 F.3d at 1221 (original emphasis) (*quoting Saffle v. Parks*, 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990)). The inquiry is not merely whether the petitioner's claim was "predicated" on or "dictated" by such pre-existing precedent; and, it is insufficient that prior decisions " 'inform, or even control or govern, the analysis of' a petitioner's claim." *Id.* (*quoting Saffle*, 494 U.S. at 491, 110 S.Ct. at 1261–62). The inquiry under *Teague*, then, is "whether it would have been objectively unreasonable, under the law existing [at the time petitioner's conviction became final], for a judge to reach a contrary result to that" urged by petitioner on habeas review. *Id.* at 1223–24. Whenever the actual holding of a precedent is "susceptible to debate among reasonable minds," *Butler*, 494 U.S. at 415, 110 S.Ct. at 1217–18, or among "reasonable jurists," *Sawyer*, 497 U.S. at 234, 110 S.Ct. at 2827, then the application of that "holding" on federal habeas review would constitute the application of a new rule in violation of *Teague* and its progeny. *O'Dell*, 95 F.3d at 1223–24. In making this determination, the "rule" must be identified at the appropriately specific level of generality; that is, "that level represented by the narrowest principle of law that was actually applied in order to decide the case in question." *Id.* at 1223.

▮▮▮ If a habeas petitioner's claim requires the application of a new rule, a federal court on habeas review must deny relief un-

---

**41.** For *Teague* purposes, a defendant's conviction becomes final when his certiorari petition from the disposition of his direct appeal is finally denied by the Supreme Court of the United States. *Penry*, 492 U.S. at 314, 109 S.Ct. at 2944. Satcher's conviction became final on April 19, 1993, when the Supreme Court denied Satcher's motion for rehearing on his denied petition for certiorari.

less "one of the two narrow exceptions to the nonretroactivity principle" applies. *Caspari,* 510 U.S. at 389–90, 114 S.Ct. at 953. In *O'Dell,* the Fourth Circuit succinctly stated the two exceptions to *Teague:*

> The first exception applies to those rules that place certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, or address a substantive categorical guarantee accorded by the Constitution, such as a rule prohibiting a certain category of punishment for a class of defendants because of their status or offense.
>
> The second exception applies to watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal procedure. This exception is clearly meant to apply only to a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. A rule that qualifies under this exception must not only improve accuracy, but also alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding.

*O'Dell,* 95 F.3d at 1238–39 (internal quotation marks and citations omitted) (original emphasis). Undoubtedly, these two exceptions are exceedingly rare and difficult to establish.

Because the Supreme Court and the Fourth Circuit have so broadly defined a "new rule," and because the two exceptions to the new rule doctrine are extremely narrow, *Teague* and its progeny have substantially limited what can be entertained on federal habeas.

### D. Preserved Claims.

#### Claim II(C): *Jury Selection.*

Satcher first argues that he was deprived of a fair trial under the Sixth and Fourteenth Amendments because the trial court wrongfully refused to sustain proper challenges for cause to jurors who clearly admitted to certain biases during voir dire. Two of those jurors, Goldman and Gay, actually served on the jury, through all deliberations. Juror Walch was an alternate and was excused before deliberations began. The Common-

wealth struck one challenged juror, and Satcher was forced to use peremptory challenges on the other objectionable jurors to keep them from sitting.

■ At trial, the judge expressed confidence in the ability of each challenged juror to follow the court's instructions and to render a fair verdict based upon the evidence presented. The Supreme Court of Virginia found no abuse of discretion respecting that decision. *Satcher,* 421 S.E.2d at 829–32. As a general proposition, the question of a challenge to a prospective juror for bias is a factual issue to which the presumption of correctness attaches. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). This principle reflects the recognition that the trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Wainwright v. Witt,* 469 U.S. 412, 429, 105 S.Ct. 844, 854–55, 83 L.Ed.2d 841 (1985). The presumption of correctness disappears, however, if one of eight enumerated reasons for avoiding the presumption is present. *Id.* at 431, 105 S.Ct. at 855–56; 28 U.S.C. § 2254(d)(1)–(8), discussed *supra* at note 37. Reasons 1 through 7 are inapplicable here, so this Court can disturb the State Court's rulings that the jurors were impartial only if those findings are "not fairly supported by the record." 28 U.S.C. § 2254(d)(8); *see also Witt,* 469 U.S. at 431, 105 S.Ct. at 855–56; *Boggs v. Bair,* 892 F.2d 1193, 1201–02 (4th Cir.1989), *cert. denied,* 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 521 (1990). That, of course, requires "that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even 'fair support' in the record." *Fields v. Murray,* 49 F.3d 1024, 1033 (4th Cir.1995) (quoting *Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 849–50, 74 L.Ed.2d 646 (1983)). In addition, the petitioner has the burden of producing "convincing evidence" to overcome the presumption of correctness.

### Analytical Framework For Assessing Satcher's Juror Related Claims.

■ Before considering the specific determinations of impartiality made by the

state court, it is helpful to establish the basic framework in which that assessment must take place. It, of course, begins with the premise that "[i]t is fundamental that every litigant who is entitled to trial by jury is entitled to an impartial jury, free to the furthest extent practicable from extraneous influences that may subvert the fact-finding process." *Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1535 (4th Cir.1986). Indeed, "[t]he Sixth and Fourteenth Amendments of the U.S. Constitution guarantee all criminal defendants the right to a trial by an impartial jury. The implementation of this guarantee is entrusted to the trial court." *United States v. Hinojosa*, 958 F.2d 624, 631 (5th Cir.1992). And, jurors "are presumed to be impartial, absent indications to the contrary." *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir.1987).

The assessment also proceeds under the now settled principle that trial judges are granted broad discretion in making determinations of impartiality in large measure because they have a significant and acknowledged advantage in observing the demeanor and credibility of potential jurors. *Mu'Min v. Virginia*, 500 U.S. 415, 422–24, 111 S.Ct. 1899, 1904, 114 L.Ed.2d 493 (1991); *Id.* at 428–30, 111 S.Ct. at 1907 ("A trial court's findings of juror impartiality may 'be overturned only for manifest error'") (*quoting Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984)); *United States v. Hinojosa*, 958 F.2d at 630. Likewise, reviews of a trial judge's rulings on challenges for cause must be made in perspective of the basic truth that "[t]he [trial] judge, present in the courtroom, must deal in inflections, nuances and evanescent impressions not preserved for an appellate bench." *United States v. Barber*, 668 F.2d 778, 786 (4th Cir.), *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982). The same basic principle also constrains assessment of the trial judge's decisions when considered in federal habeas proceedings.

Furthermore, voir dire has long been recognized as the vehicle for rooting out biases and for identifying those who are not able to serve impartially within the strictures of the Sixth Amendment. *See, e.g., Patton v.*

*Yount*, 467 U.S. 1025, 1038 n. 13, 104 S.Ct. 2885, 2892 n. 13, 81 L.Ed.2d 847 (1984); *Haley v. Blue Ridge Transfer Co.*, 802 F.2d at 1535. In that regard, the testimony of the venire in response to voir dire examination must be considered not in isolation, but in the context of the testimony taken as a whole. *Darden v. Wainwright*, 477 U.S. 168, 176, 106 S.Ct. 2464, 2469, 91 L.Ed.2d 144 (1986); *Briley v. Bass*, 750 F.2d 1238, 1247 (4th Cir.1984), *cert. denied*, 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985); *Pruett v. Thompson*, 771 F.Supp. 1428, 1454–55 (E.D.Va.1991), *aff'd*, 996 F.2d 1560 (4th Cir.), *cert. denied*, 510 U.S. 984, 114 S.Ct. 487, 126 L.Ed.2d 437 (1993). Thereafter, and on that basis, the trial judge is charged with making the proper determination according to the standard promulgated by the Supreme Court of the United States: A juror must be excused when his or her views would prevent or substantially impair the performance of his or her duties as a juror in accordance with the instructions of the court and his or her oath as a juror. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).

In conducting the voir dire examination, the trial court must evaluate whether a juror can lay aside preconceived impressions or opinions and render a verdict based solely upon the evidence presented in court, the instructions given by the judge, and the requirements of the juror's oath. This frequently involves asking follow-up questions designed to probe jurors' initial responses in order to clarify or interpret those responses. In making such an evaluation, however, a trial court cannot accept without question a simple promise by the juror to be fair and impartial if it follows several previous statements of obvious bias by the juror, *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), because, notwithstanding that the juror may be sincere in expressing a desire to be fair and impartial, the psychological impact of requiring such a declaration before the juror's peers and a judge could render the promise unreliable. *Id.* at 728, 81 S.Ct. at 1645–46.

Mindful of these guiding principles, the Court will consider Satcher's objections to

the selection of jurors in his case. Consideration of those issues will be informed by a brief review of the voir dire process employed at Satcher's trial.

Potential jurors were questioned in groups of four or five. The trial judge briefly informed each group about the charges against Satcher and introduced counsel. Then, the trial judge queried the jurors respecting their relationship to Satcher, the lawyers, and the victims. Thereafter, the trial judge asked each group three standard questions:

1. Do you have any interest in the outcome of the case?

2. Are you sensible or aware of any bias or prejudice that you would have for or against Michael Satcher or the Commonwealth of Virginia?

3. Do you know of any reason why you cannot give both Michael Satcher and the Commonwealth of Virginia a fair and impartial trial based solely on the evidence and the law that will be given to you at the conclusion of the case by the Court?

*See* Trial Tr., July 17, 1991 at 14. Hereafter, these will be referred to as "Standard Questions (1), (2), and (3)." No juror in any group gave an affirmative answer to any of the three Standard Questions. The voir dire examination was then turned over to counsel who posed to each group a set of essentially standard queries and then asked further questions depending upon answers given to the more general, standard inquiries. It was during the examination conducted by counsel that the issues of which Satcher complains arose. For analytical purposes, the issues may be divided into different categories.

### 1. Jurors Challenged Based On Views Of The Death Penalty.

Satcher contends that four jurors [42], Barbee, Lawson, Goldman, and Sulak, should have been excused for cause because they were predisposed towards imposing the death penalty.[43] In addition, Satcher claims that another juror, Oppenheimer, should *not* have been excused for cause because of her objections to the death penalty.

With respect to the first four jurors, the Supreme Court of Virginia concluded that "[w]e discern nothing in the record to indicate that the trial court failed to observe [the proper] standard in deciding that the five prospective jurors were not predisposed toward imposing the death penalty ..." *Satcher*, 421 S.E.2d at 831. The Supreme Court similarly found no error with respect to the dismissal of Oppenheimer. In determining whether there is fair support in the record for these conclusions, it is necessary to consider carefully the voir dire examination of these jurors respecting their views on the death penalty. Before turning to that task, however, it is appropriate to summarize the legal principles against which the death penalty voir dire is to be measured.

The Supreme Court's landmark case with respect to the "death qualification" of jurors in capital cases is *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The principles first propounded in *Witherspoon*, the reverse of which are largely at issue here, "demand inquiry into whether the views of prospective jurors on the death penalty would disqualify them from sitting." *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). In *Witherspoon*, the Court addressed the circumstances under which a juror could be properly removed by the state for cause based on reservations expressed during voir dire concerning the death penalty. The Court held that the state had the power to exclude for cause only veniremen:

who make unmistakenly clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penal-

---

**42.** Five jurors were challenged on this ground in the Supreme Court of Virginia. *See Satcher*, 421 S.E.2d at 831. However, this Court will address only these four jurors because the fifth, Juror Tuttle, was not challenged on this ground by Satcher in his Petition for Habeas Corpus.

**43.** Of these four jurors, only Juror Goldman was actually empanelled on the trial jury. Although the trial court refused to remove Sulak for cause, the Commonwealth struck Sulak with a peremptory strike. Satcher was forced to strike Jurors Barbee and Lawson with peremptory strikes.

ty would prevent them from making an impartial decision as to the defendant's guilt. *Witherspoon*, 391 U.S. at 523 n. 21, 88 S.Ct. at 1777 n. 21.

In both *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), the Supreme Court "clarified" its decision in *Witherspoon*, but in fact reformulated the standard for defining *"Witherspoon* excludables." In *Witt*, the Court "simplified" the *Witherspoon* standard by eliminating *Witherspoon*'s requirement that "a juror may be excluded only if he would never vote for the death penalty" and by removing the State's "extremely high burden of proof" of showing with "unmistakable clarity" that a juror is not "death qualified." *Witt*, 469 U.S. at 421, 424, 105 S.Ct. at 851, 852. The Court also held in *Witt* that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424, 105 S.Ct. at 852 *(quoting Adams,* 448 U.S. at 45, 100 S.Ct. at 2526); *see also Adams,* 448 U.S. at 50, 100 S.Ct. at 2529 ("[T]he State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths."). Under both *Witt* and *Adams,* the progeny of *Witherspoon,* it is clear that "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan v. Illinois,* 504 U.S. at 728, 112 S.Ct. at 2229.

Thereafter, the Supreme Court, in *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and *Morgan v. Illinois,* 504 U.S. at 719, 112 S.Ct. at 2222, developed the so-called "reverse-*Witherspoon* doctrine," which is the focus of argument respecting three jurors in Satcher's case. The reverse-

*Witherspoon* doctrine requires the removal for cause of any members of the venire who will vote automatically for the death penalty where the jury finds the defendant guilty, or whose belief that the death penalty should be imposed would prevent, or substantially impair, the performance of his duties as a juror.

The Court first alluded to the reverse-*Witherspoon* doctrine in *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). There, a state trial court refused to remove for cause a juror who declared he would vote to impose death automatically if the jury found the defendant guilty. The juror did not, however, sit on the petit jury, because he was peremptorily challenged by the defendant. The Court announced that because the Sixth and Fourteenth Amendments guarantee a capital defendant the right to an impartial jury, the trial court's failure to remove the juror for cause was constitutional error under the standard enunciated in *Adams* and *Witt. Ross,* 487 U.S. at 85, 108 S.Ct. at 2276–77. The Court emphasized that "[h]ad [this juror] sat on the jury that ultimately sentenced petitioner to death, ... the sentence would have to be overturned." *Id. (citing Adams* ).[44]

In *Morgan v. Illinois,* 504 U.S. 719, 733, 112 S.Ct. 2222, 2232, 119 L.Ed.2d 492 (1992), the Court revisited the issue of a petitioner's "ability to exercise intelligently his complementary challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt." The Court "reiterated" and elaborated on its explication of the reverse-*Witherspoon* doctrine:

A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due

---

**44.** The Court held, however, that the Sixth Amendment requirement of jury impartiality was not violated where such a juror did not actually sit on the jury. *Ross,* 487 U.S. at 85–87, 108 S.Ct. at 2277. On this basis, the Court upheld the death sentence in *Ross. Id.*

Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views.

*Id.* at 729, 112 S.Ct. at 2229–30.

The Court emphasized that the views of a prospective juror who would automatically impose a death sentence after a finding of guilt would prevent, or substantially impair, that venireman from properly executing his duties as a juror. This is so because "such jurors obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty; they not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id.* at 736, 112 S.Ct. at 2233.

The articulation of such a view by a juror would be inconsistent with the requirements of the Virginia death penalty statute, Va. Code §§ 19.2–264.2, –264.5, pursuant to which Satcher was sentenced. The Virginia statute, which is similar to the Illinois death penalty statute examined in *Morgan,* provides that the capital sentencing jury must consider any mitigating evidence which is relevant to the imposition of the death penalty, and lists certain mitigating and aggravating factors that the legislature has deemed relevant to such imposition. Va.Code § 19.2–264.4. The statute explicitly directs the procedure controlling this jury deliberation at the penalty phase of the trial. *Id.* As the Court stated in *Morgan,* under such a statutory scheme:

> [a]ny juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence and to decide if it is *sufficient* to preclude imposition of the death penalty … The statute plainly indicates that a lesser sentence is available where mitigating evidence exists; thus any juror who would invariably impose the death penalty upon conviction cannot be said to have reached this decision based on all the evidence.

*Morgan,* 504 U.S. at 738, 112 S.Ct. at 2234 (original emphasis). Under *Morgan,* any

such juror should be disqualified for cause, "for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial." *Id.* at 739, 112 S.Ct. at 2235.

It is against these principles which we measure Satcher's objections to the trial court's refusal to remove jurors Barbee, Lawson, Goldman, and Sulak for cause based on their views of the imposition of capital punishment.

### (a) Juror Lawson.

The first juror challenged on this ground by Satcher is Juror Lawson. Satcher does not assert that his Sixth Amendment rights under the reverse-*Witherspoon* doctrine have been violated with respect to the refusal to dismiss Lawson for cause. Because Lawson was not empaneled on the petit jury, a claim based on the Sixth Amendment is foreclosed by the Supreme Court in *Ross v. Oklahoma,* 487 U.S. at 85–86, 108 S.Ct. at 2276–2277. In *Ross,* the Supreme Court held:

> Petitioner was undoubtedly required to exercise a peremptory challenge to cure the trial court's error. But we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury [Sixth Amendment]. We have long recognized that peremptory challenges are not of constitutional dimension.... *So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.*

*Id.* (emphasis added) (internal citations omitted).

 Relying largely on *Ross,* however, Satcher asserts that the trial court's failure to remove Lawson for cause violated his Fourteenth Amendment right to due process by arbitrarily denying or impairing his right to exercise the full complement of peremptory challenges to which he was entitled under Virginia law. Satcher contends that the refusal to remove Juror Lawson for cause under the reverse-*Witherspoon* doctrine was a violation of due process. Satcher exercised a peremptory challenge to prevent Lawson from sitting on the petit jury; and that, he

claims, "denied or impaired" his state-given right to use peremptory challenges only against a panel of jurors not subject to removal for cause. *Ross,* 487 U.S. at 89, 108 S.Ct. at 2278–79. The Respondent, however, argues that this interpretation of *Ross,* and the result sought via that interpretation, would announce a new rule in violation of *Teague* and its progeny.

The merits of Satcher's challenge cannot be considered until the Court determines whether applying *Ross v. Oklahoma* in the way Satcher suggests would be to announce a new rule because "the *Teague* inquiry is a threshold matter." *O'Dell,* 95 F.3d at 1220 (*citing Graham v. Collins,* 506 U.S. 461, 466, 113 S.Ct. 892, 897, 122 L.Ed.2d 260 (1993); *Saffle v. Parks,* 494 U.S. 484, 487, 110 S.Ct. 1257, 1259–60, 108 L.Ed.2d 415 (1990)). In its recent decision in *O'Dell,* the Fourth Circuit quoted the Supreme Court's holding in *Caspari v. Bohlen,* 510 U.S. 383, 389–90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994), that, "if the State . . . argue[s] that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply *Teague* before considering the merits of the claim." *O'Dell,* 95 F.3d at 1220 (original emphasis). Here, the *Teague* inquiry must begin with a review of the Supreme Court's Fourteenth Amendment analysis in *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273.

In *Ross,* the state trial court erroneously refused to dismiss a juror for cause who stated that, if the jury found the defendant guilty, he would vote to impose death automatically. The Supreme Court recognized that, although "peremptory challenges are not of constitutional dimension" the due process right to exercise such challenges is "one of the most important of the rights secured to the accused." *Id.* at 88–89, 108 S.Ct. at 2278 (*quoting Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965)). The Court went on to explain:

> [b]ecause peremptory challenges are a creature of statute and are not required by the Constitution, it is for the State to determine the number of peremptory challenges allowed and to define their purpose

and the manner of their exercise. *As such, the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides.*

*Id.* 487 U.S. at 89, 108 S.Ct. at 2279 (emphasis added) (internal citations omitted). Under the law of Oklahoma, where Ross was convicted, a defendant, in order to preserve the claim on appeal, was required to exercise a peremptory challenge to remove any juror who was not removed for cause.[45] *Id.* at 89–90, 108 S.Ct. at 2278–2279. Considering this limitation on the "right" to exercise peremptory challenges as established under Oklahoma law, the Supreme Court held that Ross had "received all that Oklahoma law allowed him, and therefore his due process challenge fail[ed]." *Id.* at 91, 108 S.Ct. at 2279–80.

 Satcher is correct in asserting that in Virginia, unlike Oklahoma, a defendant need not use his peremptory challenges to cure an erroneous decision on a challenge for cause. Rather, Virginia law provides that peremptory challenges are to be exercised against "a panel free from exceptions." Va.Code § 8.01–357. Therefore, unlike *Ross,* the fact that a defendant used a peremptory challenge to remove a prospective juror from the panel ultimately selected is irrelevant on appeal in determining whether the trial court committed error in not dismissing a juror for cause. *Justus v. Commonwealth,* 220 Va. 971, 266 S.E.2d 87, 90 n. * (1980). More to the point, forcing the defendant to use a peremptory challenge to remove a juror who should have been excused for cause is prejudicial error under Virginia law. *Griffin v. Commonwealth,* 19 Va.App. 619, 454 S.E.2d 363, 364 (1995). Thus, under Virginia law, Satcher was entitled to exercise his peremptory challenges against a panel which contained no juror who should have been stricken for cause; and, under Satcher's interpretation of *Ross,* the failure of the state court to afford him that right is of constitutional import.

Acknowledging the difference between Virginia law and the state law in *Ross,* the Respondent nonetheless asserts that the re-

---

45. The Court found the Oklahoma statute at issue, which placed this limitation on the right to exercise peremptory challenges, to be constitutional. *Ross,* 487 U.S. at 90, 108 S.Ct. at 2279.

sult sought here by Satcher would announce a new rule in violation of *Teague* and its progeny. In making this argument, Respondent relies upon the text in footnote 4 of the *Ross* opinion, wherein the Court stated that it:

> need not decide the broader question whether, in the absence of Oklahoma's limitation on the 'right' to exercise peremptory challenges, a 'denial or impairment' of the exercise of peremptory challenges occurs if the defendant uses one or more challenges to remove jurors who should have been excused for cause.

*Ross,* 487 U.S. at 91 n. 4, 108 S.Ct. at 2280 n. 4 (citations omitted). Respondent argues, then, that the Supreme Court expressly did not rule on the precise proposition Satcher attributes to *Ross;* and, thus, to apply that very rule of law to Satcher's petition would be to apply a "new rule" in violation of *Teague* and its progeny.

Understandably, footnote 4 has become the source of much confusion. In the text of the *Ross* opinion, the Supreme Court strongly suggested that due process rights are violated where a defendant does not receive all that state law provides when it observed that: "[T]he 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides". *Id.* at 89, 108 S.Ct. at 2278–79. In fact, four United States Courts of Appeals, one federal district court, and one state court of last resort seem to have interpreted *Ross* as having decided precisely that issue.[46] Notwithstanding the suggestion to the contrary in the text of the opinion, the Court, in footnote 4, expressly declined to consider the issue outside the context of Oklahoma's statutory limitation on peremptory challenges. Based on footnote 4, two United States Courts of Appeals and one district court have found that *Ross* did not rule upon the proposition Satcher attributes to it.[47]

In light of footnote 4, it cannot be said that a state court considering Satcher's claim at the time his conviction became final (October 3, 1994) would have felt "*compelled* by existing precedent to conclude that the rule [petitioner] seeks was *required* by the Constitution." *O'Dell,* 95 F.3d at 1224 (original emphasis) (*quoting Saffle,* 494 U.S. at 488, 110 S.Ct. at 1260). Whatever the true interpretation of *Ross* may be, that interpretation was, at the time Satcher's conviction became

**46.** *See United States v. Baker,* 10 F.3d 1374, 1403–03 (9th Cir.1993), *cert. denied,* sub nom. *Baker v. United States,* —— U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994) ("In *Ross,* [] the Supreme Court limited *Swain* by *holding* that the due process 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive the full complement of challenges to which he is entitled by law") (emphasis added); *Bonin v. Vasquez,* 794 F.Supp. 957, 975 (C.D.Cal. 1992) ("*Under Ross, petitioner can establish a constitutional violation only if he can demonstrate that he was denied that which he was granted under state law.*") (emphasis added), *aff'd,* 59 F.3d 815, *cert. denied,* —— U.S. ——, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996); *State v. Phillips,* 194 W.Va. 569, 461 S.E.2d 75, 93–94 (1995) (finding that under *Ross,* "it is necessary to resort to our [state] statutory and case law to determine whether a defendant's 'right' to peremptory challenges is 'denied or impaired' ") (*quoting Ross*); *Sloan v. Delo,* 54 F.3d 1371, 1387 (8th Cir.1995), *cert. denied,* sub nom *Sloan v. Bowersox,* —— U.S. ——, 116 S.Ct. 728, 133 L.Ed.2d 679 (1996) (quoting *Ross* and holding that "because [petitioner] had a panel of qualified jurors on which to use his peremptory challenges, he received all that [state] law guarantees and thus all the fourteenth amendment guarantees"); *Turpin v. Kassulke,* 26 F.3d 1392, 1401

(6th Cir.1994) (same), *cert. denied,* —— U.S. ——, 115 S.Ct. 916, 130 L.Ed.2d 797 (1995); *Getter v. Wal–Mart Stores, Inc.,* 66 F.3d 1119, 1122–23 (10th Cir.1995) (quoting *Ross* and stating that, "applying *Ross,* plaintiff's right to due process was not violated"), *cert. denied,* —— U.S. ——, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996).

**47.** *See, e.g., Kirk v. Raymark Ind., Inc.,* 61 F.3d 147, 157 (3rd Cir.1995) (quoting footnote 4 and noting that "[t]he Supreme Court specifically declined to decide this issue in *Ross v. Oklahoma* "), *cert. denied,* —— U.S. ——, 116 S.Ct. 1015, 134 L.Ed.2d 95 (1996); *Murray v. Delo,* 34 F.3d 1367, 1378–79 (8th Cir.1994) (citing footnote 4 and noting that "the Supreme Court has not specifically decided this question"), *cert. denied,* —— U.S. ——, 115 S.Ct. 2567, 132 L.Ed.2d 819 (1994); *Pickens v. Lockhart,* 4 F.3d 1446, 1450 (8th Cir.1993) (noting that "[t]he Court did not decide the broader question" left open in footnote 4), *cert. denied,* 510 U.S. 1170, 114 S.Ct. 1206, 127 L.Ed.2d 553 (1994); *George v. Angelone,* 901 F.Supp. 1070, 1088 n. 11 (E.D.Va. 1995) ("*[T]he Ross footnote relied upon by Petitioner makes clear that this question has not been addressed or decided and by resolving that question, we would clearly be breaking new constitutional ground.*") (quotation marks and citations omitted).

final, certainly "susceptible to debate among reasonable minds," *Butler,* 494 U.S. at 415, 110 S.Ct. at 1217, or among "reasonable jurists." *Sawyer,* 497 U.S. at 234, 110 S.Ct. at 2827; *see also O'Dell,* 95 F.3d at 1229–30.[48] Also, "new rules" include developments "that state courts would have found to be ... predictable ...," *Sawyer v. Smith,* 497 U.S. at 236, 110 S.Ct. at 2828, and even minor or "gradual developments in the law [as long as they are ones] over which reasonable jurists [could] disagree." *Id.* at 234, 110 S.Ct. at 2827. Therefore, the application of *Ross* to Satcher's petition, in the manner advanced by the Satcher, would be to announce a "new rule" within the meaning of *Teague* and its progeny.[49]

Faced with a similar situation, the Fourth Circuit in *Gray v. Thompson,* 58 F.3d 59 (4th Cir.1995), *rev'd on other grounds, sub. nom. Gray v. Netherland,* —— U.S. ——, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996), declined to apply the rule advanced by the petitioner on federal habeas review. In *Gray,* the petitioner contended that the state court's refusal to appoint a private investigator for the defense contravened due process. Citing an explicit reservational limitation in the footnote of a Supreme Court decision, the Fourth Circuit held:

The Supreme Court, however, has flatly declined to address the question whether, 'as a matter of federal constitutional law[,] what if any showing would [entitle] a defendant to [private] assistance.' *Caldwell v. Mississippi,* 472 U.S. 320, 323–24 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985). *By resolving that question, we would clearly be breaking new constitutional ground.*

*Id.* at 66. Similarly, Satcher seeks the application of a rule which the Supreme Court declined to address, albeit more equivocally than the declination in *Caldwell.* And, as in *Caldwell,* to apply Satcher's interpretation of *Ross* to the petition here would be to impermissibly "break new constitutional ground" on federal habeas review. *See George v. Angelone,* 901 F.Supp. 1070, 1088 n. 11 (E.D.Va.1995) ("In relying on the *Ross* footnote, Petitioner seeks to have the Court announce a new rule regarding use of peremptory challenges. *Under the 'new rule' doctrine of Teague and its progeny, the Court is unable to announce such a rule.*") (emphasis added).

Based on the foregoing analysis, and finding that neither of the two aforementioned exceptions to the *Teague* nonretroactivity principle applies,[50] the Court declines to ap-

**48.** Indeed, "reasonable minds" and "reasonable jurists" have *actually disagreed* over the interpretation of *Ross. See supra* notes 46 and 47. Even *within the Eighth Circuit,* there is no consistent interpretation of *Ross. Compare Murray v. Delo,* 34 F.3d 1367, 1378–79 (8th Cir.1994) (citing footnote 4 and noting that "the Supreme Court has not specifically decided this question") and *Pickens v. Lockhart,* 4 F.3d 1446, 1450 (8th Cir. 1993) (noting that "[t]he Court did not decide the broader question" left open in footnote 4), with *Sloan v. Delo,* 54 F.3d 1371, 1387 (8th Cir.1995) (quoting *Ross* and holding that "because [petitioner] had a panel of qualified jurors on which to use his peremptory challenges, he received all that [state] law guarantees and thus all the fourteenth amendment guarantees").

**49.** The Supreme Court has taken as evidence of "reasonable disagreement" the fact that lower courts had split on an issue of law. *See Sawyer v. Smith,* 497 U.S. at 237, 110 S.Ct. at 2828–29 (reasonable disagreement where circuit courts and state courts split); *Saffle,* 494 U.S. at 490, 110 S.Ct. at 1261. *See generally Butler,* 494 U.S. at 415, 110 S.Ct. at 1217–18 (rule is new if characterized by "significant difference of opinion on the part of several lower courts that had

considered the question previously"); Robert Weisberg, *A Great Writ While It Lasted,* 81 J.Crim.L. & Criminology, 9, 29 (1990) (under *Butler,* the "fact that lower courts had split on the ... issue was enough to establish that the ruling in the defendant's favor was a new rule"); *see also* 2 Liebman & Hertz, *Federal Habeas Corpus Practice and Procedure* (2 ed.), § 25.5 at 759–760 (1994).

**50.** The first exception "is clearly inapplicable here," *O'Dell,* 95 F.3d at 1239 (*quoting Gilmore v. Taylor,* 508 U.S. 333, 345, 113 S.Ct. 2112, 2119–20, 124 L.Ed.2d 306 (1993)), because the alleged "rule" announced in *Ross* "neither decriminalize[s] a class of conduct nor prohibit[s] the imposition of capital punishment on a particular class of persons [because of their status or offense]." *Id.* (*quoting Saffle,* 494 U.S. at 495, 110 S.Ct. at 1263–64). The second exception is equally inapplicable, as the alleged "rule" announced in *Ross* is not "on par with the rule announced in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), a rule the Court has 'usually cited ... to illustrate the type of rule coming within the exception.' " *O'Dell,* 95 F.3d at 1239 (*quoting Saffle,* 494 U.S. at 495, 110 S.Ct. at 1263–64).

**1280**

ply *Ross* in the manner urged by Satcher, and thus is unable to find that there has been a violation of due process under the Fourteenth Amendment.

■ Even if *Ross* had established the proposition that, where a defendant does not receive the full complement of peremptory challenges afforded under state law, the "right" to peremptory challenges is "denied or impaired" in violation of the Fourteenth Amendment, it would not help Satcher's claim with respect to Juror Lawson. Based on a review of the voir dire record, the Court finds that the trial court did not commit constitutional error in refusing to dismiss Lawson for cause under the reverse-*Witherspoon* doctrine. Thus, Satcher was not forced to unnecessarily use a peremptory challenge to exclude an improper juror in contravention of Virginia law.

Upon initial voir dire examination, Lawson indicated that her decision whether to impose the death penalty would depend on the circumstances of the case. When asked whether a person convicted of a murder and whose guilt had been proved beyond a reasonable doubt should receive the death penalty, Lawson answered "It depends on the situation." Trial Tr., July 17, 1991 at 78. She also was asked whether she believed in the adage "an eye for an eye and a tooth for a tooth." *Id.* at 78. Again she replied: "Depending on the situation." *Id.* at 79.

Lawson's subsequent responses to further questioning raise some doubts, however, as to whether she was "death-qualified" under *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) and *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). When asked whether she felt that the death penalty would be the appropriate punishment for the type of murder committed in this case, involving rape, robbery, beating and 21 stab wounds, Lawson responded, "Yes. Right." Trial Tr., July 17, 1991 at 80. In response to a second inquiry respecting whether she "would be predisposed towards imposing the death penalty" on facts identical to the Borghesani murder, Lawson responded, "Yes." *Id.*

Subsequently, when the entire group in which Lawson was examined was asked follow-up questions respecting application of Virginia's death penalty statute, Lawson indicated by silence that she was capable of conforming with its requirements. When asked if there was "any type of murder in which [the group members] would have difficulty considering life imprisonment as the appropriate penalty," all prospective jurors in the group, including Lawson, indicated by their silence that there was not. Furthermore, when the group was asked whether it could weigh the evidence and render a fair and impartial verdict on guilt or innocence and whether it could consider evidence presented in mitigation at sentencing, *see id.* at 80–81, all prospective jurors in the group, including Lawson, indicated by their silence that they would be "able and willing to follow that instruction." *Id.* at 84. The trial judge ultimately rejected the challenge to Lawson finding that she, and the others in her group, have "indicated in response to the questions which were quite candid that they would stand indifferent to this cause and not reach any conclusion until all of the law and the evidence is in, and apply the instructions of the Court in accordance with their oath." *Id.* at 88.

While some of Lawson's responses raise doubts whether her views on the appropriateness of capital punishment would "prevent or substantially impair the performance of her duties as a juror," *Witt*, 469 U.S. at 424, 105 S.Ct. at 852, these doubts fall short of the standards necessary to implicate the reverse-*Witherspoon* doctrine. As discussed above, *Ross* and *Morgan* make clear that prospective jurors are properly removable by a defendant for cause only where they (1) would automatically vote to impose the death penalty if the jury found the defendant was guilty, and (2) would be unwilling to weigh and consider, as required, the relevant aggravating and mitigating evidence. *Ross*, 487 U.S. at 85, 108 S.Ct. at 2276–77; *Morgan*, 504 U.S. at 727–31, 112 S.Ct. at 2229–2230. Lawson's voir dire responses fall short of this standard.

Although Lawson indicated that she was "predisposed towards imposing the death penalty," in circumstances similar to the Borghesani murder, and that "the death penalty

would be the appropriate punishment for that type of murder," she by no means expressed that she would *automatically* vote to impose a capital sentence or that she would ignore relevant mitigating evidence. To the contrary, Lawson indicated that to a significant degree her sentencing determination would be dependent upon the specific factual circumstances presented at trial. Trial Tr., July 17, 1991 at 78–79. In addition, Lawson indicated that she would have no "difficulty in considering [ ] evidence in mitigation." *Id.* at 81.

Jurors are not excludable for cause under the reverse-*Witherspoon* doctrine merely for a predisposition towards, or a belief in the appropriateness of, a capital sentence for a specific offense. Such jurors may remain "death-qualified" notwithstanding such predispositions or beliefs if voir dire questioning establishes that their views would not prevent or substantially impair the performance of their duties as jurors under the applicable death penalty statute. *See Witt*, 469 U.S. at 424, 105 S.Ct. at 852; *Adams*, 448 U.S. at 45, 100 S.Ct. at 2526. This means, however, that a juror who is predisposed to impose the death penalty must signify the willingness and the ability to lay aside the predisposition and to decide the case on the mitigating and aggravating sentencing factors. *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992). Juror Lawson's responses on voir dire, *when looked at in their entirety*, establish that she would have lawfully carried out her responsibilities under the Virginia death penalty statute and under her oath.

For the foregoing reasons, the Court finds that the trial court's finding of impartiality as to Juror Lawson is "fairly supported by the record." 28 U.S.C. § 2254(d)(8).[51]

### (b) Juror Barbee.

Satcher's challenge with respect to Juror Barbee is virtually identical to that which he asserted as to Juror Lawson. For the reasons discussed above, Satcher's challenge of the state trial court's ruling, based on *Ross v. Oklahoma*, is barred by the new rule doctrine.

■ Alternatively, based on a review of the voir dire record, the Court finds that the trial court did not commit constitutional error in refusing to dismiss Juror Lawson for cause. Thus, Satcher was not forced to unnecessarily use a peremptory challenge to exclude an improper juror in contravention of Virginia law.

To the question: "How many of you believe that a person who commits a murder and whose guilt has been proven beyond a reasonable doubt should receive the death penalty?" Barbee responded: "It depends on what are the circumstances." *See* Trial Tr., July 17, 1991 at 37.[52]

Satcher's counsel then posited a scenario in which a person is found guilty of a murder during which a young woman was beaten and stabbed 21 times (which, of course, is what happened to Borghesani), and then asked Barbee: "Would you ... start out with the predisposition that someone who is found guilty of such an offense should receive the death penalty, or would you require convincing that he should not receive the death penalty?" Although Barbee responded, "Yes," *id.* at 40, he also stated that the Commonwealth would have to carry its burden of proof: "The Commonwealth has to prove to me that the crime was so gruesome that it would require the death penalty, also."

---

**51.** The record does not, however, fairly support the conclusion of the Supreme Court of Virginia that Lawson was "not predisposed toward imposing the death penalty," *Satcher*, 421 S.E.2d at 831, because that conclusion is contrary to Lawson's voir dire responses. *See* Trial Tr., July 17, 1991 at 80. As discussed above, however, this predisposition *alone* does not necessarily disqualify Lawson from sitting on the petit jury.

**52.** Satcher considers Barbee's affirmative response to a query whether a person who has committed more than one murder should receive

the death penalty to be important in view of the subsequent follow-up question. Barbee was next asked whether it would be difficult for him to change that inclination. He answered: "No, I think that it could change, they just have to prove to me that—" *Id.* When asked by Satcher's counsel: "But we would have to convince you to prove to you that the death penalty should not be imposed, right?" Barbee responded: "Yes." *Id.* at 38–39. This exchange is not significant here because there was no evidence that Satcher had committed more than one murder.

*Id.* at 50. Satcher was forced to use a peremptory challenge to excuse Barbee, even though the Commonwealth expressed no objection to excusing Barbee. *Id.* at 46.

Because Barbee indicated that whether the death penalty should be imposed "depends on ... the circumstances," *id.* at 37, and because he recognized that the Commonwealth likewise would be required to prove eligibility for the death penalty, there is fair support in the record for the findings made by the trial judge and by the Supreme Court of Virginia that Barbee, when properly instructed respecting burdens of proof, could properly and dispassionately carry out his oath as a juror.

### (c) Juror Goldman.

█ Unlike jurors Lawson and Barbee, who were excused on peremptory challenge, Juror Goldman *was actually empaneled* on the petit jury. Satcher challenges the trial court's refusal to remove Goldman for cause under the reverse-*Witherspoon* doctrine. That doctrine cannot be considered a "new rule" under *Teague. See Ross v. Oklahoma,* 487 U.S. at 81, 108 S.Ct. at 2273; *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222. Hence, Satcher's claim must be resolved on its merits.

During voir dire, when asked whether a person who was convicted of a murder should receive the death penalty, Goldman repeatedly responded, "It depends on the circumstances," Trial Tr., July 17, 1991 at 78, "It depends on the situation," *id.,* and when asked about his willingness to assess the death penalty on facts identical to the one here involved, Goldman stated, "It depends on the facts." *Id.* at 79. He clarified that "not every person" convicted of murder should receive the death penalty. *Id.* at 78. And, upon further probing, Goldman stated that "[y]ou'd have to give me some other factors to convince me that the death penalty should not be imposed. I mean I would need additional factors to do that." *Id.* at 80.

This record makes clear that Goldman had an open mind and that, although he may have been inclined to impose the death penalty on the facts as presented to him, his ultimate decision would have to await the presentation of all pertinent evidence. Thus,

there is fair support for the conclusion of the state courts that Goldman could discharge his sworn duty and act impartially, basing his judgment solely on the evidence presented in this case. This is the clear meaning of Goldman's repeated insistence that imposition of the death penalty depended upon the facts and circumstances of the case and that not everyone convicted of murder should receive the death penalty. Under *Morgan v. Illinois,* 504 U.S. at 727–31, 112 S.Ct. at 2229–30, the refusal to remove Goldman for cause under the reverse-*Witherspoon* doctrine was not constitutional error.

### (d) Juror Sulak.

It is not clear under what theory Satcher challenges the trial court's refusal to remove Juror Sulak for cause. On the one hand, Sulak was not actually empaneled on the petit jury, and thus cannot be challenged on reverse-*Witherspoon* or Sixth Amendment jury impartiality grounds. *See Ross v. Oklahoma,* 487 U.S. at 85–86, 108 S.Ct. at 2277 ("[The challenged juror] did not sit [on the jury].... Any claim that the jury was not impartial, therefore, must focus not on [that juror], but on the jurors who ultimately sat"). On the other hand, the Commonwealth actually struck Sulak, and thus Satcher was not forced to use a peremptory challenge to exclude Sulak from the jury. Therefore, there could be no "denial or impairment" of Satcher's Fourteenth Amendment due process right to "exercise the full complement" of peremptory challenges provided him under Virginia law. *Ross,* 487 U.S. at 88–91, 108 S.Ct. at 2278–80. Furthermore, this Fourteenth Amendment claim would be barred under the *Teague* new rule doctrine.

█ Even if, however, the reverse-*Witherspoon* doctrine was applicable to Sulak, the Court finds that the trial court committed no error in refusing to dismiss Sulak for cause. In response to a query whether she would be predisposed to impose the death penalty in an offense involving facts identical to the murder of Borghesani, Sulak signaled her agreement with the statements of the previously questioned juror that "I'd have to have more background on what happened," and then stated that she was "[n]ot necessarily"

predisposed towards imposing the death penalty. Trial Tr., July 17, 1991 at 39–40. Thereafter, Sulak was asked again whether she would be predisposed to impose the death penalty if a murder involved a specified set of facts identical to the Borghesani murder. Sulak replied, "It would depend—" *Id.* at 40. Sulak then was asked: "Would you be in a position because of your views that you would require convincing that the death penalty should not be imposed?" She responded, "Uh-huh." *Id.* It is unclear from the record whether this utterance meant "yes" or "no." Later, however, when the panel was asked whether "any of you, given your views concerning the death penalty, feel that those views would affect your ability to be impartial in evaluating the guilt or innocence phase of this trial?," Sulak indicated by her silence that she could maintain impartiality. *Id.* at 42. The trial court, after the panel was asked three similar questions, noted that "[t]hey've all indicated the willingness, a desire and an ability to follow the instructions of the Court, both with respect to the imposition or ... not imposing the death penalty. And it would depend on the circumstances, and they haven't been presented all of the circumstances." *Id.* at 49.

According deference to the opportunity of the trial judge to view Sulak's demeanor, and recognizing that Sulak offered no affirmative statement indicating a predisposition to the death penalty (indeed, the only intelligible statement she made regarding the propriety of imposing the death penalty was that "It would depend"), there is fair support in the record for the state court's finding that Sulak's views would not prevent or substantially impair the lawful performance of her duties as a juror.

### (e) Juror Oppenheimer.

■■ Satcher's last challenge based on the "death qualification" phase of the jury selection is to the trial court's decision to strike Juror Oppenheimer for cause because of the misgivings she expressed on voir dire about imposing the death penalty. Satcher's Sixth Amendment claim is governed under the *Witherspoon* doctrine as altered by the Court in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and *Wainwright*

*v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The new rule doctrine does not foreclose such a claim.

When asked whether, after finding a defendant guilty, any of the panel would say: "I don't care what the evidence is, I will not vote to impose the death penalty?" Oppenheimer responded "I believe that I would say that." *Id.* at 248.

When subsequently asked whether: "If the judge were to instruct you that you should consider that as a potential punishment, would you be able to follow those instructions and consider the death penalty as a potential punishment?" Oppenheimer responded, "I don't know, I can't honestly answer that question. ... not sure I can ..." *Id.* at 270–71. To the query: "Do you feel that your strong personal beliefs would override your oath as a juror?," Oppenheimer replied "If my oath potentially could require me to support the evidence, then my answer would be yes ... and I could not honestly take that oath if there—it would require me to support the death penalty." *Id.* at 271. Asked again, "If your oath were to require you to consider the death penalty as a punishment, would you be able to follow your oath?" she answered, "It is so important to me that I don't know." *Id.* at 271–72. The Commonwealth objected to Oppenheimer and she was excused for cause. *Id.* at 272.

A juror may not be excluded merely because of conscientious scruples about capital punishment, if the juror is "willing to *consider* all of the penalties provided by state law," and is not "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *Witherspoon v. Illinois,* 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776 (1968) (emphasis in original). "A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." *Id.* at 519, 88 S.Ct. at 1775.

However, "where the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance

with his instructions and his oath,'" the juror may properly be excluded for cause. *Witt,* 469 U.S. at 424, 105 S.Ct. at 852 (*quoting Adams,* 448 U.S. at 45, 100 S.Ct. at 2526). The question whether a juror should be stricken under *Witherspoon* and its progeny is "'committed to the trial court's discretion,' and will only be reversed for an abuse of discretion." *Briley v. Bass,* 750 F.2d 1238, 1246 (4th Cir.1984) (quoting *Keeten v. Garrison,* 742 F.2d 129, 135 (4th Cir.1984), *cert. denied,* 476 U.S. 1145, 106 S.Ct. 2258, 90 L.Ed.2d 702 (1986)), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985).

In this case, Oppenheimer stated that she believed she would disregard the evidence and refuse to impose the death penalty. She also stated she could not take the juror's oath if it could require her to impose the death penalty. Oppenheimer's response during voir dire constitutes fair support for the findings of the trial court and the appellate court that "Ms. Oppenheimer clearly indicated that her views would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Satcher,* 421 S.E.2d at 832 (internal citations omitted). Therefore, Juror Oppenheimer was properly excluded for cause under *Witherspoon.*

### 2. Jurors' Views About DNA Evidence.

■■■ Satcher argues that four prospective jurors, Barbee, Goldman, Walch, and Gay, were predisposed to accept DNA evidence as a reliable method of identification and hence should have been excused because this predilection shifted to Satcher the burden of proving that DNA evidence is not a reliable method of proving identity. Of these challenged jurors, only Goldman and Gay served on the petit jury. Juror Walch was an alternate and was excused before deliberations began. And, as discussed above, Juror Barbee was

removed by Satcher with a peremptory challenge.[53]

■■■ The relevant line of inquiry on voir dire was initiated by Satcher's counsel who queried each group respecting its familiarity with DNA and its reliability. In the first group, the following exchange occurred with Juror Barbee:

Q. And do you recall developing any preconceptions about the use of DNA that you developed with reading those articles?

A. Just that this was an identification that could be made, sort of like a fingerprint of a person.

Q. And based on those articles, did you develop an opinion concerning the reliability of this type of identification?

A. I think it would be pretty accurate.

Q. And your views of those articles would be that that type of identification is similar to a fingerprint?

A. Yes.

*See* Trial Tr., July 17, 1991 at 26–27. On the basis of this exchange, Satcher's counsel moved to strike Barbee for cause because he was predisposed to accept DNA evidence as reliable. There was no further questioning on the issue by the Commonwealth's Attorney or by the trial judge. Nonetheless, the challenge for cause was denied for the reason that:

The questions and answers to all of these jurors have been answered with frankness and candor. The Court is of the opinion that again they are capable of standing indifferent to this cause and reach no conclusions while the evidence is given and that they will follow their judgment and the instructions of the Court.

Any testimony, and especially an expert, I don't believe that the indications that they've given from their answers is indica-

---

**53.** Since Barbee did not sit on the petit jury, Satcher's challenge to the trial court's refusal to dismiss Barbee for cause must be predicated on the Fourteenth Amendment right to the exercise of peremptory challenges under the aforementioned interpretation of *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1989). For the reasons discussed above, with respect to Satcher's challenges under the reverse-*Wither-*

*spoon* doctrine, this Fourteenth Amendment claim is barred by the new rule doctrine under *Teague.* Even if, however, the new rule doctrine did not foreclose this challenge, the Court finds that, for the reasons explained in the text, the trial court did not commit error in refusing to dismiss Barbee for cause based on her views concerning the DNA evidence.

tive of the position you take, and your exception is noted.

*Id.* at 45–46. The record, however, does not disclose any answers given by Barbee from which the trial judge could have drawn the assurance of indifference reflected in this finding. Thus, fairly construed, Juror Barbee responded affirmatively that he had a pre-existing belief that DNA identification was similar to a fingerprint and was highly accurate.

Two jurors, Goldman and Walch, in the second group questioned disclosed general familiarity with DNA evidence.

Walch, a biology major in college, stated that he had developed no opinion "as to the reliability of DNA as a means of identification" but that because of certain articles he had read he "would be required to be convinced that DNA is not a reliable form of identification." *Id.* at 66, 68.

Goldman stated that he had "developed an opinion" and had formed "preconceptions" that DNA was a reliable means of identification, and then the following exchange occurred:

Q. So the preconception that you have would be that it is reliable?

A. Basically.

\* \* \* \* \* \*

Q. Mr. Goldman, given your views concerning reliability, would you be in a position that you would have to be convinced that the DNA was not a reliable form of identification?

A. I don't think that's—I'd have to be convinced that it was.

*Id.* at 67, 68. Again, neither the trial judge nor the prosecutor posed any questions on the topic. Satcher moved to strike Walch and Goldman for cause because of the foregoing answers. *Id.* at 85–88.

Because Satcher simultaneously asserted a for cause challenge to Goldman because of his views on the death penalty, it is difficult to discern from the record the basis for the denial of the DNA challenge, but the best reading of the transcript is that the ruling was almost verbatim the same as the one

made in denying the challenge to Barbee. *Id.* at 88–89.

Once again there is nothing in the record to suggest why the trial judge came to that conclusion; but, fairly construed, the record is that Walch had a preconception that DNA was a reliable means of identification while Goldman required convincing that DNA testing was reliable.

In the third group, Juror Gay advised that he had read about DNA as a means of identification. The following exchange ensued:

Q. Based on what you've read do you believe that it is [a reliable means of identification]?

A. I would say that apparently in some cases it's the same as a fingerprint.

Q. And would you have to be—would you based [sic] your views from what you have read and your belief that its the same as a fingerprint, would you have to be convinced that it was not a reliable means of identification?

A. Yep.

*Id.* at 104–05. No other questions were addressed to Gay on that subject. Following Satcher's challenge for cause, the trial judge responded: "Your exception is noted." *Id.* at 130.

Considering the voir dire examination in its entirety, including that specifically directed to the reliability of DNA evidence, the record demonstrates beyond question that Barbee, Walch, and Gay had preconceived views that DNA was a reliable means of identification and that Walch and Gay would have to be convinced that it was not reliable for that purpose. The record does not disclose how firmly Barbee held his opinion of DNA reliability and the record shows that Goldman would have to be convinced that DNA testing was reliable.

It is equally clear that the only possible record support for the trial judge's finding that Walch, Gay and Barbee could stand indifferent to the cause, withhold opinion until all the evidence is in, and follow the instructions of the court, is to be found, if at all, in the silence of those jurors in response to Standard Questions (2) and (3) posed by the judge at the beginning of each group

interrogation. Considering that those Standard Questions were posed before the colloquy on DNA evidence and that nothing else in the record required those jurors to disavow their preconceptions, it cannot be said that silence in response to the Standard Questions is fair support for the decision of the trial judge to deny the challenges for cause of Barbee, Walch, or Gay. *Irvin v. Dowd,* 366 U.S. at 728, 81 S.Ct. at 1645–46.

Nonetheless, in viewing the entire voir dire examination respecting DNA evidence, there is fair support in the record for the determination made by the Supreme Court of Virginia that "[i]n stating that they considered DNA evidence reliable, the prospective jurors merely displayed knowledge of a conclusion that is part of the established law of this Commonwealth. Hence, their possession of such knowledge did not disqualify them from service on the jury." *Satcher,* 421 S.E.2d at 830. The factual determinations inherent in that legal ruling are entitled to deference and the legal conclusion based on those determinations involves no constitutional infirmity.

### 3. Juror Middle.

■ Satcher also asserts that Juror Middle should have been removed for cause because, during voir dire, Middle disclosed that his son-in-law was an Arlington County police officer, that Middle knew several of the prosecution's law enforcement witnesses as friends of his son-in-law, and, in fact, that several of Middle's son-in-law's law enforcement friends actually had visited in Middle's house. The state trial court refused to dismiss Middle for cause; Satcher removed Middle, however, with a peremptory challenge.

Since Middle did not sit on the petit jury, Satcher's challenge to the state trial court's ruling must be predicated on the Fourteenth Amendment right to the exercise of peremptory challenges under the previously described interpretation of *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), urged by Satcher. For the reasons discussed above with respect to Satcher's jury selection challenges under the reverse-*Witherspoon* doctrine, this Fourteenth

Amendment claim is foreclosed by the new rule doctrine under *Teague.*

■ If, however, the new rule doctrine did *not* foreclose this challenge, the Court finds for the reasons set forth below, that it was manifest error to refuse to dismiss Middle for cause based on his relations with the law enforcement officers at issue. Hence, considerations of judicial efficiency necessitate an explanation of the basis for this conclusion so that the entire issue may be resolved on appeal, if the Court of Appeals should conclude that the *Teague* analysis is in error.

The assessment of the challenge to Middle begins with his response to questions concerning whether he knew any of the prosecution's witnesses who were identified by the prosecutor as law enforcement officers. Middle responded: "I know a few of those officers. My son-in-law is a policeman also." *See* Trial Tr., July 17, 1991 at 165.

The prosecutor then asked:

Q. *Do you know any of them so closely* that you think you would give *undue weight* to their testimony?

A. *Some mostly,* only one of them.

Q. What's his name?

A. Steven Ferrone. He's Arlington Police. He's not the only one, I can say I know Triplett and a few of the other officers. I'm not saying as far as this case, no, I won't.

Q. You give their testimony special—

A. I think right now—interfering with this, but I do know them and that's what I'm saying.

*Id.* at 165–66 (emphasis added). That somewhat equivocal exchange was pursued by Satcher's counsel:

Q. Mr. Middle, you have indicated that Steve Marone is your son-in-law, is that correct; you have fairly constant contact with him?

A. Just about every day.

 \* \* \* \* \* \*

Q. But has he mentioned anything to you about this particular case?

A. Not that I know of. Not off hand. I mean he *might mention it but* as far as—

\* \* \* \* \* \*

Q. And the other officers that you mentioned, have they met at your home or—

A. Well, like I said, he parks his car at the house and then there's other ones that come there and use the car and chit-chat....

Q. *Are you on a fairly friendly basis with these officers?*

A. Friendly basis.

Q. Do you think that the fact that you know these officers and have this type of relationship with them that that might cause you to give more weight to their testimony than you might give to someone that you don't know.

A. It's a possibility, I can't say for sure. Being this type of case, it's hard to be persuaded one way or another by somebody's personal sayings. He might know somebody else—somebody else and so on and talk to me about it. I don't know. I like, myself, I guess, going into a Judge's chambers *I might be swayed to go along with whatever they want or what the Court wants.*

Q. You feel that you might because of your relationship with Officer Ferrone and the other officers that you—

A. There's a possibility, like I said, *I might be swayed to their side* of the story automatically. With a hearing of this type, it might be best to—*I'd like to be excused from it as far as a fair draw on it if possible.*

Q. Do you feel that the—because of your relationship with Officer Ferrone and other police officers that it might be difficult for you to render a fair and impartial verdict in this case?

A. That's right.

*Id.* at 169–72 (emphasis added).

When the prosecutor followed up with a question whether Middle would give more weight to the testimony of a policeman than a

regular citizen, Middle responded "I would have to weigh it for myself first and find out. In other words, I wouldn't weigh from one person to the other. I would weigh the facts we are going on here against the officer that's ..." *Id.* "So you wouldn't just sort of assume 'Hey, the officer is right, I don't care what the other person says for that matter.'" Middle replied, "That's right. Well, how they phrase it or so on ..." *Id.* at 196.

However, upon further questioning by Satcher's counsel respecting whether, all other things being equal, Middle would resolve the conflict in favor of a police officer that he knew, Middle responded, "Like I said, I would weigh the facts of both sides. The way he's pronounced it or produced his case. I have to weigh the difference on either side...." *Id.* at 198.

Middle continued: "I know quite a few [officers] and have known them for years. *A lot of the older officers I worked with and I knew a lot of the officers in the County.*" Then Middle disclosed: "I do know, like I said, a lot of the officers in undercover and so on *because I've worked with a lot of them and ride along with them in the police car.*" *Id.* (emphasis added).

And finally Middle was asked:

Q. Given that type of really close connections on this, you are indicating that it would be difficult for you to render a fair and impartial verdict?

A. I said I'd weigh the facts between the two of them, one way or another. I don't know Mr. Satcher as far as a person and everything and these other fellows like I said, I relate with them everyday. That's the only thing I'm kind of partial to saying which way I weighed the facts on them.

*Id.* at 198–99.

The trial judge then asked Middle whether he could "stand indifferent to this cause and not put extra weight or credence on anybody's testimony as a police officer's, for example, just because he's a police officer." Middle responded, "Right." *Id.* at 199. When the trial judge asked whether he would give more weight to the testimony of a

person who put on a uniform in the morning, Middle responded: "No, like I said, I weigh the facts of both sides. Just like, if I knew you real well, it would be the same way. *If I know you as a real person close by against a person I don't know, you know, I would weigh the facts different ways.*" *Id.* at 200 (emphasis added). That answer, at a minimum, rendered Middle's previous assurance to the contrary equivocal. Thus, in a last effort to ascertain Middle's position, the trial judge asked: "But you would weigh the evidence and the facts and make your decision based on that; not because you may or may not know somebody solely for that reason?" Middle stated, "Right." *Id.*

When the voir dire of Middle is considered in its entirety, the record shows that Middle disclosed an extraordinarily close relationship with the Arlington County law enforcement agency which investigated the offenses for which Satcher was on trial and with some of the law enforcement witnesses in Satcher's case. Middle indicated that he could be impartial only after repeated and persistent questioning by the trial judge every time a previous question had elicited a response with which the judge, for good reason, was not comfortable. Even then, Middle's own words disclosed his bias in favor of the Arlington County law enforcement officers whom he knew so well and with whom he had such a close relationship. In so doing, he confessed his inability to serve impartially. Given the facts that Middle honestly disclosed, it is not surprising that Middle could not shed himself of the bias even when pushed to do so by the trial judge.

Middle knew several law enforcement witnesses with whom he confessed a friendly relationship. His son-in-law was a member of the police department which investigated the crimes with which Satcher was charged. Middle worked with and rode along in the police car with other members of the department. Others, including some of the prosecution witnesses, visited Middle's house for "chit-chat." It is no wonder that Middle recognized the serious risk that he could be swayed to their view of things because he knew them and because of his association with them. Not surprisingly, *Middle literal-ly asked to be excused from service because he recognized his own biases in favor of the law enforcement officer witnesses whom he knew. See Id.* ("With a hearing of this type, it might be best to—I'd like to be excused from it as far as a fair draw on it if possible").

Consequently, the Court cannot find fair support in the record for the decision not to excuse Middle for cause. However, because Satcher's challenge is effectively barred by the new rule doctrine, that error is not grounds for granting the writ.

### 4. Juror Tuttle.

 Satcher's last complaint about the jury selection process is that Juror Tuttle warned the trial court that having a daughter the victim's age "probably would" affect his ability to render a fair and impartial verdict. Consequently, asserts Satcher, Tuttle should have been removed for cause. The trial court refused to exclude Tuttle for cause, and Satcher removed the juror with a peremptory challenge.

 Since Tuttle did not sit on the petit jury, Satcher's challenge to the state trial court's ruling must be predicated on the Fourteenth Amendment right. For the reasons discussed above with respect to Satcher's other jury selection challenges, this Fourteenth Amendment claim is foreclosed by the new rule doctrine. Even if the new rule doctrine did not foreclose this challenge, the Court finds for the reasons set forth below, that it was not manifest error to refuse to dismiss Tuttle for cause based on his concerns over having a daughter the victims' age.

On voir dire, Tuttle was asked whether, given that his daughter is the same age as the victims in this case, "that would affect your ability to render a fair and impartial verdict in this case on the issue of guilt or innocence or on the issue of punishment?" Tuttle responded, "It probably would." *See* Trial Tr., July 17, 1991, at 111. When the subject of his daughter was brought up again, Tuttle offered: "That's the only thing that's bothering me." *Id.* at 123. Tuttle then was asked whether he was willing to

listen to the evidence in the case, with an open mind, and to make a decision on the basis of the evidence presented. He replied: "Yes ... I can follow the instructions." *Id.* at 123–24.

However, Tuttle also stated that he could not positively affirm that the age of his daughters would have no influence on his deliberations. *Id.* at 125. "I haven't heard all of the evidence or anything like that. We're the typical family, we get emotional and a bit bitter, so you're talking about young ladies here that I can identify with.... *I'd like to think that we can control it, but I'm trying to tell you that I couldn't guarantee that I could." Id.* at 125–26. The prosecutor followed that equivocal statement by asking whether Tuttle could render a decision based only on the evidence presented and the instructions given, "no matter how you might feel about it, can you do that?" Tuttle responded, "Yes." Asked "Would you do that?" he replied, "Yes." *Id.* at 126.

The trial judge rejected Satcher's challenge of Tuttle for cause, holding that: "[w]hat [Tuttle] did indicate was he's extremely intelligent and he's very candid, and he's honest ... and he'll follow the instructions of the Court." *Id.* at 127–28. "He indicated that he could set aside his feelings about the similarity of ages between the victims and his daughter and render a verdict based on the evidence and the court's instructions." *Id.* at 128.

The decision not to strike Juror Tuttle for cause is one over which trial judges could differ based on the text of the record. Although, prudence and fairness would seem to have dictated excusing Tuttle,[54] the challenge to Tuttle presents the quintessential circumstance for deference to the trial judge's assessment of a juror's "inflections [and] nuances" and to the trial judge's "evanescent

impressions" of the juror's answers. *See United States v. Barber,* 668 F.2d at 786.

Tuttle first said that the fact that the victims were the age of his own daughters "probably would" affect his ability to render a fair and impartial verdict. Clearly, by Tuttle's own words "it bothered" him. And, although Tuttle said that he would follow instructions and make a decision on the evidence, he undercut that assurance by immediately thereafter saying that he could not "positively state that given the age of [his] daughters that that will not have some influence." *Id.* at 125. Nonetheless, in the end, he specifically assured that he could, and would, decide the case on the evidence "no matter what [he] might feel about it." If the principle of deference has meaning, it must be applied to circumstances such as this because the trial judge is on the scene and has the best ability to assess the impartiality of the juror.

Applying the controlling measure of deference, the Court finds fair support in the record for the conclusion of the trial judge and the Supreme Court of Virginia that Tuttle could "set aside [his] feelings and render a verdict based on the evidence and on the instructions." *Satcher,* 421 S.E.2d at 830 n. 8.

**Claim II(G):** *Abel's In–Court Identification.*

Satcher argues that the admission of Deborah Abel's in-court identification of him as her assailant violated federal due process. The Court agrees that the Abel identification should not have been admitted. And, there can be no serious doubt that the erroneous admission of that tainted evidence resulted in an unfair trial. The circumstances surrounding Abel's identification warrant detailed recitation.

### 1. Factual Background.

The attack against Abel took place at approximately 7:00 p.m. on March 31, 1991. At the time, the sun "just had gone down, but the sky was still light, and ... it was probably right before dusk." *See* Trial Tr., July

---

54. There is considerable force to Satcher's argument that retention of Juror Tuttle was error. And, Satcher correctly argues that, in a capital case, discretion is best exercised in favor of excusing jurors such as Tuttle for cause. Indeed, it is difficult to discern why the prosecution would

oppose the excusal of a juror whose answers were as equivocal as those given by Juror Tuttle, considering that retention of such a juror is reasonably calculated to give rise to an appeal and permits a perception that a juror of doubtful objectivity was not excused.

19, 1991 at 39. Abel thought that the lights on the bike path had been turned on. *Id.* As Abel approached a hill, her speed diminished slightly and she was pedaling harder to "get back [her] speed" when she "look[ed] up and [saw] a man coming down in [her] direction, walking." *Id.* at 40.

According to Abel, she "looked up a few times, but [she] kept [her] ... eyes on [her] bike and everything else. But [she] noticed him coming.... He was staying on his side of the bike path and [she] was on [hers]." *Id.* She, and the approaching male, made eye contact as they passed. Immediately thereafter, Abel was jumped from behind and pushed from her bike. Abel's glasses were knocked from her face when she was pulled from behind and her glasses remained off throughout the attack. *Id.* at 67. As Abel, without her glasses, lay on the ground on her stomach, her assailant repeatedly hit her in the head and tried to take her pants down. On each occasion when Abel attempted to turn her head around, her assailant "would hit me or push my head away so I couldn't see." *Id.* at 90. As Abel put it, "[h]e would never let his hands off my eyes." *Id.* at 41.

Abel's recollection was that the entire incident consumed between five and seven minutes and that, during that entire period of time, her assailant had his hands over her eyes "[p]robably half the time. The other time, I didn't really try to look behind me. I was too scared." *Id.* at 69. As Polemani approached, the assailant broke off the attack and fled, but Abel could not see him except for a brief view of his profile and the back of his head. *Id.*

Approximately ten or twelve minutes after Polemani interrupted the attack, a police officer arrived and Abel gave him a description of her assailant: a black male, approximately 5'9" to 5'10" in height, approximately 190 to 200 pounds in weight with a large stocky build, aged 25 to 30 years, with no facial hair, no scars, no jewelry, and an Afro hair style.[55]

*Id.* at 44, 70–71. At the time of his arrest, Satcher was 5'6" tall, weighed 152 pounds, was of medium build, had visible scars, was 21 years old and had a short cropped hairstyle.

Abel and Polemani both helped a police artist to draw a sketch of the assailant.[56] Both sketches were similar and they matched, in general, the descriptions given to the police officers by Abel and by Polemani shortly after the attack. In fact, Abel testified that she "would rate [the sketch] an eight or a nine on a scale of ten." *Id.* at 53. Of course, the description given by Abel and Polemani did not remotely match Satcher's height, weight, age, hair style or scarring condition.

Fifteen months later, on July 2, 1991, and approximately two weeks before the start of the trial, Abel attended a police lineup. Satcher's lawyer also attended the lineup. There is no challenge to the method by which the lineup was conducted. According to Abel, the police instructed her "to choose one of the six people in the line-up and to choose one only if [she] felt completely, absolutely sure that [she] could match that person with who attacked [her]." *Id.* at 54. At the time, Abel was aware that Satcher had been charged with the offenses against her and she knew that Satcher would be in the lineup. *Id.* at 73. Abel viewed the lineup for approximately 15 minutes and then asked to see suspects number two and number four [Satcher] again. *Id.* at 56. Thereafter, Abel identified suspect number two as her attacker. *Id.* at 74. Notwithstanding that Abel had viewed the police sketch before the lineup, she did not select Satcher as her assailant. However, she explained that: "[N]umber four [Satcher], I had decided in my mind, looked extremely close and accurate to the picture that I had seen since fifteen months previous to that, since the attack and since I had helped the artist draw it. And I decided

**55.** On direct examination, Abel testified that her assailant had "very short to the head hair." *Id.* at 44. On redirect examination, Abel defined "Afro" to mean "that he had hair that was very curly, kinky you could call it, close to the head." *Id.* at 82.

**56.** Polemani described the assailant as 25 to 30 years old, weighing 170–180 pounds, standing 5'9" to 5'10" tall, with an athletic or bullish build, and without visible scars or facial hair.

that four [Satcher] looked very very—almost identical to the picture." *Id.*[57]

Two weeks after the lineup at which Abel had identified someone other than Satcher as her assailant while expressing an inclination toward Satcher, the trial began. Abel sat through two days of jury selection. When she came to the court on the first day, she knew that Satcher was on trial and she knew which individual was Satcher. She saw Satcher sitting at the defense table and walking back and forth to the bench. He was the only black man in the area. *Id.* at 60–62. On the second day of jury selection process, Abel approached the prosecuting attorney and said "that's the guy." *Id.* at 62.

Satcher's counsel objected to Abel's testimony as "basically an in-court show-up of one person" which was "highly suggestive, overly suggestive" and one "that's going to lead to misidentification." *Id.* Based solely on the fact that the prosecuting attorney represented that Abel had been in the courtroom for a few hours and had informed the prosecuting attorney that "that's the guy," the trial judge overruled the objection and Abel was permitted to identify Satcher as her assailant. Hence, the record contains no finding by the trial judge as to whether Abel's identification was reliable or instead was the product of impermissible suggestion.

The remainder of the record concerning Abel's ability to make the identification was developed on cross-examination. At that time, Abel testified that [15 months after the attack]:

I just would observe him and just look at him a lot and to see—and to kind of bring myself back to that night.

And the way he walked, the way he shrugged his shoulders when he would come back from the bench, it would put the picture in my mind or remind me of exactly that night.

And to me, I remember him coming down the path exactly the same way—the same way he would walk back to his chair in this room.

*Id.* at 77–78. On this basis, the trial court allowed Abel to identify Satcher based on the way he walked. Nowhere did Abel's testimony indicate that Satcher's facial appearance or other bodily characteristics brought to mind her assailant whom, of course, she had described as a substantially larger man immediately after the attack. Satcher's counsel vigorously cross-examined Abel respecting her previous failure to identify Satcher and the discrepancy between Satcher's actual appearance and the descriptions given by Abel immediately after the attack.

### 2. The Applicable Legal Standard.

The Supreme Court of the United States has explained the dangers of unreliable eyewitness identification. For example, in determining that a suspect was entitled to the aid of counsel at a pretrial lineup, the Court, in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), observed that:

[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are riffed with instances of mistaken identification.... a major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.... Suggestion can be created intentionally or unintentionally in many subtle ways. *And the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his suspectability to suggestion the greatest.*

*Id.* at 228–29, 87 S.Ct. at 1933 (internal citations omitted) (emphasis added).[58]

---

57. Polemani also attended the lineup and also viewed the police sketches before doing so. He was unable positively to identify any person as Abel's assailant, but he had a strong belief that number four [Satcher] might be the assailant. Nonetheless, because he was unable to make a positive identification, Polemani did not give identification testimony at trial. However, he

was questioned about the lineup in a way which allowed his "belief" to come into evidence.

58. The Fourth Circuit has similarly stressed the potential "dangerousness" of positive identification testimony:

Positive identification testimony is the most dangerous evidence known to the law. That is

To avoid the dangers of unreliable identifications, the Supreme Court has outlined a two-step analysis for determining whether identification testimony is admissible at trial. First, the defendant must show that the pretrial identification was impermissibly suggestive. *Neil v. Biggers,* 409 U.S. 188, 198–99, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite,* 432 U.S. 98, 110, 97 S.Ct. 2243, 2250–51, 53 L.Ed.2d 140 (1977). Second, even if the pretrial identification was suggestive, the in-court identification is nevertheless admissible if it was reliable under the totality of the circumstances. *Biggers,* 409 U.S. at 198–200, 93 S.Ct. at 382; *Manson,* 432 U.S. at 110, 97 S.Ct. at 2250–51. In order to justify suppression of the identification, the defendant must prove that the in-court identification gave rise to a "very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

This case presents a slightly different scenario than most identification cases. Generally, the in-court identification follows a constitutionally suspect pretrial photographic lineup or showup. *See, e.g., Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375; *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243. In this case, the in-court identification of the defendant followed a proper pretrial lineup during which the victim selected an individual other than the defendant as her attacker. Satcher does not challenge the constitutionality of the line-up. Here, instead, the challenge is that the two-day jury selection process during which Abel arrived at her identification of Satcher created the suggestive environment which rendered invalid the subsequent in-court identification testimony.

Notwithstanding this slightly different factual scenario, the Supreme Court's two-part

analysis under *Biggers* and *Manson* supplies the controlling test here. The Fourth Circuit has consistently applied the *Biggers* analysis in situations where there is no out-of-court identification offered at trial and where the Government's identifying witness is allowed to see the defendant seated at the defense table prior to their testimony. *See, e.g., United States v. Murray,* 65 F.3d 1161, 1169 n. 6 (4th Cir.1995) (holding that, under the *Biggers* "totality of the circumstances" test, in-court identifications were admissible despite the fact that the government allowed identifying witnesses to view defendant at defense table prior to their testimony) (*citing Code v. Montgomery,* 725 F.2d 1316 (11th Cir.1984) (same)); *Smith v. Paderick,* 519 F.2d at 74 (recognizing the applicability of the *Biggers* "totality" test in a jury trial where identifying witness' courtroom viewing of defendant at defense table with previously-identified co-defendants created an atmosphere of suggestiveness); *United States v. Morsley,* 64 F.3d 907 (4th Cir.1995) (where government did not attempt to introduce identifying witness' out of court identification, factors from *United States v. Wade,* which substantially overlap with the *Biggers* factors, are applicable to assess the "independent recollection" of the witness), *cert. denied,* —— U.S. ——, 116 S.Ct. 749, 133 L.Ed.2d 697 (1996).[59]

Moreover, the primary evil to be avoided in either scenario remains the same: deprivation of the right to due process of law by misidentification. *Neil v. Biggers,* 409 U.S. at 198, 93 S.Ct. at 381–82. The Abel identification must be measured under these precepts to ascertain the suggestiveness of the surrounding circumstances and the overall reliability of the identification.

---

true because it is easier to deceive ourselves than others: pressured to help solve a heinous crime, often conscious of a duty to do so, and eager to be of assistance, a potential witness may be readily receptive to subtle, even circumstantial, insinuation that the person viewed is the culprit. Unless such a witness is far more introspective than most, and something of a natural-born psychologist, he is usually totally unaware of all the influences that result in his say, "That is the man." And that

enables him to speak with conviction and utter honesty—further enhancing the danger.
*Smith v. Paderick,* 519 F.2d 70, 75 (4th Cir.), *cert. denied,* 423 U.S. 935, 96 S.Ct. 293, 46 L.Ed.2d 267 (1975).

**59.** The Supreme Court of Virginia, in reviewing Satcher's conviction on automatic direct appeal, applied the *Biggers* factors in evaluating the reliability of the Abel identification. 421 S.E.2d at 838–39.

### (a) Suggestiveness of the Identification.

Where, as here, the prosecution offers no evidence of an out-of-court identification and the Government's identifying witness is allowed to see the defendant *qua* defendant in the courtroom before giving identification testimony, the first step of the inquiry must focus on whether the "subsequent in-court identification [of the defendant] was unrelated to the [previous suggestive] identification and was based on [the identifying witness'] 'independent recollection' of [the defendant's] appearance." *United States v. Morsley*, 64 F.3d at 916 (citing *United States v. Wade*, 388 U.S. at 240, 87 S.Ct. at 1939 and *United States v. Crews*, 445 U.S. 463, 473, 100 S.Ct. 1244, 1250–51, 63 L.Ed.2d 537 (1980), *cert. denied*, —— U.S. ——, 116 S.Ct. 749, 133 L.Ed.2d 697 (1996)).

■ The decisions of the Fourth Circuit also teach that, in making this analysis, it is necessary to determine whether the in-court identification is based on an independent source of familiarity with the defendant such as previous knowledge of, or acquaintance with, the defendant or a significant opportunity to view the defendant at the time of the crime. Indeed, the Court of Appeals has permitted identifications to stand only where there is some independent knowledge which objectively can be said to attenuate, in a meaningful way, the inherently suggestive environment of a courtroom identification of a single defendant. *See, e.g., United States v. Murray*, 65 F.3d at 1169 (identification based upon witness' "clear recollection of [defendant] during the robbery"); *United States v. Johnson*, 732 F.2d 379, 380 (4th Cir.) (identification based upon an opportunity to view the defendant at a time other than in the courtroom), *cert. denied*, 469 U.S. 1033, 105 S.Ct. 505, 83 L.Ed.2d 396 (1984); *United States v. Wilcox*, 507 F.2d 364, 372 (4th Cir. 1974) (identification found to have stemmed from witness' observations on the date of the crime, based on her testimony that she would never really forget what the defendant looked like), *cert. denied*, 420 U.S. 979, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975); *United States v. Morsley*, 64 F.3d at 915 (in-court identification based upon previous knowledge and association with the defendant).

■ Moreover, where there is no improper pretrial identification, but where the challenge to the identification focuses on the suggestive environment of the courtroom, the issue is whether, under the "totality of the circumstances," the in-court presentation, whether wittingly devised by the prosecution or otherwise, created a substantial likelihood of misidentification. *United States v. Murray*, 65 F.3d at 1169. In *Wade*, the Supreme Court considered several ways in which the identification of a defendant can be suggestive. In each instance, the Court considered whether the situation suggested to the witness that the individual who was presented for identification was believed by the government to be guilty. *Id.* 388 U.S. at 233–34, 87 S.Ct. at 1935–36.

In this case, the allegedly suggestive circumstances preceding the in-court identification were the in-court trial procedures conducted during voir dire examination for two days before the identifying witness testified. During those two days, Abel saw Satcher, whom she knew to be accused of the attack against her, repeatedly identified by the court and by counsel as "the defendant." At the time, she knew that she had identified her assailant as a black male; and Satcher was the only black male in the relevant part of the courtroom.[60] There is, therefore, no

---

**60.** The Second Circuit has recognized that a similar in-court identification amounted to an impermissibly suggestive "show-up". *See United States v. Archibald*, 734 F.2d 938 (2d Cir.1984). In *Archibald*, the Court of Appeals held that an in-court identification procedure was impermissibly suggestive where the defendant was the only black person in the courtroom (other than a United States Marshall) and was seated next to counsel during trial. In so holding, the Second Circuit recognized the dangers of in-court identifications where the defendant is seated at the counsel table, *Id.* at 941–42 (*citing* Judge Friend-

ly's statement that "there is always the question of how far in-court identification is affected by the witness' observing the defendant at the counsel table," *United States ex rel. Phipps v. Follette*, 428 F.2d 912, 915 (2d Cir.), *cert. denied*, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970)).

In denying a petition for rehearing in *United States v. Archibald*, however, the Second Circuit made clear that such in-court identifications were only constitutionally infirm where the defendant makes a timely request for protective procedures. 756 F.2d 223 (2d Cir.1984); *see*

question that, under the meaning of *Wade*, Abel knew that the government considered the person identified by the witness to be the person who had committed the crime against her. Furthermore, as discussed in detail below, Abel had no independent source of familiarity with Satcher and had only a limited opportunity to view her attacker during the incident. That information tends to support the conclusion that Abel's in-court identification was preceded by a high degree of suggestiveness.[61] Accordingly, the Court concludes that the Abel identification was suggestive.

**(b) Reliability of the Identification.**

The fundamental question to be resolved is always the reliability of the in-court identification. *Manson*, 432 U.S. at 110, 97 S.Ct. at 2250–51; *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir.1996). Therefore, even if the procedure was *suggestive*, the identification could nevertheless be admissible if, under the totality of the circumstances, it was *reliable*—that is, if there is no substantial likelihood of misidentification. *Biggers*, 409 U.S. at 199, 93 S.Ct. at 382. The totality of the circumstances requires courts to take into account the same factors prescribed by the Supreme Court in *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382–383. They are: "[a] the opportunity of the witnesses to view the criminal at the time of the crime, [b] the witness' degree of attention, [c] the accuracy of the witness' prior description of the criminal, [d] the level of certainty demonstrated by the witness at the confrontation, and [e] the length of time between the crime and the confrontation." *United States v. Murray*, 65 F.3d at 1169 n. 6 (citing *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382–383). Suppression of the in-court identification will occur only where there is a *very substantial likelihood of irreparable misidentification*. *Neil v. Biggers*, 409 U.S. at 198, 93 S.Ct. at 381–82; *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

Accordingly, it is necessary to apply the factors identified in *Neil v. Biggers* to assess the admissibility of the Abel identification. Before conducting that assessment, however, it is appropriate briefly to review the circumstances presented in *Biggers*.

In *Biggers*, the Supreme Court found no substantial likelihood of misidentification where the victim had spent up to a half an hour with her rapist under a full moon, had given the police a reasonably approximate description of the defendant shortly after the attack, and expressed certainty that there was something about his face that she did not think she "could ever forget." *Id.* 409 U.S. at 201, 93 S.Ct. at 383. Although there was a seven month lapse between the rape and the confrontation, normally a "seriously negative factor," the victim had made no previous identification of any other person at any of the showups, lineups, or photographic showings. "Her record for reliability was thus a good one, as she had previously resisted whatever suggestiveness inheres in a showup." *Id.*

■■■ In this case, the Supreme Court of Virginia determined that Abel's identification of Satcher met each prong of the *Biggers* test. "Considering the totality of the circumstances in this case, we have no difficulty in saying that Ms. Abel's in-court identification of Satcher was reliable." *Satcher*, 421 S.E.2d at 839. There is no Section 2254(d) presumption of correctness accorded to a state court's determination concerning whether the identification procedures were unduly suggestive because that determination involves a mixed question of law and fact

---

*also United States v. Brown*, 699 F.2d 585, 593–94 (2d Cir.1983) (where the defendants were sufficiently aware that identification testimony would be presented at trial, but failed to request a lineup or any other protective procedure, the in-court identification was not a violation of the defendant's rights). Satcher made no such request during his state trial, so *Archibald* is not directly applicable here. Nor is it necessary here to decide the extent to which suggestiveness requires more than the mere fact that the defendant is seated at counsel table, because the record here shows far more suggestivity than that.

**61.** As the Court stated in *Wade:* "We do not assume that [the suggestive influences] are the result of [ ] procedures intentionally designed to prejudice an accused. Rather we assume they derive from the dangers inherent in eyewitness identification and the suggestibility inherent in the context of the pretrial identification." 388 U.S. at 235, 87 S.Ct. at 1936.

subject to plenary review. *Sumner v. Mata,* 455 U.S. at 597, 102 S.Ct. at 1306–07. However, all of the facts underlying the state court's determination are given the presumption of correctness. *Thompson v. Keohane,* —— U.S. ——, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The trial court made no factual determinations because it did not consider the reliability of Abel's identification.

This Court will now turn to a *de novo* analysis of the Abel identification under the *Biggers* calculus.

**(i) *Opportunity to View Criminal;* and**

**(ii) *Degree of Attention.***

■ Abel first saw her assailant when he was between 30 and 50 feet away from her on the bicycle path. She testified that she looked at him a few times and made eye contact with him when they passed each other on the path. At the time they passed, they were less than two feet apart. However, Abel's glasses were knocked off when she was grabbed from her bicycle. The trial transcript reveals that Abel was thrown face down in the ditch alongside the bike path and that during the five to seven minute attack, the assailant kept her head facing downward and kept his hand over her eyes or beat her in the face so that she could not see him.

Abel's opportunity to view her assailant was considerably less than that of the victim in *Biggers,* who faced her assailant during the entire fifteen to thirty minute attack. *See also United States v. Revels,* 575 F.2d 74, 76 (4th Cir.1978) (noon to sunset); *United States v. Young,* 529 F.2d 193, 195 (4th Cir. 1975) (20 minutes). In fact, Abel's sole opportunity to view her assailant consisted only of the brief time it took them to pass each other on the bike path because after that, her glasses were knocked off, her back was to the attacker, she was not permitted to see him during the course of the attack, and she was being dealt repeated blows to her head and face. Moreover, the degree of Abel's attention thereafter was understandably minimal because she was being brutally assaulted.[62]

These two *Biggers* factors weigh against admissibility of the Abel identification.

**(iii) *Accuracy Of The Previous Description.***

After the attack, Abel described Satcher as 5'9" to 5'10" in height, 190–200 pounds, large and stocky, scarless, 25–30 years old, with a short Afro haircut. This description was very close to the one given by Polemani. In actuality, Satcher was 5'6" tall, weighed 152 pounds, was of medium build, had visible scars, was 21 years old, and had a short, cropped hairstyle. Abel also gave a description of her assailant to a police artist, who reduced the description to a sketch. The Supreme Court of Virginia decided this portion of the *Biggers* analysis on the basis that:

> [i]t would have been unusual ... had Ms. Abel's description of her assailant matched Satcher's physical characteristics in every detail; in any event, *the differences between her description and Satcher's actual appearance went to the weight, not the admissibility, of her identification evidence.*

*Satcher,* 421 S.E.2d at 838–39 (emphasis added).

This legal determination was erroneous, however, because the third *Biggers* factor instructs that *the accuracy of the prior description must be determined by the court as a precondition to admissibility.* That is essential to give meaning to the defendant's due process right to be free from the risk of conviction on the basis of an unreliable identification.

■ *Biggers,* of course, does not require absolute precision in a description. In *Biggers,* the Supreme Court noted that although the victim's description "might not have satisfied Proust," it "was more than ordinarily thorough." 409 U.S. at 200, 93 S.Ct. at 383. There, the victim's description to the police "included the assailant's approximate age, height, weight, complexion, skin texture, build and voice." *Id.* Likewise, in *United States v. Hughes,* 716 F.2d 234 (4th Cir.1983), the Fourth Circuit determined that, although

---

**62.** Although here, unlike in *Biggers,* there was a second eyewitness to the attack who conceivably could have lent corroboration to Abel's descrip-

tion of the attacker, that witness, Mark Polemani, was likewise unable to identify Satcher as the assailant at the pretrial lineup.

there was some disparity between the description of the attacker and the actual appearance of the accused, those "differences were not so great, standing alone, that suppression [was] required." *Id.* at 241. "The proper approach in this situation is not suppression, but to encourage defendant's counsel to bring these inconsistencies to the attention of the jury in closing argument, and thus lessen the impact of the identification on the jury panel's minds." *Id.*

In Satcher's case, however, Abel's previous description of her attacker was strikingly *unlike* the actual appearance of Satcher at the time of his arrest. She described the assailant as an individual who was 3 to 4 inches taller, 40 to 50 pounds heavier, 4 to 9 years older, and with an entirely different body build than Satcher. These significant differences, coupled with Abel's previous failure to recognize Satcher in a non-suggestive lineup in which she knew her assailant to have been present, militate in favor of suppressing the in-court identification.

### (iv) *Level of Certainty.*

The fourth *Biggers* factor in this case necessitates an inquiry into the certainty of the identifying witness at three different periods: (1) Abel's initial description to the police and her approval of the artist's sketch; (2) the pre-trial lineup identification; and (3) the in-court identification. Both Abel and Polemani were *certain* of the attacker's appearance when they described him to the police artist, the day after the attack. The artist drew two different sketches based upon their separate descriptions and the resulting two drawings bore a striking resemblance to each other.

Both Abel and Polemani demonstrated rather remarkable uncertainty, however, during the lineup staged two weeks before trial and 15 months after the attack on Abel. After viewing the lineup for about 15 minutes, Abel asked to see suspect number two and number four [Satcher] again. Abel ultimately identified number two as her attacker. She explained later, "number four

[Satcher], I had decided in my mind, looked extremely close and accurate to the picture that I had ... helped the artist draw." However, she indicated: "I also had a weird feeling about number two." *See* Trial Tr., July 19, 1991 at 56. Abel selected number two because he looked "very unthreatening" and the man who attacked her had looked unthreatening that night. *Satcher,* 421 S.E.2d at 839. Similarly, Polemani viewed the same lineup and was unable positively to identify anyone. Polemani was later allowed to testify that, at the time of the lineup, he felt that number four [Satcher] was probably the man he had seen on that night, though he could not be positive. However, he was never able positively to identify Satcher as the attacker.

During the jury selection process, Abel observed Satcher over a two-day period during which Satcher was continuously identified as "the defendant" in the Abel attack and was the only black person at the defense table. When Abel saw Satcher walk in the courtroom, she noted that "the way he walked, the way he shrugged his shoulders when he would come back from the bench ... would ... remind me of ... that night ... [a]nd ... him coming down the path exactly ... the same way he would walk back to his chair in this [court]room." *See id.* at 77–78. Abel then approached the prosecutor, and said, "That's the guy." *Id.* at 62.

The Supreme Court of Virginia gave great weight to the fact that Abel's "in-court identification of Satcher was unequivocally positive." *Satcher,* 421 S.E.2d at 839. However, only when her identification was bolstered by the institutional identification of Satcher as "the defendant" in the jury selection process and the fact that he was the only black man at the defense table, did Abel (understandably) demonstrate a high level of certainty that Satcher was her attacker. It simply cannot be ignored that, during a neutral pre-trial lineup when Satcher stood next to four other similarly-clad black men, Abel selected someone other than Satcher.[63] On this rec-

---

63. Only one factor varied between the pre-trial line-up and Ms. Abel's in-court identification of Satcher—the circumstances of confrontation. Whereas the setting of the pre-trial lineup was

neutral, the confrontation preceding the in-court identification was highly suggestive. It was only after Satcher was effectively singled-out for prosecution by the government and the police that

ord, the Court concludes that Abel's identification of Satcher was determined by the circumstances of his presentment to her as her assailant in the formal judicial process, and not by her observation of him during the attack upon her.

A previous misidentification, such as the one in this case, is cause for extreme concern. In *Biggers,* the fact that the victim had made no previous misidentification at any of the showups or lineups, contributed to the conclusion of the Supreme Court that her identification was reliable. The requisite level of certainty here is based on Abel's subjective assertions of confidence, but the objective facts materially undercut the certainty determination made by the state court.

With regard to the fourth *Biggers* factor, therefore, the facts of this case auger against admission of the Abel identification.

### (v) *Length Of Time Passing.*

Abel's description of her assailant to the police and the police artist's sketches were completed the day after the attack. Both the lineup and Abel's in-court identification occurred 15 months after the attack. In *Biggers,* the Supreme Court noted that the seven month time lapse between the attack and the identification in that case was a negative factor, but held that it was outweighed by the strength of the evidence in support of the other factors. 409 U.S. at 201, 93 S.Ct. at 383. Here, the 15 month lapse between the attack and the in-court identification is unquestionably a "strongly negative factor." *Id.* And, unlike *Biggers,* it is not outweighed here by the strength of the other four factors. Abel had a limited opportunity to view her attacker; her vision was affected by the loss of her glasses; her degree of attention was impeded by the repeated blows to her face and the attacker's hand over her eyes; the accuracy of her previous description is subject to substantive dispute; and her level of certainty was poor given her misidentification at the pre-trial lineup.

▮ In *Biggers,* the Supreme Court underscored that "the primary evil to be avoided is a very substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. at 198, 93 S.Ct. at 381–82. Of course, it is "the likelihood of misidentification which violates a defendant's right to due process." *Id.* There no doubt exists in any identification the risk that it is erroneous, but that risk is not constitutionally infirm so long as the circumstances surrounding the identification do not suggest its ultimate outcome. Where the outcome of the identification process is not preordained by a suggestive procedure, the risk of misidentification is adequately protected, within the meaning of the Fourteenth Amendment, by the rights of confrontation and cross-examination. *Id.*

However, where the suggestive process renders the identification inherently unreliable, due process is offended because the remedial process of confrontation and cross-examination cannot, at law, undo the prejudice created by the suggestive identification. And, that is what happened here.

Abel's first description of her assailant was at substantial variance with Satcher's actual appearance. Some 15 months later and about two weeks before trial, Abel failed in a lineup to identify Satcher as her assailant. In fact, even after being warned not to select anyone unless she was absolutely sure that he was the attacker, Abel pointed to someone other than Satcher. It was only after Abel sat in the courtroom, saw Satcher seated at the defense table, and heard Satcher referred to as "the defendant" in a case which involved the attack on her, that Abel concluded "with certainty" that Satcher was the man who attacked her.

The process of allowing Abel to sit in on jury selection and see Satcher identified by the court as the defendant as the only black man at the defense table clearly pointed Abel to the identification of Satcher (which she made with certainty, but which was at odds with the similarly certain identification of another man that she made but two weeks earlier). That, of course, is precisely the likelihood of misidentification which *Biggers* seeks to preclude.[64]

---

Abel could "identify" him as her assailant with "certainty."

**64.** The Respondent argues that this result is "absurd" because it would foreclose entirely the in-court identification of a defendant by any witness

Considering the totality of the circumstances, the record here demonstrates that there was a substantial likelihood of misidentification. Perhaps most like the present case is *Smith v. Paderick*, 519 F.2d 70, 72 (4th Cir.), *cert. denied*, 423 U.S. 935, 96 S.Ct. 293, 46 L.Ed.2d 267 (1975), in which the trial court itself arranged an in-court lineup requiring each defendant to be grouped with four others and then brought each into the courtroom seriatim for the witness to view. The witness correctly identified all the defendants except Smith and, in fact, selected another individual who did not resemble Smith. Although the trial judge dismissed the charges against Smith because of the failure to identify him, the grand jury subsequently indicted Smith. At trial, the same witness who previously had failed to identify Smith viewed Smith seated at counsel table with his three co-defendants and thereafter made an in-court identification of all four as the perpetrators of the crime against him.

During the course of the trial, the witness admitted that he had picked out the wrong person at the pretrial lineup, that he had limited opportunity to view his attackers, and testified that he could not say definitely whether the fact that Smith was seated at counsel's table, with the other defendants whom the witness previously had identified, influenced his in-court identification of Smith. The Fourth Circuit upheld the admissibility of the in-court identification only because the case was being tried to a judge, observing that *"[h]ad Smith's state trial been to a jury*

we would be inclined to agree ... that failure to exclude [the in-court identification] amounted to reversible error." Id. at 75 (emphasis added). In explanation of the resolution, the Court of Appeals cautioned that "[p]ositive identification testimony is the most dangerous evidence known to the law." *Smith v. Paderick*, 519 F.2d at 75. Therefore, "[t]ainted identification evidence cannot be allowed to go to a jury because they are likely to accept it uncritically." *Id.* In this case, Abel's positive and powerful in-court identification of Satcher, notwithstanding her previous identification of another individual, is just the type of danger against which *Biggers* and *Smith* seek to protect: a substantial likelihood of misidentification.

■ Based on the foregoing analysis, the Court holds that the Abel in-court identification was made under impermissibly suggestive circumstances, and that the identification was not otherwise independently reliable.[65] Therefore, the trial court committed constitutional error in admitting Abel's identification testimony.

### 3. Harmless Error Analysis.

■ The analysis is not complete, however, with this finding of constitutional error. Because the improper admission of identification testimony is considered a "trial error," it is subject to harmless error review. *See Moore v. Illinois*, 434 U.S. 220, 232, 98 S.Ct. 458, 466–67, 54 L.Ed.2d 424 (1977) (remanding for determination of whether the errone-

---

unless he or she had "no prior knowledge of who the defendant was." *See* Respondent's Motion to Dismiss at 29–30. However, Respondent fails to recognize that only in-court identifications that are suggestive and unreliable under the totality of the circumstances are inadmissible under the analysis set forth above. Surely this constitutionally-mandated requirement is not "absurd."

Moreover, the exclusion of reliable identification testimony can be prevented by the simple expedient of keeping the potential witness away from the jury selection process. Indeed, prudent prosecutorial strategy would seem to anticipate the need to do that where, as here, there exists any hope that the witness, who has before missed the mark, might nonetheless be able correctly to identify the defendant when she testifies at trial. Of course, this also permits the defense the opportunity to raise with the trial judge the need to adopt methods which will foreclose the risk that

certain factors, such as the method of examination or the placement of a defendant, will suggest or prompt the identification.

The so-called "absurd" result apprehended by Respondent also can be avoided if the prosecutor presents the issue in advance to the trial judge out of the presence of the jury and offers evidence on the basis of which a *Biggers* analysis can be made. The prosecution must bear the consequence of that failure.

65. Under the law of the Fourth Circuit, other evidence of guilt may be considered in assessing the reliability of identification under the *Biggers* test. *United States v. Wilkerson*, 84 F.3d at 695. However, as discussed below with respect to the harmless error analysis, even considering all of the other evidence of Satcher's guilt, this Court cannot conclude that the Abel in-court identification was reliable.

ous failure to exclude identification testimony was harmless constitutional error). Thus, notwithstanding this constitutional infirmity, Satcher is entitled to relief only if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637, 113 S.Ct. at 1722 (*quoting Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *Sherman v. Smith,* 89 F.3d at 1140–41. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish "actual prejudice." *See Brecht,* 507 U.S. at 637, 113 S.Ct. at 1722 (*quoting United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986)). "Actual prejudice" has been defined by the Supreme Court to mean simply that an error "had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (*quoting Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *see also O'Neal v. McAninch,* 513 U.S. at ——, 115 S.Ct. at 996.

In *Brecht,* the Supreme Court clarified the harmless error standard to be used by federal courts in conducting habeas corpus review. In formulating the standard, however, the Court quoted and adopted the standard set forth in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See Brecht,* 507 U.S. at 637–38, 113 S.Ct. at 1721–22; *McAninch,* 513 U.S. at ——, 115 S.Ct. at 994. Significantly, in *Kotteakos,* the Supreme Court stated the harmless error test in practical terms:

> If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. *The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.*

*Kotteakos,* 328 U.S. at 764–65, 66 S.Ct. at 1247–48 (emphasis added).

In *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the Supreme Court recently re-emphasized that petitioners are to be given the "benefit of the doubt" in the face of constitutional trial error; the petitioner *does not* carry the burden of proof. In *O'Neal,* the Court expressly eschewed a burden of proof analysis, stating that, "[in] such a case, we think it is conceptually clearer for the judge to ask directly, 'Do I, the judge, think the error substantially influenced the jury's decision?' than for the judge to try to put the same question in terms of proof burdens." *Id.* at ——, 115 S.Ct. at 995. The Court held that, where a federal judge in a habeas proceeding finds a constitutional trial error, and "is in *grave doubt* about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' *that error is not harmless. And, the petitioner must win."* *Id.* at ——, 115 S.Ct. at 994 (emphasis added); *see also Sherman v. Smith,* 89 F.3d at 1143; *O'Dell,* 95 F.3d at 1261–62 (Ervin, J., concurring in part, dissenting in part); *Correll v. Thompson,* 63 F.3d at 1291. The Supreme Court defined "grave doubt" narrowly:

> Normally a record review will permit a judge to make up his or her mind about the matter. And indeed a judge has an obligation to do so.... (By 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.)

*Id.* at ——, 115 S.Ct. at 994.

Although in *O'Neal,* the Court recognized the undeniably important and legitimate state interest in the finality of its judgments, it found that the "grave doubt" rule was "consistent with the basic purposes underlying the writ of habeas corpus." *Id.* at ——, 115 S.Ct. at 997.

[W]e are dealing here with an error of constitutional dimension—the sort that risks an unreliable trial outcome and the consequent conviction of an innocent person. We also are assuming that the judge's conscientious answer to the question, 'But, did that error have a 'substantial and injurious effect or influence' on the jury's decision?' is, 'It is extremely difficult to say.' In such circumstances, a legal rule requiring issuance of the writ will, at least often, avoid a grievous wrong—holding a person 'in custody in violation of the Constitution ... of the United States.' 28 U.S.C. §§ 2241(c)(3), 2254(a). Such a rule thereby both protects individuals from unconstitutional convictions and helps to guarantee the integrity of the criminal process by assuring that trials are fundamentally fair.... By way of contrast, the opposite rule, denying the writ in cases of grave uncertainty, would virtually guarantee that many, in fact, will be held in unlawful custody—contrary to the writ's most basic traditions and purposes. And, it would tell judges who believe individuals are quite possibly being held 'in custody in violation of the Constitution' that they cannot grant relief.

*Id.* at ——–——, 115 S.Ct. at 997–98 (internal citation omitted).

The *O'Neal* Court thus concluded that: "On balance, we must doubt that the law of habeas corpus would hold many people in prison 'in violation of the Constitution,' for fear that otherwise a smaller number, not so held, may eventually go free." *Id.* at ——, 115 S.Ct. at 998. The Fourth Circuit has not hesitated to conclude that error was not harmless under the *Kotteakos* standard. *See, e.g., United States v. Madden,* 38 F.3d 747, 753 (4th Cir.1994); *United States v. Ince,* 21 F.3d 576, 585 (4th Cir.1994); *United States v. Sanders,* 964 F.2d 295, 299–300 (4th Cir.1992); *United States v. Taylor,* 900 F.2d 779, 783 (4th Cir.1990).

With the Supreme Court's instructions in mind, the Court now considers whether the erroneous admission of the Abel in-court identification was "harmless error." Because this Court finds that the trial court's error was *not* harmless under the *Brecht/Kotteakos*

standard and that, at a minimum, "grave doubt" exists as to whether the error had "substantial and injurious effect or influence in determining the jury's verdict," Satcher's petition as to this claim of constitutional error is granted.

### (a) Evidence Adduced At The Guilt Phase of The Trial.

In conducting harmless error analysis, this court reviews the record de novo to determine whether the identification has had a substantial and injurious effect on the verdict. *See Fulminante,* 499 U.S. at 295, 111 S.Ct. at 1257; *Correll v. Thompson,* 63 F.3d 1279, 1291; *Smith v. Dixon,* 14 F.3d at 978 ("Harmless error analysis must necessarily be conducted on a cold record, whether the court be federal or state") (*citing Booker v. Dugger,* 922 F.2d 633, 636 n. 4 (11th Cir.) ("Federal courts are not ... bound by state court rulings on harmless error"), *cert. denied,* 502 U.S. 900, 112 S.Ct. 277, 116 L.Ed.2d 228 (1991)). Accordingly, it is necessary to summarize the evidence, in total, that was admitted during the guilt phase of Satcher's state court trial.

### (i) Evidence Pertaining To Abel Offenses.

The evidence adduced at trial relating to the Abel offenses consists of the following:

(1) The Abel in-court identification;

(2) Abel's purse was found (near that of Borghesani) six days after the Abel attack in bushes next to a parking lot located across the highway from the bike path;

(3) Police sketches based on descriptions by Abel and Polemani given immediately after the attack describing assailant as a black male who was 25 to 30 years of age, stood approximately 5'9" to 5'10" in height, weighed 190 to 200 pounds, had no visible facial hair or scars, and who wore a short Afro haircut;

(4) Polemani's testimony that Abel's assailant carried-off Abel's purse upon fleeing the scene of attack; and

(5) Polemani's testimony that, although he was unable to positively identify Satcher in the police line-up, at the time of the lineup, he was "pretty sure" that

No. 4 [Satcher] was *probably* the man he had seen on the night in question.[66]

### (ii) Evidence Pertaining To Borghesani Offenses.

The evidence presented at trial relating to the Borghesani offense, consists of the following:

(1) DNA evidence and related witness testimony indicating that: 99.999998% of the black population was eliminated as possible donors of the semen found on Borghesani's body; Satcher was not eliminated; and that the probability of a random match between Satcher's DNA and another black person's DNA was one in forty million;

(2) After his arrest and upon being transported to the police station, Satcher, in response to the comment "What's up?", told an officer that the police were "trying to frame [him] for a murder or something or a rape or something." Prior to his unsolicited statement, nothing had been said to him concerning the Borghesani rape and murder.

(3) An awl was found in the glove compartment of Satcher's car. Satcher admitted to owning the Awl at the time of the Abel and Borghesani attacks. Satcher testified that he kept the awl in his car in order to repair his car radio. The medical examiner testified that the awl was "consistent" with the weapon used to inflict the twenty-one stab wounds upon Borghesani. The "blade" used to stab Borghesani was approximately 3.5"—4" long and one-quarter of an inch in diameter; the tip of the blade was sharp. The examiner testified that the weapon used could not have been an ordinary screwdriver (flat-head or Phillips-head) or an ice pick (unless it was substantially wider in diameter than an average ice pick). However, the examiner conceded that the weapon used may have been a scissors, nail, or a sharpened screwdriver.

Additionally, the examiner indicated that she could not establish whether the awl was, in fact, the murder weapon, and that there was no trace of blood on Satcher's awl;

(4) Testimony of a forensic analyst indicating that: two of twenty-nine Negroid pubic hairs found on the body of Borghesani could not have come from Satcher or Borghesani; one Caucasian head hair was found which was microscopically different from Borghesani's hair; and that of the remaining twenty-seven Negroid hairs found, the witness "found no hairs, pubic hairs ... that would match with those identified to me as coming from Michael Satcher." Trial Tr. 7/25/91 at 217;

(5) Testimony of a forensic serologist indicating that, in the tests she conducted, Satcher could not be eliminated as a donor of a semen stain found on Borghesani's pants; the witness said that seven percent of the population were possible contributors to the stain and, of eleven blood samples taken from suspects, two persons, Satcher and "WL," could have contributed the stain; in addition, a semen stain found on Borghesani's coat could not be typed because of insufficiency in amount;

(6) One of Borghesani's shoes was found along the bike path (in the vicinity of the Abel attack);

(7) Borghesani's purse was found (near that of Abel) six days after the Borghesani attack in bushes next to a parking lot located across the highway from the bike path; and

(8) Evidence submitted by Satcher relating to Borghesani's class ring: Evidence showed that Borghesani wore two rings "all the time." The rings, including her class ring from Tufts, were missing from her body when it was discovered the morning after the murder. The operator of a consign-

---

**66.** This analysis assumes that this evidence was properly admitted even though it is not possible to determine the basis for allowing a witness who cannot identify the defendant to state at trial that he was "pretty sure" of an identification at a lineup.

ment shop testified that, about a month after the murder, two white females in their mid-twenties attempted to sell him a class ring bearing Borghesani's initials. In rebuttal, the Commonwealth introduced the order form for the ring, which called for a ring bearing the full name, "Ann E. Borghesani," and not merely the initials "AEB."

### (iii) Evidence Pertaining To Both Offenses.

(1) Satcher's testimony that he did not attack Abel or Borghesani;

(2) Testimony from Satcher's employer that Satcher did not come to work as scheduled on March 30 and March 31, 1990, the two days preceding the Abel and Borghesani attacks. The witness testified that it was unusual for Satcher to miss work without calling ahead of time with an excuse. Satcher offered no explanation for his failure to appear at work as scheduled; and

(3) Testimony of Joyce Ann Bern indicating that she saw Satcher "running," not "jogging," "right off the bike trail" on August 18, 1990, the day of Satcher's arrest. The bike trail referred to by Bern was in Arlington, but was different than the trail on which Abel was attacked and Borghesani's body was found. Bern identified Satcher in court.[67]

### (b) Application of the Harmless Error Standard.

Recent Fourth Circuit precedent outlines the primary factors to which courts look in determining whether a constitutional trial error had "substantial and injurious effect or influence" on the jury's verdict: (1) whether steps were taken by the court to mitigate the

error, *Ince,* 21 F.3d at 583; (2) whether the evidence was a confession, or otherwise infected an issue central to the case, *Ince,* 21 F.3d at 583; (3) whether the evidence was heavily relied on by the prosecution, *Tuggle v. Netherland,* 79 F.3d 1386, 1393–95 (4th Cir.1996); *United States v. Madden,* 38 F.3d 747, 753 .(4th Cir.1994); *Brecht,* 507 U.S. at 639, 113 S.Ct. at 1722; (4) whether the evidence was merely cumulative of other abundant evidence in the record, *Sherman v. Smith,* 89 F.3d at 1142; (5) whether there are any indications that the jury was hesitant or entertained doubt in reaching its determination, *Tuggle v. Netherland,* 79 F.3d at 1395; and (6) whether the evidence was part of a case in which the evidence, taken as a whole, was sufficiently weighty, or whether the case was too close to give a "fair assurance that the [tainted] evidence did not substantially sway the jury to its verdict," *Ince,* 21 F.3d at 585 (internal quotations omitted).

Finally, the fundamental nature of the constitutional error in this case must be taken into account in performing the harmless error analysis. The Supreme Court has long-since recognized the substantial influence and effect that improper identification testimony has upon a jury's verdict:

> [T]he confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.... A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in

---

**67.** It is important to note that the whole sequence of events surrounding Satcher's arrest on April 18, 1990 was not admitted in the *guilt phase* of the trial, and thus must be ignored by the Court in conducting the immediate harmless error analysis. Specifically, the jury did not learn of the attacks on Misses Chusid, Overholt, and the attempted attack on Ms. Rooney. Thus, there was no inference to be drawn that Satcher was "running" from potential rescuers or from

pursuing police officers. Additionally, no evidence was admitted indicating that upon arrest, Satcher held an open knife with a four-inch blade in his hand and was spotted giving chase to Ms. Rooney. Much of this evidence was admitted only at the *sentencing phase* of the trial. In addition, the harmless error analysis assumes that Bern's testimony was admissible even though there is no discernable basis to have admitted it.

which the prosecution presents the suspect to witnesses for [ ] identification.... 
*[T]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined.* ... And the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest.

*United States v. Wade*, 388 U.S. at 228–29, 87 S.Ct. at 1933 (internal quotations and citations omitted) (emphasis added); *see also Smith v. Paderick*, 519 F.2d at 75 ("Positive identification testimony is the most dangerous evidence known to law"); *supra* note 58.

The identification of Satcher in this case came from the surviving victim herself. Live testimony from the understandably sympathetic victim of such a heinous attack would undoubtedly have a powerful and emotional effect upon anyone sitting in the jury box. Indeed, like confessions, in-court identifications in general "have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Fulminante*, 499 U.S. at 296, 111 S.Ct. at 1257 (discussing coerced confessions). In Satcher's case, however, the jury was not instructed to put the erroneously admitted identification evidence "out of mind." The risk that the identification is unreliable, coupled with the profound impact that the identification has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the in-court identification at trial was harmless error. *See Id.* at 296–98, 111 S.Ct. at 1258.

Careful consideration of these factors convinces the Court that it is "impossible to conclude" with any "fair assurance" that the erroneous admission of the Abel in-court identification did not have a "substantial and injurious effect or influence" on the jury's verdict. *O'Neal v. McAninch*, 513 U.S. at ——, ——, 115 S.Ct. at 995, 997 (quoting *Kotteakos*, 328 U.S. at 764, 776, 66 S.Ct. at 1247–48, 1253).

### (i) Abel Offense.

■ An extensive analysis is not necessary to determine that, with respect to the Abel conviction, the Abel in-court identification "had substantial and injurious effect or influence" on the jury's verdict.[68] Here, it is sufficient to recognize that the Abel identification was *the only* significant evidence connecting Satcher to the Abel offense.

The other evidence presented with respect to the Abel attack at best provides the slightest of inferences that Satcher was the assailant. The contemporaneous descriptions provided by Polemani and Abel immediately after the attack were significantly dissimilar to Satcher's actual appearance. The facts that Polemani saw Abel's attacker carry-off her purse and that the purse was found six days later in the same parking lot as Borghesani's in no way connects Satcher to the Abel crimes. There was no evidence that the two handbags were dropped in the area of a parking lot by Satcher, or for that matter, by the same person, at the same time. No linkage between Satcher and the Abel attack can be adduced from this fact.[69] Lastly, the Polemani "identification" was, at best, inconclusive. Polemani was unable to positively identify Satcher in a pre-trial lineup, and merely indicated, at trial, that he was "pretty sure," at the lineup, that No. 4 [Satcher] was the man he had seen on the night in question.

Additionally, none of the admitted evidence which pertains to both the Abel attack and the murder of Borghesani significantly implicates Satcher in those crimes. The fact that

68. A detailed evaluation of the Abel identification under the factors outlined by the Fourth Circuit is, rather, conducted below with respect to the Borghesani conviction.

69. Additionally, the record is somewhat inconsistent as to whether Ms. Borghesani's assailant took her handbag. While the prosecutor indicated in closing argument that both handbags had been found in the parking lot, Trial Tr., July 29, 1991 at 109, and argued that this demonstrated that the same person had committed the offenses against both women, Sergeant Carter, an Arlington County detective, testified that Borghesani's purse was visible in a photograph of her body taken on the morning of April 1, 1991. Trial Tr., July 19, 1991 at 206.

Satcher unusually failed to appear at work the two days preceding the attacks in no way identifies Satcher as either Abel's or Borghesani's attacker. Although somewhat suspicious, this fact is largely irrelevant considering that the attacks took place at night, well after the work day. The testimony by Joyce Bern and certain police officers, which indicated that Satcher was "running" off another bike path in Arlington, provides no inference that Satcher was involved in the Abel or Borghesani attacks which occurred five months earlier on a different path. Lastly, Satcher's testimony that he did not attack Abel or Borghesani, although perhaps considered incredible by the jury, did not provide substantial evidence that Satcher was involved in either attack.

Considering the paucity of evidence, independent of the Abel identification, implicating Satcher in the Abel attack, the Court simply cannot say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *McAninch*, 513 U.S. at ——, 115 S.Ct. at 995 (*quoting Kotteakos*, 328 U.S. at 764–65, 66 S.Ct. at 1247–48).[70] Therefore, because the Abel identification had "substantial and injurious effect and influence" on the jury's verdict in the Abel offense, the erroneous admission of the in-court identification was *not* harmless error.

### (ii) The Borghesani Offenses.

■ The murder and rape of Borghesani present a much closer case. The DNA evidence, as well as testimony concerning Satcher's spontaneous statement to the police, provided strong evidence implicating Satcher in the Borghesani murder and rape. However, apart from the association with the Abel attack, which is dependent on the improper Abel identification, the DNA and spontaneous statement evidence is the *only* significant evidence connecting Satcher to the Borghesani crimes. While that evidence is certainly

sufficient to support the jury's verdict, that is not the relevant inquiry here. *See Kotteakos*, 328 U.S. at 764–65, 66 S.Ct. at 1248 ("*The inquiry cannot be merely whether there was enough [evidence] to support the result*, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.") (emphasis added).

The evidence concerning the awl discovered in Satcher's car does not significantly implicate Satcher in the Borghesani murder. Firstly, Satcher offered a reasonable explanation for why the tool was in the glove compartment: it was useful in removing his car radio when it rained, which was necessary due to the car's broken alternator. *See* Trial Tr., July 26, 1991 at 38. Even if the jury found Satcher's explanation to be incredible, and found it suspicious that he kept the awl in his car, the evidence does not connect Satcher to the Borghesani attack. Although the awl was "consistent" with the murder weapon, there was no trace of blood found on it and the murder weapon could have been a wide ice pick, a sharpened screwdriver, a scissors or a sharp nail—all common household items. There is simply no evidence that *Satcher's* awl was implicated in the murder.[71]

More importantly, there is a significant amount of evidence which could have put a reasonable doubt into the jurors' minds. Most significant is the fact that the defense hair expert found one Caucasian and two Negroid hairs in Borghesani's pubic area that conclusively *could not have come from Satcher or from Borghesani*. Furthermore, *none* of the twenty-nine Negroid pubic hairs found were conclusively consistent with Satcher's hair samples. In addition, serology evidence indicated merely that Satcher was part of the seven percent of the population that could have contributed to the semen stains found on Borghesani's body, and that another suspect, "WL," could also have been

---

**70.** The Supreme Court of Virginia recognized the substantial effect the identification testimony had upon the jury's verdict, concluding that "Abel's in-court identification of Satcher was sufficient alone to establish him as her assailant ..." *Satcher*, 421 S.E.2d at 843.

**71.** For the reasons stated above with respect to the Abel crimes, the evidence pertaining to both the Abel and Borghesani attacks (i.e. the testimony from Satcher, Bern, and Satcher's employer) also does not significantly implicate Satcher in the Borghesani murder.

the contributor. The semen stain on Borghesani's coat was unreadable.

Nor does the balance of the evidence respecting the Borghesani murder and rape implicate Satcher as the perpetrator of the crimes. The evidence concerning the sale of the class ring was introduced by the defense in order to show that "someone with no connection" to Satcher attempted to sell the ring. However, such an inference would merely be speculative based on the record. In addition, the facts that Borghesani's shoe was found on the bike path and that her purse was found near Abel's are insignificant to implicate Satcher in the Borghesani offenses absent the Abel identification.

Faced with the evidence of the DNA test results and Satcher's suspicious spontaneous statement on the one hand, and with the evidence of the foreign hairs in Borghesani's pubic region, inconclusive hair test results, and serology tests indicating that another suspect could have been the semen donor on the other, the Abel identification takes on extreme significance, for it is the crucial link between the Abel and Borghesani offenses.

The evidence of the Abel attack, therefore, was an important part of the Commonwealth's proof of the Borghesani murder. DNA, of course, is a powerful basis for identification, but here that evidence alone did not compel a finding of guilt, especially given the extensive and effective cross-examination conducted by Satcher's defense attorneys and other evidence which could have placed a reasonable doubt into the minds of the jurors. Absent the Abel identification, which places Satcher on the bike path at the time of Abel's attack, the evidence at trial connecting the Abel and Borghesani murders is *significantly* weakened.[72] The jury undoubt-

edly found the connection between the two offenses, supported largely by the Abel identification, to be corroborative of the DNA identification in the Borghesani case. Thus, absent evidence of the Abel attack, which depended on Abel's identification, a jury reasonably could have rejected the results of the DNA evidence and could have succumbed to doubt created by other testimony.

A review of the evidence, through the prism of the six primary factors prescribed by the Fourth Circuit for determining whether a trial error is harmless, "leaves the conscientious judge in grave doubt about the likely effect," *McAninch*, 513 U.S. at ——, 115 S.Ct. at 994, of the erroneous admission of the Abel identification on the jury's verdict as to the Borghesani offense.

■ As for the first factor, the Court cannot conclude that the trier of fact was able to disregard the error in admitting the Abel identification and nonetheless find Satcher guilty because this case was tried before a jury and guilt was determined by people not able by training and experience on their own motion to identify error and disregard it. *Cf. Pemberton v. Collins*, 991 F.2d 1218, 1226–27 (5th Cir.1993). Moreover, no steps whatsoever were taken to mitigate the error in this case. *Cf. Ince*, 21 F.3d at 583. In fact, the prejudice that resulted from the admission of the Abel identification was compounded, rather than cured, by the trial court when it refused to give an appropriate limiting instruction.[73] Of course, even had the trial judge taken steps to minimize the "substantial and injurious" effect of the Abel identification upon the Borghesani verdict, evidence of a victim in-court identification, like that of a confession, may have "such a

---

**72.** The other evidence at trial connecting the Abel and Borghesani offenses was limited to the following: (a) the attacks took place within the same twelve-hour period; (b) the Abel assault occurred off the same bike path, albeit at a different location, along which Borghesani's body was found; (c) Abel's and Borghesani's purses were found in the same parking lot; and (d) Borghesani was raped and Abel's pants were pulled down.

**73.** Satcher's counsel requested such an instruction by stating: "Your Honor, one of the problems in this case—and we dealt with it on our

motion to severe [sic]—is that the case is almost exclusively separate evidence on both charges. [Sic] The concern I have is that somehow the jury might figure from the mountain of evidence that Mr. Satcher must be guilty of one or the other, rather than looking at the facts on each independently and then having found guilt beyond a reasonable doubt in one by facts of the other two. [Sic]." Trial Tr. 7/29/91 at 73–74. The trial court's response was simply that the request for this type of instruction was "denied." *Id.*

devastating and persuasive effect that mitigating steps, no matter how quickly and ably taken, cannot salvage a fair trial for the defendant." *Ince*, 21 F.3d at 583 (evaluating the effect of the evidence of the defendant's coerced confession).

 The second factor calls for an evaluation of the centrality of the improperly admitted evidence: whether the evidence infected an issue central to the case. It is beyond doubt that identity of a defendant as the perpetrator of an offense is central to any criminal case.

 The third factor to be considered in assessing whether the verdict actually rendered was attributable to the error—i.e., the extent to which the prosecution relied on the erroneously admitted evidence—also suggests that the error here cannot be judged harmless. This factor was extremely significant in both *Brecht*, 507 U.S. at 637, 113 S.Ct. at 1722 ("The state's references to petitioner's post-*Miranda* silence were infrequent ..."), and *Fulminante*, 499 U.S. at 297–98, 111 S.Ct. at 1258–59 (noting that the invalid confession was the "centerpiece" of the government's case). Under Fourth Circuit precedent, this factor depends significantly on whether there are "repeated, clear references to [the error] in the prosecutor's [ ] argument[s]." *United States v. Madden*, 38 F.3d 747, 753 (4th Cir.1994); *see, e.g. Tuggle v. Netherland*, 79 F.3d at 1394–95.

Although in this case the prosecution emphasized the DNA evidence more heavily in its closing argument, the Abel identification was showcased at length and in detail. The prosecution went to great pains, in both closing and rebuttal argument, to bolster the credibility of the identification in light of Abel's unfavorable sketch descriptions and the fact that Abel failed to positively identify Satcher at the pre-trial lineup. The prosecution clearly "relied heavily" on the identification evidence to convict Satcher for both the Abel and Borghesani offenses.

The fourth and fifth factors similarly indicate that there is *at least* "grave doubt" as to whether the Abel identification had a "substantial and injurious effect or influence" on the jury's Borghesani verdict. Unlike the situation in *Sherman v. Smith*, 89 F.3d 1134, the Abel identification was not "cumulative of [ ] abundant evidence admitted at trial" about the identification of Borghesani's assailant. *Id.* at 1142 (finding that a juror's improper site visit was harmless error under *Brecht* where there was abundant other evidence about the crime scene) (*citing Brecht*, 507 U.S. at 639, 113 S.Ct. at 1722–23). As explained above, the other significant evidence identifying Borghesani's attacker, other than the identification, was the DNA evidence. While the DNA evidence was certainly powerful (indeed, it can be sufficient for conviction, *see Spencer v. Murray*, 5 F.3d 758 (4th Cir.1993)), it by no means constituted "abundant evidence" of identification which would permit one to describe the Abel identification as merely "cumulative."

The fifth factor calls for an evaluation of whether there were "any indications that the jury was hesitant or entertained doubt in reaching its [ ] determination." *Tuggle v. Netherland*, 79 F.3d at 1393. In *Tuggle*, the Fourth Circuit found that the jury indicated no such hesitation, because "the jury returned its [ ] verdict after only a little more than an hour of deliberation." *Id.* at 1395. In Satcher's case, however, the jury began its deliberations at 6:45 P.M., July 29, 1991, and did not return the verdict until *after 4:00 P.M. the following day.* The fulsome deliberations in this case indicate that the jury may have been "hesitant" or may have "entertained doubt." *Id.* at 1393.[74]

The final factor to be examined in determining whether the verdict actually rendered was attributable to error—i.e. the closeness of the case—also indicates that the error here cannot be regarded as harmless. Apart from the Abel identification and the evidence made relevant because of it, the only significant evidence connecting Satcher to Bor-

---

**74.** Quite frankly, this Court considers the length of jury deliberations to be of very little, if any, probative value in determining whether there is hesitation or doubt unless the deliberations are either quite abbreviated or very protracted.

Nonetheless, district courts in this circuit are told to consider that factor and here the length of deliberations point toward the presence of a close case.

ghesani's murder is the DNA evidence and Satcher's spontaneous statement. Satcher, however, presented significant exculpatory *physical evidence:* evidence of the foreign hairs in Borghesani's pubic region, inconclusive hair test results, and serology tests indicating that another suspect could have been the semen donor. This exculpatory evidence is certainly strong enough to create a reasonable doubt; and, in light of the fact that the exculpatory evidence is *physical,* this is a fairly close case, notwithstanding the DNA evidence and Satcher's suspicious spontaneous statement.[75]

In a case of that sort, the Abel identification takes on extreme significance, for it provides the only link between the Abel and the Borghesani offenses, and thus it tends to corroborate the DNA identification. In a very real way, the Abel identification could have tipped the balance on the Borghesani offenses. Thus, without the Abel identification, the evidence against Satcher on the Borghesani murder charge was not extremely "weighty," as in *Brecht,* 507 U.S. at 637, 113 S.Ct. at 1722, let alone "overwhelming," as in *Correll v. Thompson,* 63 F.3d at 1291–92, and as defined by the Supreme Court. *See United States v. Lane,* 474 U.S. at 450, 106 S.Ct. at 732 ("*[T]he threshold of overwhelming evidence of guilt is far higher than mere sufficiency to uphold conviction.*").

To be sure, without the Abel identification, there was sufficient evidence on which a jury could have returned a verdict of guilty on the Borghesani murder and rape. But, in determining whether the error in admitting the identification was harmless, the question is not whether the jury was correct in its judgment as to guilt or innocence. *Kotteakos,* 328 U.S. at 764, 66 S.Ct. at 1247–48. The "closeness" inquiry, as the Fourth Circuit has recognized, "is not for the purpose of determining whether, if independently considered, the other evidence would have sufficed to convict." *Ince,* 21 F.3d at 584 (*quoting United States v. Urbanik,* 801 F.2d 692, 699 (4th Cir.1986)). Rather, the inquiry into the closeness of the evidence requires consideration of whether the other evidence "is sufficiently powerful in relation to the tainted evidence to give fair assurance that the tainted evidence did not substantially sway the jury to its verdict." *Id.* (internal quotations omitted).

Here, the impact of the Abel identification on the jurors is simply too forceful to be denied. Faced with the evidence of the DNA test results and Satcher's suspicious spontaneous statement on the one hand, and with the evidence of the foreign hairs in Borghesani's pubic region, inconclusive hair test results, and serology tests on the other, the Abel identification reasonably can be said to have been extremely persuasive to any juror. Careful consideration of the evidence convinces the Court that it is "impossible to conclude" with any "fair assurance" that the error in admitting the Abel identification did not have a "substantial and injurious effect or influence" on the jury's verdict. *O'Neal v. McAninch,* —— U.S. at ——, ——, 115 S.Ct. at 995, 997 (*quoting Kotteakos,* 328 U.S. at 764, 776, 66 S.Ct. at 1247–48, 1253–54).

For the foregoing reasons, Satcher's petition as to this claim of constitutional error is granted.[76]

**Claim II(I)(1):** *Prosecutorial Misconduct—Violation of Pretrial Discovery Agreement.*

The only element of this prosecutorial misconduct claim that has been preserved

---

**75.** In Satcher's case, there is both exculpatory (i.e. hair tests, foreign hairs, and serology tests) and inculpatory (i.e. DNA evidence) physical evidence. This is, therefore, a close case.

**76.** The Court would grant Satcher's petition as to this claim even if the 1996 Effective Death Penalty Act were applicable to Satcher's petition. Because the Supreme Court of Virginia committed legal error in construing and applying *Biggers* and its progeny, the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable interpretation of, clear-

ly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Lindh v. Murphy,* 96 F.3d 856, 861 (7th Cir.1996) (*en banc*) ("[W]hen the state court addresses a legal question, it is the law 'as determined by the Supreme Court of the United States' that prevails"). By invoking *Biggers,* Satcher is "able to point to an authoritative decision of the Supreme Court in order to secure a writ" under new Section 2254(d)(1). *Lindh v. Murphy,* 96 F.3d at 869.

for federal habeas review is the claim that the prosecutor breached a pretrial discovery agreement, which required the parties to provide a curriculum vitae for all expert witnesses before trial. In particular, Satcher argues that this agreement was breached when the prosecutor failed to provide Satcher with a copy of either Dr. Ferrara's or Dr. McElfresh's curriculum vitae prior to trial. The Supreme Court of Virginia determined, with respect to Dr. Ferrara, that (1) he was properly treated as a factual witness,[77] not subject to the curriculum vitae provision; and (2) that his presence in the courtroom during witness testimony in violation of a rule excluding fact witnesses from the courtroom was harmless error. *Satcher,* 421 S.E.2d at 836. Those determinations are entirely correct and, for the same reasons, this Court can find no constitutional error in the failure to provide the defense with Dr. Ferrara's vitae or in allowing his presence in the courtroom during the testimony of other witnesses.

■ With respect to Dr. McElfresh, the Supreme Court of Virginia determined that (1) because McElfresh was subpoenaed as a defense witness, the prosecution had no obligation to furnish the defense with his vitae;[78] and (2) Satcher was not prejudiced by the omission because he received the vitae two days before McElfresh actually testified as an expert for the prosecution. *Id.* Those findings clearly are correct and this Court finds no constitutional error.

**Claim II(J)(1) and (2):** *Prejudicial Conduct by Commonwealth.*

■ The only elements of this component of Satcher's prosecutorial misconduct claim that have been preserved for federal habeas review are the claims that the Commonwealth injected passion and prejudice into the jury's sentencing determination because (1) Satcher was convicted for the murder and rape of a white woman by an all-white jury; and (2) the prosecutor inflamed the jury with argument about unadjudicated assaults against three other white women.

Satcher argues that the Supreme Court of Virginia failed properly to review his case for passion and prejudice under Virginia Code § 17–110.1(C). Section 17–110.1(C) requires the Court to ensure that the death penalty was not "imposed under the influence of passion, prejudice or any other arbitrary factor." In conducting that review, the Supreme Court of Virginia considered the claims respecting both the jury and the unadjudicated assaults; and, thereupon, concluded that "nothing in the record supports [Satcher's] statement that his jury was all white" and alternatively, that there is nothing "in the record to support his claim that any sort of racial bias entered into the trial of this case or produced any passion or prejudice against him." *Satcher,* 421 S.E.2d at 845. A careful review of the record confirms that there is nothing to suggest Satcher's sentence was imposed under the influence of passion or prejudice.

**Claim IV(A):** *Unconstitutionality of DNA Statute.*

■ Satcher next argues that the Virginia statute making DNA evidence presumptively reliable is unconstitutionally vague because (1) it does not specify which of the various methods of DNA testing should be deemed reliable and provides no standards regarding who is qualified to run such tests, acceptable testing procedures, or chain of custody; and (2) it impermissibly shifted the burden to prove the reliability of its evidence from the Commonwealth onto Satcher.

Virginia Code § 19.2–270.5 states that:

---

**77.** Ferrara was scheduled to be called as a fact witness to testify about the Tidewater Laboratory procedures. However, he ultimately testified as well about the propriety and reliability of the methodologies and procedures followed by the laboratory, and whether the laboratory was in conformity with the appropriate standards agreed upon by the "consensus" of the NRC Committee.

**78.** After limited direct examination by the defense respecting the custody of a database, the prosecutor on cross-examination asked McElfresh about the nature of that database. Defense counsel objected because the question went beyond the scope of cross-examination. Therefore, the prosecutor announced that he would make McElfresh his witness on rebuttal. That is when the defense objected because the prosecution had not furnished it with a vitae in compliance with the discovery agreement.

In any criminal proceeding, DNA ... testing shall be deemed to be a reliable scientific technique and the evidence of a DNA profile comparison may be admitted to prove or disprove the identity of any person. This section shall not otherwise limit the introduction of any relevant evidence bearing upon any question at issue before the court. The court shall, regardless of the results of the DNA analysis, if any, consider such other relevant evidence of the identity of the accused as shall be admissible in evidence.

The Supreme Court of Virginia considered Satcher's challenge and concluded that the statute should be read as meaning "that DNA testing shall be considered or treated as a reliable scientific technique." *Satcher*, 421 S.E.2d at 834. Under that interpretation, which is fully consistent with its plain language, the statute "neither creates a presumption nor shifts the burden of proof. 'It merely creates a rule of evidence and does not determine the guilt of the accused.'" *Id.* (quoting *Dooley v. Commonwealth*, 198 Va. 32, 92 S.E.2d 348, 350 (1956)). This Court, therefore, finds no constitutional error respecting this claim.

**Claim IV(B):** *Unconstitutionality of Virginia's Aggravating Factors.*

■ Satcher next argues that Virginia's aggravating factors, contained in Virginia Code § 19.2–264.4, are unconstitutional. First, Satcher contends that the future dangerousness aggravating factor is unconstitutionally uncertain, vague, speculative, and overbroad. The statute provides that the Commonwealth must prove:

beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society ...

Va.Code § 19.2–264.4(C).

■ Satcher further contends that the vileness aggravating factor, which permits a jury to sentence a defendant to death if "his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim," Va.Code § 19.2–264.4(C), is unconstitutionally vague in that it does not define "outrageously or wantonly vile, horrible or inhuman."

The Supreme Court of Virginia rejected these challenges outright as already addressed and answered by the decision in *M. Smith v. Commonwealth*, 219 Va. 455, 248 S.E.2d 135, 148–49 (1978), *cert. denied*, 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979). Likewise, the Fourth Circuit repeatedly has rejected such challenges. *See, e.g., Turner v. Williams*, 35 F.3d 872, 891–94 (4th Cir.1994); *Jones v. Murray*, 976 F.2d 169, 174 (4th Cir.), *cert. denied*, 505 U.S. 1245, 113 S.Ct. 27, 120 L.Ed.2d 951 (1992). They are rejected here for the same reasons.

**Claim IV(C):** *Unconstitutionality of the Death Penalty.*

■ Next, Satcher argues that imposition of the death penalty constitutes cruel and unusual punishment in violation of the Eighth Amendment and that the death penalty is imposed in a discriminatory manner. The Supreme Court of Virginia, however, rejected this claim as already answered by *M. Smith*, 248 S.E.2d at 148. The Fourth Circuit similarly has rejected such arguments outright. *Briley v. Booker*, 746 F.2d 225, 227 (4th Cir.1984). This Court, too, rejects this claim of constitutional error.

**Claim II(B):** *Sufficiency Of The Evidence.*

■ Finally, Satcher asserts that the evidence presented at trial was insufficient to convict him of the Abel and Borghesani offenses. The Supreme Court of Virginia rejected this claim, stating that, "Deborah Abel's in-court identification of Satcher was sufficient alone to establish him as her assailant and the DNA typing was adequate by itself to show he was Ann Borghesani's murderer." As explained previously, with the Abel identification there is sufficient evidence upon which a jury could have returned a guilty verdict on the Abel offenses. Without that evidence, there is not. With or without the Abel identification, there was evidence

**1310**

from which a jury could have returned a verdict of guilty on the Borghesani offenses. However, for the reasons set forth above, that conviction cannot stand.

## CONCLUSION

For the foregoing reasons, the Court finds that Satcher's convictions of the Abel and the Borghesani offenses must be set aside because they are the product of violations of Satcher's constitutional rights to due process of law. Specifically, Satcher's conviction was returned by a jury, which had been exposed to an inherently unreliable and prejudicial in-court identification, in violation of the Fifth and Fourteenth Amendments.

While the writ of habeas corpus is an extraordinary remedy, this is an extraordinary case, which presents one of those rare instances where an error of constitutional import has infected a state court conviction with constitutional infirmity. In instances such as this, it is a federal court's duty to intercede. Although granting the writ of habeas corpus will have the immediate effect of nullifying Satcher's state conviction, it will serve the long-term state and federal interest in maintaining the integrity of the judicial process. Without denigrating the costs involved in retrying a criminal defendant, the Court notes that " '[a] prisoner ... need not go free if he is in fact guilty, for [the State] may ... try him again by the procedure which conforms to constitutional requirements.' " *Rose v. Mitchell,* 443 U.S. 545, 558, 99 S.Ct. 2993, 3001, 61 L.Ed.2d 739 (1979) (quoting *Hill v. Texas,* 316 U.S. 400, 406, 62 S.Ct. 1159, 1162, 86 L.Ed. 1559 (1942)).

In this case, where the petitioner has been sentenced to death in a constitutionally infirm trial, these concerns are significantly heightened. *See Turner v. Murray,* 476 U.S. at 35, 106 S.Ct. at 1687–88 ("The Court ... has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the [proceedings]") (*quoting California v. Ramos,* 463 U.S. 992, 998–99, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171 (1983)). Consequently, Satcher's petition for a Writ of Habeas Corpus is granted. The Commonwealth of Virginia, however, is entitled to reprosecute Satcher.

The Clerk is directed to send a copy of this Memorandum Opinion to the petitioner and to all counsel of record.

It is so ORDERED.